**EXHIBITS IN SUPPORT OF**
**LINDA SIMMONS' OBJECTION**
**TO HIAWATHA MANOR ASSOCIATION'S MOTION FOR SUMMARY JUDGMENT**

United States Bankruptcy Court
Middle District of Tennessee
In re Hiawatha Manor Association, Inc., Debtor
Case No. 25-01916
Adversary No. 25-90051

## Exhibit 1

Debtor's Corporate Disclosures and Schedules (Selected Pages)

Filed by Debtor in Case No. 25-01916

(Showing no bylaws, resolutions, minutes, or delegations of authority)

# United States Bankruptcy Court
## Middle District of Tennessee

In re __Hiawatha Manor Association, Inc.__

Debtor(s)

Case No. 25-01916

Chapter 11

## CORPORATE OWNERSHIP STATEMENT (RULE 7007.1)

Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the undersigned counsel for __Hiawatha Manor Association, Inc.__ in the above captioned action, certifies that the following is a (are) corporation(s), other than the debtor or a governmental unit, that directly or indirectly own(s) 10% or more of any class of the corporation's(s') equity interests, or states that there are no entities to report under FRBP 7007.1:

■ None [*Check if applicable*]

05/06/2025

Date

/s/ Blake D. Roth

**Blake D. Roth 031499**
Signature of Attorney or Litigant
Counsel for __Hiawatha Manor Association, Inc.__
**Holland & Knight LLP**
**511 Union St**
**Suite 2700**
**Nashville, TN 37219**
**615-850-8144 Fax:615-244-6804**
**blake.roth@hklaw.com**

**Ex. 1-2**

## Part 9: Real property

**54. Does the debtor own or lease any real property?**

☐ No. Go to Part 10.

☒ Yes. Fill in the information below.

**55. Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property<br>Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1 Timeshare resort land | _____ | $ 141,142 | _____ | $ 141,142 |
| 55.2 _____ | _____ | $ _____ | _____ | $ _____ |
| 55.3 _____ | _____ | $ _____ | _____ | $ _____ |
| 55.4 _____ | _____ | $ _____ | _____ | $ _____ |
| 55.5 _____ | _____ | $ _____ | _____ | $ _____ |
| 55.6 _____ | _____ | $ _____ | _____ | $ _____ |

**56. Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.

$ 141,142

**57. Is a depreciation schedule available for any of the property listed in Part 9?**

☒ No

☐ Yes

**58. Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☒ No

☐ Yes

## Part 10: Intangibles and intellectual property

**59. Does the debtor have any interests in intangibles or intellectual property?**

☒ No. Go to Part 11.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 60. Patents, copyrights, trademarks, and trade secrets | $ _____ | _____ | $ _____ |
| 61. Internet domain names and websites | $ _____ | _____ | $ _____ |
| 62. Licenses, franchises, and royalties | $ _____ | _____ | $ _____ |
| 63. Customer lists, mailing lists, or other compilations | $ _____ | _____ | $ _____ |
| 64. Other intangibles, or intellectual property | $ _____ | _____ | $ _____ |
| 65. Goodwill | $ _____ | _____ | $ _____ |

**66. Total of Part 10.**

Add lines 60 through 65. Copy the total to line 89.

$ _____

**Ex. 1-3**

Official Form 206A/B      Schedule A/B: Assets — Real and Personal Property      Page 6

Case 2:25-bk-90051 Doc 248-1 Filed 03/03/25 Entered 03/03/25 16:33:47 Desc Main
Exhibit Exhibit Document to Objection Page 4 of 66

67. **Do your lists or records include personally identifiable information of customers (as defined in 11 U.S.C. §§ 101(41A) and 107)?**

☐ No

☐ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**

☐ No

☐ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**

☐ No

☐ Yes

<table>
<tr><td colspan="2"><b>Part 11:</b>   <b>All other assets</b></td></tr>
</table>

70. **Does the debtor own any other assets that have not yet been reported on this form?**

Include all interests in executory contracts and unexpired leases not previously reported on this form.

☒ No. Go to Part 12.

☐ Yes. Fill in the information below.

<b>Current value of<br>debtor's interest</b>

71. **Notes receivable**

Description (include name of obligor)

_____   _____ − _____ = ➡   $_____

                                   Total face amount     doubtful or uncollectible amount

72. **Tax refunds and unused net operating losses (NOLs)**

Description (for example, federal, state, local)

_____    Tax year _____   $_____

_____    Tax year _____   $_____

_____    Tax year _____   $_____

73. **Interests in insurance policies or annuities**

                                   $_____

74. **Causes of action against third parties (whether or not a lawsuit has been filed)**

                                   $_____

Nature of claim     _____

Amount requested     $_____

75. **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

                                   $_____

Nature of claim     _____

Amount requested     $_____

76. **Trusts, equitable or future interests in property**

                                   $_____

77. **Other property of any kind not already listed** *Examples:* Season tickets, country club membership

_____             $_____

                                   $_____

78. **Total of Part 11.**

Add lines 71 through 77. Copy the total to line 90.         $_____

79. **Has any of the property listed in Part 11 been appraised by a professional within the last year?**

☐ No

☐ Yes

<b>Ex. 1-4</b>

Official Form 206A/B   Case 2:25-bk-00051   Doc 248-2 Filed 03/03/26 Entered 03/03/26 16:13:40 Desc Main   page 7
Schedule A/B: Assets — Real and Personal Property
Exhibit Exhibits in to Objection 7 of Page 5 of 66

## Part 12: Summary

In Part 12 copy all of the totals from the earlier parts of the form.

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. Cash, cash equivalents, and financial assets. Copy line 5, Part 1. | $ 14,520.94 | |
| 81. Deposits and prepayments. Copy line 9, Part 2. | $ 19,411.58 | |
| 82. Accounts receivable. Copy line 12, Part 3. | $ 312,666.72 | |
| 83. Investments. Copy line 17, Part 4. | $ | |
| 84. Inventory. Copy line 23, Part 5. | $ | |
| 85. Farming and fishing-related assets. Copy line 33, Part 6. | $ | |
| 86. Office furniture, fixtures, and equipment; and collectibles. Copy line 43, Part 7. | $ | |
| 87. Machinery, equipment, and vehicles. Copy line 51, Part 8. | $ 10,398.57 | |
| 88. Real property. Copy line 56, Part 9. ............................➤ | | $ 141,142 |
| 89. Intangibles and intellectual property. Copy line 66, Part 10. | $ | |
| 90. All other assets. Copy line 78, Part 11. | + $ | |
| 91. Total. Add lines 80 through 90 for each column.............91a. | $ 356,997.81 | + 91b. $ 141,142 |

92. Total of all property on Schedule A/B. Lines 91a + 91b = 92. .................................  $ 498,139.81

**13. Transfers not already listed on this statement**

List any transfers of money or other property—by sale, trade, or any other means—made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☒ None

| | Who received transfer? | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|---|
| 13.1. | _____ | _____ | _____ | $_____ |
| | **Address** | _____ | | |
| | Street | | | |
| | City  State  ZIP Code | | | |
| | **Relationship to debtor** | | | |
| | | | | |
| 13.2. | Who received transfer? | _____ | _____ | $_____ |
| | _____ | _____ | | |
| | **Address** | | | |
| | Street | | | |
| | City  State  ZIP Code | | | |
| | **Relationship to debtor** | | | |

## Part 7:  Previous Locations

**14. Previous addresses**

List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

☒ Does not apply

| | Address | Dates of occupancy |
|---|---|---|
| 14.1. | _____ Street | From _____ To _____ |
| | _____ City  State  ZIP Code | |
| 14.2. | _____ Street | From _____ To _____ |
| | _____ City  State  ZIP Code | |

**Ex. 1-6**

**24.** Has the debtor notified any governmental unit of any release of hazardous material?

☒ No

☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|
| | | | |

Name _____

Street _____

City        State    ZIP Code

Name _____

Street _____

City        State    ZIP Code

---

**Part 13:** **Details About the Debtor's Business or Connections to Any Business**

**25.** Other businesses in which the debtor has or has had an interest

List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

☒ None

| Business name and address | Describe the nature of the business | Employer Identification number |
|---|---|---|
| | | Do not include Social Security number or ITIN. |

**25.1.**

Name _____

Street _____

_____

City        State    ZIP Code

EIN: __ __ – __ __ __ __ __ __ __

Dates business existed

From _____  To _____

**25.2.**

Name _____

Street _____

_____

City        State    ZIP Code

Describe the nature of the business

Employer Identification number
Do not include Social Security number or ITIN.

EIN: __ __ – __ __ __ __ __ __ __

Dates business existed

From _____  To _____

**25.3.**

Name _____

Street _____

_____

City        State    ZIP Code

Describe the nature of the business

Employer Identification number
Do not include Social Security number or ITIN.

EIN: __ __ – __ __ __ __ __ __ __

Dates business existed

From _____  To _____

**Ex. 1-7**

Official Form 207        Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy        page 10

Case 2:25-kp-00051 Doc 2648-1 Filed 05/03/26 Entered 05/03/26 06:43:4 Desc Main
Exhibit Exhibit 1 Atto Opegation 1 of Page 8 of 66

## 26. Books, records, and financial statements

26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.

☐ None

**Name and address**

26a.1. *Vacatia Inc*
Name

*548 Market Street*
Street

*San Francisco*          *CA*          *94104*
City                     State          ZIP Code

**Dates of service**

From _02/2023_ To _05/2024_

**Name and address**

26a.2. _____
Name

_____
Street

_____
City          State          ZIP Code

**Dates of service**

From _____ To _____

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

☒ None

**Name and address**

26b.1. _____
Name

_____
Street

_____
City          State          ZIP Code

**Dates of service**

From _____ To _____

**Name and address**

26b.2. _____
Name

_____
Street

_____
City          State          ZIP Code

**Dates of service**

From _____ To _____

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☐ None

**Name and address**

26c.1. *Holiday Property Partners, LLC*
Name

*7380 West Sand Lake Road*
Street

*Suite 130*

*Orlando*          *FL*          *32819*
City          State          ZIP Code

**If any books of account and records are unavailable, explain why**

_____

_____

_____

**Ex. 1-8**

Official Form 207          Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy          page 11

Case 2:25-bk-09051   Doc 2648-2   Filed 05/30/23/26   Entered 05/30/23/26 06:48:47   Desc Main
Exhibit Exhibit 1 Atto Original   Page 9 of 66

| | Name and address | | | If any books of account and records are unavailable, explain why |
|---|---|---|---|---|

26c.2.

Name _____     _____

Street _____     _____

City _____     State _____     ZIP Code _____     _____

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

☒ None

**Name and address**

26d.1.

Name _____

Street _____

City _____     State _____     ZIP Code _____

**Name and address**

26d.2.

Name _____

Street _____

City _____     State _____     ZIP Code _____

## 27. Inventories

Have any inventories of the debtor's property been taken within 2 years before filing this case?

☒ No

☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of Inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|
| _____ | _____ | $ _____ |

**Name and address of the person who has possession of inventory records**

27.1.

Name _____

Street _____

City _____     State _____     ZIP Code _____

**Ex. 1-9**

Official Form 207          Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy          page 12

Case 2:25-ap-90051   Doc 2-8  Filed 05/30/25   Entered 05/30/25 06:43:47   Desc Main
Exhibit Exhibit 1-4 to Objection   Page 10 of 66

United States Bankruptcy Court
Middle District of Tennessee
In re Hiawatha Manor Association, Inc., Debtor
Case No. 25-01916
Adversary No. 25-90051

**Exhibit 2**

70-Week Transfer Deed (Recorded January 8, 2025)

(BK 1713/ PG 1456-1464, Cumberland County Register of Deeds)

| BK/PG: 1713/1456-1464 | |
|---|---|
| 25029548 | |
| 9 PGS : QUITCLAIM DEED | |
| BAILEY DAVIS  208282 - 25029548 | |
| 01/08/2025 - 01:01 PM | |
| VALUE | |
| MORTGAGE TAX | 0.00 |
| TRANSFER TAX | 0.00 |
| RECORDING FEE | 45.00 |
| DP FEE | 2.00 |
| REGISTER'S FEE | 2.00 |
| TOTAL AMOUNT | 49.00 |

STATE OF TENNESSEE, CUMBERLAND COUNTY
**TREY KERLEY**
REGISTER OF DEEDS

Address New Owner:
PO BOX 469
Crossville, TN 38557

Send Tax Bill to:
PO BOX 469
Crossville, TN 38557

**QUITCLAIM DEED**
HIAWATHA MANOR

This instrument prepared by and after recording return to:
**Lemonjuice Solutions**
**7380 W. Sand Lake Rd. Suite 130**
**Orlando, Florida 32819**

**MADE AND ENTERED INTO THIS DAY,** January 8, 2025, for and in consideration of the sum of Ten Dollars ($10.00), cash in hand paid, together with other good and valuable consideration not herein mentioned, receipt of all of which is hereby acknowledged, HIAWATHA MANOR WEST ASSOCIATION, INC., with an address of 8007 Cherokee Tr. Crossville, TN 38572, (hereinafter, the **"Grantor"**), has this day bargained and sold, and by these presents does hereby bargain, sell, transfer, quitclaim, assign and convey unto HIAWATHA MANOR ASSOCIATION, INC., (hereinafter, the **"Grantee"**), its successors and assigns, all of Grantor's interest in the following described real property, lying and being in the THIRD CIVIL DISTRICT of Cumberland County, Tennessee, bounded and described as follows:

Any right, title, and interest in Certain real estate located in Crossville, Cumberland county, Tennessee ( Subject Time-Share Estates) being Units and Weeks as designated in Exhibit "A", attached hereto and incorporated herein at:

TANSI RESORT, INC.'S HIAWATHA MANOR WEST, of record and as filed in the Declaration of Horizontal Property Regime, Deed Book 256, page 91, Register's Office, Cumberland County, Tennessee, as amended, including all rights, privileges, easements, and appurtenances thereto, wheresoever situated and howsoever derived.

This is improved property known as 8007 Cherokee Tr. Crossville, TN 38572.

**THE GRANTOR HEREBY APPOINTS** Grantee as its true and lawful "Attorney-in-Fact", granting unto said attorney the full power and authority to do and perform any and all acts deemed by Grantee to be necessary to correct or amend this instrument by "Corrective Deed", or similar instrumentation for the purpose of correcting book, page, spelling and innocuous and immaterial errors, for matters of public record and the vesting of proper title in the Grantee. A reference to the Book and Page of this Deed filing in the applicable land records in a Corrective deed or similar conveyance shall be sufficient to substantiate the applicability and effectiveness of the rights hereby conferred. This Power of Attorney cannot be revoked and shall survive the death, disability and incompetence of Grantor, individually and/or collectively.

This Property is conveyed subject to such limitations, restrictions and encumbrances as may affect the premises. Grantor makes no representations or warranties whatsoever with regard to the Property or the Grantor's interest therein.

**IN WITNESS WHEREOF**, the said Grantor caused this instrument to be signed ~~and sealed~~ these presents the day and year first above written.

GRANTOR
By: R. Scott MacGregor
Its: Authorized Agent

Ex. 2-

**STATE OF FLORIDA**
**COUNTY OF ORANGE**

Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared R. Scott MacGregor, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself to be the Authorized Agent of Hiawatha Manor Association, Inc. the within named bargainor, a Tennessee not-for-profit corporation, and that he as such Authorized Agent being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the Hiawatha Manor Association, Inc. by himself as its Authorized Agent.

WITNESS my hand and official seal at Orlando, Florida, this 8th day of January, 2025.

Notary Public

My Commission Expires: Jun 7, 2025

MARIELA ALVAREZ DE VAN ADELBERG
Notary Public - State of Florida
Commission # HH 139031
My Comm. Expires Jun 7, 2025
Bonded through National Notary Assn.

## AFFIDAVIT OF CONSIDERATION

**STATE OF FLORIDA**
**COUNTY OF ORANGE**

The actual consideration for this transfer is $0.00.

R. Scott MacGregor, Affiant

Subscribed and sworn to before me this the 8th day of January, 2024.

Notary Public

My Commission Expires: Jun 7, 2025

MARIELA ALVAREZ DE VAN ABELBERG
Notary Public - State of Florida
Commission # HH 139031
My Comm. Expires Jun 7, 2025
Bonded through National Notary Assn.

Ex. 2-4

Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection   Page 14 of 66
Book 1713 Page 1458

# EXHIBIT "A"

Blocks, units, weeks and derivations are as follows:

| Block | Unit | Week | Grantor | Book | Page | Date of registration | Parcel |
|-------|------|------|---------|------|------|----------------------|--------|
| 2 | A | 5 | J. Warren Layne and Marion E. Layne | D456 | 373 | 9/21/1993 | 149D-A-2.00 |
| 3 | B | 5 | Crown Resorts Development, Llc. | 1576 | 538 | 5/13/2020 | 149D-A-2.00 |
| 1 | B | 2 | Crown Resorts Development, Llc. | 1576 | 538 | 5/13/2020 | 149D-A-2.00 |
| 2 | C | 3 | Crown Resorts Development, Llc | 1576 | 538 | 5/13/2020 | 149D-A-2.00 |
| 19 | B | 5 | Crown Resorts Development, Llc. | 1576 | 538 | 5/13/2020 | 149D-A-1.00 |
| 20 | D | 5 | Crown Resorts Development, Llc. | 1576 | 538 | 5/13/2020 | 149D-A-1.00 |
| 19 | A | 48 | Crown Resorts Development, Llc. | 1576 | 538 | 5/13/2020 | 149D-A-1.00 |
| 7 | F | 6 | Crown Resorts Development, Llc. | 1576 | 538 | 5/13/2020 | 149D-A-3.00 |
| 9 | C | 1 | Crown Resorts Development Llc | 1587 | 1155 | 9/21/2020 | 149D-A-3.00 |
| 9 | D | 1 | Crown Resorts Development Llc | 1587 | 1155 | 9/21/2020 | 149D-A-3.00 |
| 18 | B | 6 | Hazel R. Dowdy, Sole Survivor of Joint Tenancy With William T. Dowdy | 1593 | 69 | 11/16/2020 | 149D-A-3.00 |
| 3 | D | 5 | RANDALL LEE DAVIDSON, Executor of The Estate of ALETA N. DAVIDSON who was sole survivor of joint tenancy with J. C. DAVIDSON | 1606 | 1967 | 4/8/2021 | 149D-A-2.00 |
| 9 | B | 10 | Hughes Electric Kentucky, Inc., Katherine C. Hughes, President | 1606 | 1969 | 4/8/2021 | 149D-A-3.00 |
| 6 | B | 22 | BERCHIE MARIE ROBERTS, Executrix of The Estate Of WAYNE O. ROBERTS | 1611 | 364 | 5/24/2021 | 150-25.00 |
| 24 | B | 8 | Paul V. Wells | 1616 | 1193 | 7/19/2021 | 149D-H-1.00 |

**Ex. 2-5**

Case 2:25-ap-90051    Doc 48-2    Filed 03/03/26    Entered 03/03/26 16:33:47    Desc
Exhibit Exhibits 1-4 to Objection    Page 15 of 66
Book 1713 Page 1459

| Block | Unit | Week | Grantor | Book | Page | Date of registration | Parcel |
|-------|------|------|---------|------|------|---------------------|--------|
| 3 | C | 21 | Robert E. Hargrave And Sylvia Hargrave | 1621 | 1179 | 9/7/2021 | 149D-A-2.00 |
| 7 | A | 2 | Carl E. Richardson, Jr. And Etta R. Richardson | 1621 | 1175 | 9/7/2021 | 149D-A-3.00 |
| 8 | C | 13 | CATHERINE ABERNATHY, Sole Survivor of Joint Tenancy With MICHAEL D. ABERNATHY | 1624 | 218 | 10/1/2021 | 149D-A-3.00 |
| 18 | D | 1 | Dallas W. Johnson and Peggie A. Johnson | 1624 | 216 | 10/1/2021 | 149D-A-1.00 |
| 8 | D | 14 | JAMES DOUGLAS HAGAR, Only Living Heir Of MARY I. HAGAR | 1624 | 212 | 10/1/2021 | 149D-A-3.00 |
| 6 | C | 49 | Stuart W. Fletcher and Kimberly K. Fletcher | 1624 | 206 | 10/1/2021 | 149D-A-3.00 |
| 4 | A | 52 | Craig Alan Stephenson and Brittany Blankenship Stephenson fka Brittany Leanne Blankenship | 1625 | 2237 | 10/21/2021 | 149D-A-2.00 |
| 2 | B | 52 | Daniel L. Hammond and Wanda G. Hammond | 1626 | 2444 | 11/1/2021 | 149D-A-2.00 |
| 21 | A | 25 | Arvil Stearman and Opal Stearman | 1629 | 1277 | 11/29/2021 | 149D-A-1.00 |
| 18 | C | 50 | Teresa Reed | 1632 | 760 | 12/28/2021 | 149D-A-1.00 |
| 19 | C | 36 | Roger D. Dotson and Lisa M. Dotson | 1633 | 682 | 1/10/2022 | 149D-A-1.00 |
| 8 | E | 27 | Elaine M. Standridge, Sole Survivor of joint tenancy with Earl Standridge | 1637 | 2130 | 3/4/2022 | 149D-A-3.00 |
| 18 | A | 8 | Donavin Gillespie and Alyne Gillespie | 1656 | 305 | 9/26/2022 | 149D-A-1.00 |
| 20 | B | 37 | Marian T. White, sole survivor of joint tenancy with Billy M. White | 1657 | 987 | 10/11/2022 | 149D-A-1.00 |
| 9 | A | 50 | Todd R. Cognion and Darby A. Cognion and Chad J. Gingrich, Sole Survivors Of Joint Tenancy With Larry C. | 1657 | 989 | 10/11/2022 | 149D-A-3.00 |

**Ex. 2-6**

Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection   Page 16 of 66
Book 1713 Page 1460

| Block | Unit | Week | Grantor | Book | Page | Date of registration | Parcel |
|---|---|---|---|---|---|---|---|
| | | | Gingrich and Shirley J. Gingrich | | | | |
| 8 | B | 46 | Todd R. Cognion and Darby A. Cognion and Chad J. Gingrich, sole Survivors of joint tenancy with Larry C. Gingrich and Shirley J. Gingrich | 1657 | 989 | 10/11/2022 | 149D-A-3.00 |
| 21 | C | 19 | Jon D. Epperson and Shirley F. Epperson | 1658 | 808 | 10/24/2022 | 149D-A-1.00 |
| 8 | A | 15 | Walter L. Crox and Barbara H. Crox | 1658 | 1804 | 10/31/2022 | 149D-A-3.00 |
| 22 | D | 39 | Patricia A. Reeves, sole survivor of joint tenancy with Richard D. Reeves | 1659 | 682 | 11/8/2022 | 149D-H-1.00 |
| 21 | B | 32 | Jimmy Denham and Teresa Denham | 1660 | 430 | 11/22/2022 | 150-25.00 |
| 7 | C | 20 | Mark Beaty and Connie Beaty | 1661 | 994 | 12/12/2022 | 149D-A-3.00 |
| 7 | B | 44 | Bettie L. Miller, sole survivor of joint tenancy with James L. Miller, Jr. | 1663 | 1835 | 1/25/2023 | 149D-A-3.00 |
| 25 | A | 2 | Phyllis L. Hart | 1664 | 38 | 1/31/2023 | 149D-H-1.00 |
| 21 | D | 45 | Mike Russell and Susan Russell | 1664 | 2064 | 2/13/2023 | 149D-A-1.00 |
| 24 | D | 41 | Sam B. Mckinney, Jr. and Key E. Mckinney | 1665 | 935 | 2/21/2023 | 149D-H-1.00 |
| 23 | A | 26 | Robert F. Kohler, Sole Survivor Of Joint Tenancy With Judith B. Kohler | 1665 | 931 | 2/21/2023 | 149D-H-1.00 |
| 24 | C | 6 | Johnathan R. Carter and Barbara Carter | 1665 | 951 | 2/21/2023 | 149D-H-1.00 |
| 25 | B | 4 | Sammy Popwell and Linda J. Popwell | 1665 | 1384 | 2/23/2023 | 149D-H-1.00 |
| 26 | A | 21 | Larry Brackner and Sharon Brackner | 1665 | 1380 | 2/23/2023 | 149D-H-1.00 |
| 8 | F | 31 | James T. Bandy and Peggy J. Bandy | 1665 | 1398 | 2/23/2023 | 149D-A-3.00 |

**Ex. 2-7**

Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection    Page 17 of 66
Book 1713 Page 1461

| Block | Unit | Week | Grantor | Book | Page | Date of registration | Parcel |
|-------|------|------|---------|------|------|----------------------|--------|
| 23 | B | 3 | Judith E. Poland aka Judith E. Polland Trochelman | 1666 | 818 | 3/6/2023 | 149D-H-1.00 |
| 22 | A | 8 | Dana N. Hassler and Kassandra Hassler | 1666 | 822 | 3/6/2023 | 149D-H-1.00 |
| 20 | A | 41 | Richard N. Mercader and Charlotte D. Mercader | 1668 | 365 | 3/30/2023 | 149D-A-1.00 |
| 24 | A | 22 | Benjamin Alig and Debra L. Alig | 1668 | 353 | 3/30/2023 | 149D-H-1.00 |
| 3 | A | 23 | Van M. Jodon and Phyllis J. Jodon and Christopher S. Jodon and Angelinque N. Aviles | 1668 | 347 | 3/30/2023 | 149D-A-2.00 |
| 22 | B | 42 | Kent B. West, sole survivor of joint tenancy with Cheryl E. West | 1669 | 748 | 4/17/2023 | 149D-A-1.00 |
| 9 | E | 32 | Anthony H. Ritter and Mary Jane Ritter | 1671 | 930 | 5/15/2023 | 149D-A-3.00 |
| 23 | D | 12 | Horace Bill Brent, Jr. and Ruth Lee Brent | 1671 | 964 | 5/15/2023 | 149D-H-1.00 |
| 26 | B | 24 | Robert E. Moffett and Kimberly R. Moffett | 1672 | 762 | 5/25/2023 | 149D-H-1.00 |
| 1 | D | 24 | Eric A. D. Bell and Barbara T. Bell | 1673 | 513 | 6/6/2023 | 149D-A-2.00 |
| 6 | D | 14 | William Reading and Donna Reading and Brian Jackson and Shirley Jackson | 1673 | 1729 | 6/12/2023 | 149D-A-3.00 |
| 22 | C | 15 | Delia N. Belcher, Sole Survivor Of Joint Tenancy With George T. Belcher | 1673 | 1723 | 6/12/2023 | 149D-H-1.00 |
| 4 | B | 26 | Glen R. Castleberry and Judith H. Castleberry | 1678 | 1668 | 8/17/2023 | 149D-A-2.00 |
| 4 | D | 31 | Wesley Hardman | 1680 | 1892 | 9/15/2023 | 149D-A-2.00 |
| 7 | E | 8 | BEATRICE GENTRY, Sole Survivor of joint tenancy with Lamour Gentry | 1680 | 1888 | 9/15/2023 | 149D-A-3.00 |
| 1 | A | 39 | Homer W. Effler and Geneva L. Effler | 1683 | 167 | 10/20/2023 | 149D-A-2.00 |
| 5 | B | 29 | Roy E. Ferrell and Linda A. Ferrell | 1683 | 161 | 10/20/2023 | 149D-A-3.00 |

| Block | Unit | Week | Grantor | Book | Page | Date of registration | Parcel |
|---|---|---|---|---|---|---|---|
| 4 | C | 41 | RALPH DAVID NORRIS, Sole Survivor Of Joint Tenancy With MARGARET DRAKE NORRIS | 1684 | 1011 | 11/9/2023 | 149D-A-2.00 |
| 23 | C | 19 | Richard S. Ball and Glendia L. Ball | 1687 | 703 | 12/22/2023 | 149D-H-1.00 |
| 19 | D | 38 | Reece Alan King, Trustee Of The Ricky and Carolin King Irrevocable Trust Dated 11/21/16 | 1692 | 1647 | 3/25/2024 | 149D-A-1.00 |
| 6 | A | 39 | Wendell Drakeford and Vickie Drakeford | 1692 | 1660 | 3/25/2024 | 149D-A-3.00 |
| 2 | D | 21 | Timothy J. Wolfram and Shirley M. Wolfram | 1693 | 2339 | 4/15/2024 | 149D-A-2.00 |
| 7 | D | 13 | Linda H. Mccoy and Susan M. Olinger fka Susan M. Mccoy and James Darren Mccoy | 1694 | 2171 | 4/29/2024 | 149D-A-3.00 |
| 5 | D | 14 | Sarah Sharp | 1696 | 630 | 5/20/2024 | 149D-A-3.00 |
| 20 | C | 11 | William D. Gocella and Donna K. Gocella | 1697 | 574 | 6/3/2024 | 149D-A-1.00 |
| 1 | C | 21 | David M. Dixon and Patricia J. Dixon | 1699 | 1225 | 7/2/2024 | 149D-A-2.00 |

**Ex. 2-9**

Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection   Page 19 of 66
Book 1713 Page 1463

**Tennessee Certification of Electronic Document**

I, Natalie Mathes , do hereby make oath that I am a licensed attorney and/or the

custodian of the original version of the electronic document tendered for registration herewith

and that this electronic document is a true and exact copy of the original document executed and

authenticated according to law on Jan 8, 2025 (date of document)

_____
Affiant Signature

01/08/2025
Date

State of Florida

County of Orange

Sworn to and subscribed before me this 8 day of January , 2025.

_____
Notary's Signature

MY COMMISSION EXPIRES: Jun 7, 2025

NOTARY'S SEAL



MARIELA ALVAREZ DE VAN ADELBERG
Notary Public - State of Florida
Commission # HH 139031
My Comm. Expires Jun 7, 2025
Bonded through National Notary Assn.

**Ex. 2-10**

United States Bankruptcy Court
Middle District of Tennessee
In re Hiawatha Manor Association, Inc., Debtor
Case No. 25-01916
Adversary No. 25-90051

**Exhibit 3**

Post-Petition Deed-Back List

List of Quitclaim Deed Transfers of Timeshare Intervals

to Debtor Hiawatha Manor Association East

(Public Records from Cumberland County, TN Register of Deed May-July 2025)

| Book # | Page # | Grantee | Date of Document | Week | Unit | |
|---|---|---|---|---|---|---|
| 1723 | 2929 | Hiawatha Manor Assoc Inc. | 5/6/2025 | 49 | O-2 | QC |
| 1725 | 1424 | Hiawatha Manor Assoc Inc. | 5/13/2025 | 14 | B-3 | QC |
| 1725 | 1609 | Hiawatha Manor Assoc Inc. | 5/13/2025 | 32 | N-2 | QC |
| 1724 | 383 | Hiawatha Manor Assoc Inc. | 5/14/2025 | 33 | N-2 | QC |
| 1724 | 167 | Hiawatha Manor Assoc Inc. | 5/15/2025 | 5 | N-3 | QC |
| 1723 | 1834 | Hiawatha Manor Assoc Inc. | 5/15/2025 | 23 | M-3 | QC |
| 1723 | 2460 | Hiawatha Manor Assoc Inc. | 5/16/2025 | 48 | N-4 | QC |
| 1724 | 379 | Hiawatha Manor Assoc Inc. | 5/22/2025 | 37 | M-7 | QC |
| 1724 | 349 | Hiawatha Manor Assoc Inc. | 5/22/2025 | 37 | C-2 | QC |
| 1724 | 2269 | Hiawatha Manor Assoc Inc. | 5/27/2025 | 13 | B-3 | QC |
| 1724 | 2273 | Hiawatha Manor Assoc Inc. | 5/28/2025 | 2 | L-7 | QC |
| 1725 | 314 | Hiawatha Manor Assoc Inc. | 5/29/2025 | 49 | P-1 | QC |
| 1725 | 257 | Hiawatha Manor Assoc Inc. | 5/29/2025 | 46 | E-3 | QC |
| 1727 | 2283 | Hiawatha Manor Assoc Inc. | 5/29/2025 | 18 | N-4 | QC |
| 1725 | 1342 | Hiawatha Manor Assoc Inc. | 5/30/2025 | 19 | N-4 | QC |
| 1726 | 629 | Hiawatha Manor Assoc Inc. | 6/2/2025 | 31 | M-5 | QC |
| 1725 | 1348 | Hiawatha Manor Assoc Inc. | 6/4/2025 | 33 | P-4 | QC |
| 1725 | 310 | Hiawatha Manor Assoc Inc. | 6/5/2025 | 16 | L-3 | QC |
| 1725 | 2891 | Hiawatha Manor Assoc Inc. | 6/5/2025 | 29 | A-2 | QC |
| 1725 | 2995 | Hiawatha Manor Assoc Inc. | 6/6/2025 | 37 | D-2 | QC |
| 1726 | 660 | Hiawatha Manor Assoc Inc. | 6/6/2025 | 33 | K-4 | QC |
| 1727 | 2325 | Hiawatha Manor Assoc Inc. | 6/9/2025 | 18 | M-4 | QC |
| 1726 | 56 | Hiawatha Manor Assoc Inc. | 6/11/2025 | 35 | L-3 | QC |
| 1725 | 1617 | Hiawatha Manor Assoc Inc. | 6/11/2025 | 52 | M-7 | QC |
| 1725 | 1617 | Hiawatha Manor Assoc Inc. | 6/11/2025 | 38 | D-3 | QC |
| 1726 | 33 | Hiawatha Manor Assoc Inc. | 6/11/2025 | 31 | M-6 | QC |
| 1726 | 623 | Hiawatha Manor Assoc Inc. | 6/13/2025 | 43 | M-6 | QC |
| 1725 | 2887 | Hiawatha Manor Assoc Inc. | 6/13/2025 | 20 | P-4 | QC |
| 1727 | 2610 | Hiawatha Manor Assoc Inc. | 6/13/2025 | 40 | M-3 | QC |
| 1726 | 60 | Hiawatha Manor Assoc Inc. | 6/16/2025 | 35 | C-3 | QC |
| 1725 | 2905 | Hiawatha Manor Assoc Inc. | 6/16/2025 | 25 | B-1 | QC |
| 1726 | 566 | Hiawatha Manor Assoc Inc. | 6/16/2025 | 51 | C-1 | QC |
| 1726 | 248 | Hiawatha Manor Assoc Inc. | 6/16/2025 | 42 | L-5 | QC |
| 1725 | 2899 | Hiawatha Manor Assoc Inc. | 6/16/2025 | 20 | M-4 | QC |
| 1725 | 2895 | Hiawatha Manor Assoc Inc. | 6/16/2025 | 49 | E-1 | QC |
| 1726 | 260 | Hiawatha Manor Assoc Inc. | 6/16/2025 | 12 | L-8 | QC |
| 1726 | 256 | Hiawatha Manor Assoc Inc. | 6/16/2025 | 22 | M-6 | QC |
| 1726 | 74 | Hiawatha Manor Assoc Inc. | 6/16/2025 | 21 | N-4 | QC |
| 1727 | 2647 | Hiawatha Manor Assoc Inc. | 6/16/2025 | 46 | C-1 | QC |
| 1727 | 2661 | Hiawatha Manor Assoc Inc. | 6/16/2025 | 26 | K-6 | QC |
| 1727 | 2639 | Hiawatha Manor Assoc Inc. | 6/17/2025 | 37 | D-1 | QC |

Ex. 3-2

| | | | | | | |
|---|---|---|---|---|---|---|
| 1727 | 2635 | Hiawatha Manor Assoc Inc. | 6/17/2025 | 12 | D-2 | QC |
| 1726 | 226 | Hiawatha Manor Assoc Inc. | 6/17/2025 | 17 | N-4 | QC |
| 1726 | 244 | Hiawatha Manor Assoc Inc. | 6/17/2025 | 26 | O-4 | QC |
| 1726 | 252 | Hiawatha Manor Assoc Inc. | 6/18/2025 | 31 | P-2 | QC |
| 1725 | 2883 | Hiawatha Manor Assoc Inc. | 6/18/2025 | 43 | L-3 | QC |
| 1726 | 664 | Hiawatha Manor Assoc Inc. | 6/18/2025 | 39 | P-4 | QC |
| 1728 | 1202 | Hiawatha Manor Assoc Inc. | 6/20/2025 | 17 | O-3 | QC |
| 1726 | 78 | Hiawatha Manor Assoc Inc. | 6/20/2025 | 30 | L-1 | QC |
| 1726 | 933 | Hiawatha Manor Assoc Inc. | 6/21/2025 | 22 | K-1 | QC |
| 1727 | 2347 | Hiawatha Manor Assoc Inc. | 6/23/2025 | 38 | M-5 | QC |
| 1727 | 2368 | Hiawatha Manor Assoc Inc. | 6/23/2025 | 14 | C-2 | QC |
| 1727 | 2356 | Hiawatha Manor Assoc Inc. | 6/23/2025 | 35 | C-2 | QC |
| 1727 | 2360 | Hiawatha Manor Assoc Inc. | 6/26/2025 | 21 | P-1 | QC |
| 1727 | 2339 | Hiawatha Manor Assoc Inc. | 6/27/2025 | 42 | K-6 | QC |
| 1728 | 469 | Hiawatha Manor Assoc Inc. | 6/27/2025 | 18 | N-5 | QC |
| 1727 | 2376 | Hiawatha Manor Assoc Inc. | 6/28/2025 | 12 | C-1 | QC |
| 1727 | 2376 | Hiawatha Manor Assoc Inc. | 6/28/2025 | 38 | C-1 | QC |
| 1727 | 2651 | Hiawatha Manor Assoc Inc. | 6/28/2025 | 30 | L-7 | QC |
| 1727 | 2351 | Hiawatha Manor Assoc Inc. | 6/30/2025 | 6 | K-1 | QC |
| 1727 | 2429 | Hiawatha Manor Assoc Inc. | 7/1/2025 | 27 | C-1 | QC |
| 1727 | 2750 | Hiawatha Manor Assoc Inc. | 7/1/2025 | 23 | L-3 | QC |
| 1728 | 169 | Hiawatha Manor Assoc Inc. | 7/2/2025 | 37 | B-3 | QC |
| 1727 | 2343 | Hiawatha Manor Assoc Inc. | 7/3/2025 | 22 | C-2 | QC |
| 1727 | 2786 | Hiawatha Manor Assoc Inc. | 7/8/2025 | 12 | M-7 | QC |
| 1727 | 2790 | Hiawatha Manor Assoc Inc. | 7/9/2025 | 45 | P-2 | QC |
| 1727 | 2794 | Hiawatha Manor Assoc Inc. | 7/9/2025 | 25 | L-4 | QC |
| 1728 | 149 | Hiawatha Manor Assoc Inc. | 7/10/2025 | 15 | M-2 | QC |
| 1727 | 2798 | Hiawatha Manor Assoc Inc. | 7/10/2025 | 22 | M-7 | QC |
| 1727 | 2372 | Hiawatha Manor Assoc Inc. | 7/10/2025 | 8 | M-6 | QC |
| 1727 | 2372 | Hiawatha Manor Assoc Inc. | 7/10/2025 | 3 | K-2 | QC |
| 1727 | 2669 | Hiawatha Manor Assoc Inc. | 7/11/2025 | 30 | K-2 | QC |
| 1727 | 2668 | Hiawatha Manor Assoc Inc. | 7/11/2025 | 35 | K-2 | QC |
| 1727 | 2802 | Hiawatha Manor Assoc Inc. | 7/12/2025 | 24 | O-1 | QC |

Ex. 3-3

United States Bankruptcy Court
Middle District of Tennessee
In re Hiawatha Manor Association, Inc., Debtor
Case No. 25-01916
Adversary No. 25-90051

## Exhibit 4

Relevant Pages of the 1979 and 1980 Declarations of Horizontal Property Regime (Master Deed)

### Part I – 1979 Declaration (Hiawatha Manor)

Declaration of Horizontal Property Regime (Master Deed)
Recorded in Book 216, Pages 209-239
Cumberland County, TN Register of Deeds *(Excerpts)*

| Recorded Page(s) | Content Description |
|---|---|
| 209-220 | Declaration text (corresponds to internal pp 1-12) |
| 221 | Site Plan (Exhibit I to Declaration) |
| 227 | Project Phasing of Clusters (Exhibit III to Declaration) |
| 233-239 | By-Laws incorporated into the Declaration |

### Part II – 1980 Declaration (Hiawatha Manor I)

Declaration of Horizontal Property Regime (Master Deed)
Recorded in Book 231, Pages 215-246
Cumberland County, TN Register of Deeds *(Excerpts)*

| Recorded Page(s) | Content Description |
|---|---|
| 215-226 | Declaration text (corresponds to internal pp 1-12) |
| 227 | Site Plan (Exhibit I to Declaration) |
| 234 | Project Phasing of Clusters (Exhibit III to Declaration) |
| 240-246 | By-Laws incorporated into the Declaration |

# DECLARATION OF HORIZONTAL PROPERTY REGIME
## MASTER DEED
## HIAWATHA MANOR
## LAKE TANSI VILLAGE
## CROSSVILLE, TENNESSEE

This Master Deed and By-Laws which are attached hereto and made a part hereof, is made and executed this 11th day of July , 1979, by TANSI RESORT, INC., a Tennessee corporation, hereinafter referred to as "Resort", for itself, its successors, grantees and assigns, pursuant to the provisions of the "Tennessee Horizontal Property Act". (Title 64, Chapter 27 of Tennessee Code Annotated)

## WITNESSETH:

WHEREAS, Resort is the owner of record of the fee simple title to the real property located in Cumberland County, Tennessee as more particularly described and set forth as the Condominium property in the Survey Exhibits attached hereto as "Exhibit No. 1", which are made a part hereof as though fully set forth herein, said Condominium property hereinafter referred to as the "Land"; and,

WHEREAS, Resort is the owner of the apartment units now existing on the Land, all of which is hereafter called "Property" (hereinafter defined); and,

WHEREAS, it is the intention of the Resort to submit the Property to a Horizontal Property (condominium) Regime and sell and convey the same to various purchasers, subject to the covenants, conditions, restrictions and By-Law provisions herein provided and reserved to be kept and observed; and,

WHEREAS, Resort desires and intends by filling this Master Deed and the Exhibits attached hereto to submit the Property to the provisions of the Horizontal Property Act as a condominium property and to impose upon said Property mutually beneficial restrictions under a general plan of improvement for the benefit of said Property and the owners thereof.

NOW THEREFORE, Resort does hereby publish and declare that all of the property referred to above and as set out and described on the Exhibits attached hereto is held and shall be held, conveyed, encumbered, leased, rented, used, occupied and improved subject to the following covenants, conditions, restrictions, uses, limitations, declarations and obligations, all of which are declared and agreed to be in furtherance of a plan for the improvement of said property and the division thereof into Condominiums (hereinafter defined), and same shall be deemed to run with the land and shall be a burden and a benefit to Resort, its successors, grantees, and assigns, and any persons acquiring or owning an interest in the property, their grantees, successors, heirs, devisees, assigns and personal representatives.

## I
## DEFINITIONS

As used in this Declaration of Condominium and By-Laws and Exhibits attached hereto, and all Amendments thereof, unless the context otherwise requires, the following definitions shall prevail:

A. Declaration, or Declaration of Condominium, means this instrument, as it may be from time to time amended. During any period when a Management Agreement is in effect, any rights or responsibilities of the Association shall also be the rights and responsibilities of the Management Firm under said Management Agreement.

B. Association, means Hiawatha Manor Association and it is responsible for the operation of the Condominium. During any period when a Management Agreement is in effect, any rights or responsibilities of the Association shall also be the rights and responsibilities of the Management Firm under said Management Agreement.

C. By-Laws, means the By-Laws of the Association, as they exist from time to time.

D. Common Elements, means the portions of the Condominium property not included in the Units. Common elements shall include the tangible personal property required for maintenance and operation of the Condominium, even though owned by the Association.

E. Limited Common Elements, means and includes those common elements which are reserved for the use of a certain unit or units, to the exclusion of all other units.

F. Condominium, means that form of ownership of Condominium property under which units of improvements are subject to ownership by one or more owners, and there is appurtenant to each unit, as part thereof, an undivided share in the common elements.

G. Condominium Act, means and refers to the Condominium Act of the State of Tennessee (Title 64, Chapter 27, T.C.A.)

H. Condominium expenses, mean the expenses for which the unit owners are liable as designated by the association, including but not limited to membership fees, assessments, maintenance fees which may include capital replacement improvements, taxes, insurance, utilities, maid service, operational costs, sinking fund and other related expenses.

I. Common Surplus, means the excess of all receipts of the Association including, but not limited to, assessments, rents profits and revenues on account of the common elements, over and above the amount of common expenses.

J. Condominium Property, means and includes the land in a Condominium, whether or not contiguous, and all improvements thereon, and all easements and rights appurtenant thereto, intended for use in connection with the Condominium.

K. Assessment, means a share of the funds required for the payment of emergency expenses when, from time to time, are assessed against the unit owners.

L. Condominium Parcel or Parcel means a unit, together with the undivided share in the common elements which are appurtenant to the unit.

M. Condominium Unit, or Unit, refers therein to each of the separate and identified units delineated in the Survey attached to the Declaration as Exhibit No. 1, and when the context permits, the Condominium parcel includes such unit, including its share of the common elements appurtenant thereto. The boundary lines of each unit are the undecorated and/or unfinished interior surfaces of its perimeter walls, bearing walls, lowermost floors, uppermost ceilings, windows and window frames, door and door frames, and trim. Each unit includes both the portions of the Building within such boundary lines and the space so encompassed, with a direct exit to a common area walkway leading to a public right-a-way.

This instrument prepared by:
Richard W. Brock
National American Corporation
P. O. Box 26
Gautier, Mississippi 39553 (1)

309

For document, see S. B. 361, pg. 501 . 8 - 12-88. CM CM.

Ex. 4-2

Case 2:25-ap-90051    Doc 48-2    Filed 03/03/26    Entered 03/03/26 16:33:47    Desc
Exhibit Exhibits 1-4 to Objection    Page 25 of 66

N. Unit Owner, or Owner of a Unit, or Parcel Owner, means the owner of a Condominium parcel.

O. Resort, means Tansi Resort, Inc., a Tennessee corporation, its successors and assigns.

P. Institutional Mortgagee, means a Bank, Savings and Loan Association, Insurance Company or Union Pension Fund authorized to do business in the United States of America, an Agency of the United States Government, a real estate or mortgage investment trust, or a lender generally recognized in the community as an Institutional type lender.

Q. Mortgage shall mean a deed of trust as well as a mortgage and a Mortgagee shall mean the beneficiary under or holder of a deed of trust as well as a mortgage.

R. Occupant means the person or persons, other than the unit owner, in possession of the unit.

S. Condominium Documents, means this Declaration, the By-Laws and all Exhibits annexed hereto, as the same may be amended from time to time.

T. Board of Administration, or Board of Directors, means the representative body responsible for administration of the Association.

U. Unless the context otherwise requires, all other items used in this Declaration shall be assumed to have the meaning attributed to said term by Section 64-2702 of the Condominium Act as of the date of this Declaration.

V. "Interval Ownership" is a concept whereby units and the share of the common elements assigned to the unit are conveyed for periods of time, the purchaser receiving a stated time period for a period of years, together with a remainder over in fee simple as tenant in common with all other purchasers of "Unit Weeks" in such Condominium Unit in the year 2029.

W. "Unit Week" means a period of ownership in a Unit committed to Interval Ownership.
"Unit Weeks" are computed as follows:

Unit Week No. 1 is the seven (7) days commencing on the first day in each year as delineated in Exhibit No. 2 attached hereto. Unit Week No. 2 is the seven (7) days succeeding. Additional weeks up to and including Unit Week No. 52 are computed in a like manner. Unit Week No. 52 contains the seven (7) days succeeding the end of Unit Week No. 51 without regard to the month or year. Unit week No. 53 contains any excess days. Unit weeks run from 5:00 P.M. on the first day of the period to 10:00 A.M. on the last day of the period or as otherwise amended by Exhibit No. two (2).

## II.
### NAME

The name by which this Condominium is to be identified shall be "Hiawatha Manor".

## III.
### COMMITTING A UNIT TO INTERVAL OWNERSHIP

A unit shall become a unit committed to Interval Ownership upon the recording of a declaration by Resort which commits said unit to interval ownership. No unit may be committed to Interval Ownership by any person, or other entity other than Resort. A unit will no longer be committed to Interval Ownership any time all unit weeks are owned by the same legal entity. Notwithstanding the above, Resort may assign its rights to commit units to any other entity to which it conveys substantially all units which it owns in the Condominium property.

## IV.
### IDENTIFICATION OF UNITS

The Condominium property consists essentially of all units and other improvements as set forth in Exhibit No. 1 attached hereto and for purpose of identification, all units located on said Condominium property are given identifying numbers and are delineated on the Survey Exhibits, collectively identified as "Exhibit No. 1", hereto attached and made a part of this Declaration. No unit bears the same identifying number as does any other unit. The aforesaid identifying number as to the unit is also the identifying number as to the Condominium parcel. The said Exhibit No. 1 also contains a survey of the land, graphic description of the improvements, and a plot plan and, together with this Declaration, they are in sufficient detail to identify the location, dimensions and size of the common elements and of each unit, as evidenced by the Certificate of the Registered Land Surveyor hereto attached. The legend and notes, contained with the said Exhibit are incorporated herein and made a part hereof by reference.

## V.
### IDENTIFICATION OF UNITS COMMITTED TO INTERVAL OWNERSHIP

Wherever the term "Unit Owner" or "Unit Owners" is used anywhere within the context of this Declaration or any Amendment or Supplementary Declaration hereto, it shall be construed to include all owners of unit weeks within any unit committed to interval ownership as one unit owner. The respective interests of each owner of unit weeks within such unit committed to interval ownership with respect to each other shall be delineated on Exhibit No. 3 which is annexed to this Declaration and made a part hereof.

## VI.
### OWNERSHIP OF COMMON ELEMENTS

Each of the Unit Owners of the Condominium shall own an undivided interest in the Common Elements and limited Common Elements, which undivided interest, as set forth in Exhibit 4, which exhibit may be amended by Resort and is annexed to this declaration and made a part hereof.

The fee title to each Condominium Parcel shall include both the Condominium Unit and the above respective undivided interest in the Common Elements, said undivided interest in the Common Elements to be deemed to be conveyed or encumbered with its respective Condominium Unit. Any attempt to separate the fee title to a Condominium Unit from the undivided interest in the Common Elements appurtenant to each Unit shall be null and void. The term "Common Elements" when used throughout this declaration shall mean both Common Elements and limited Common Elements unless otherwise specifically stated.

210

(2)

Ex. 4-3

Case 2:25-ap-90051    Doc 48-2    Filed 03/03/26    Entered 03/03/26 16:33:47    Desc
Exhibit Exhibits 1-4 to Objection    Page 26 of 66

## VOTING RIGHTS

Each interval owner shall be entitled to one vote for each Unit Week owned. An interval owner may vote by means of a proxy.

VIII.
## COMMON EXPENSE AND COMMON SURPLUS

The common expenses of the Condominium, including the obligation of each unit owner under the Management Agreement attached to this Declaration, shall be shared by the unit owners, as specified and set forth in Exhibit 5. The foregoing ratio of sharing common expenses and assessments shall remain, regardless of the purchase price of the Condominium parcels, their location, or the building square footage included in each Condominium unit.

Any common surplus of the Association shall be owned by each of the unit owners in the same proportion as their percentage ownership interest in the common elements - any common surplus being the excess of all receipts of the Association from this Condominium, including but not limited to, assessments, rents, profits and revenues on account of the common elements of the Condominium, over the amount of the common expenses of the Condominium.

IX.
## MAINTENANCE FEE FOR UNITS COMMITTED TO INTERVAL OWNERSHIP

All owners of Unit Weeks in Units committed to Interval Ownership shall pay a "maintenance fee". The maintenance fee shall include the following:

The particular Unit Week Owner's share of common expenses, as set forth in Paragraph VIII above;
Repair and upkeep of Units for normal wear and tear (example - repainting interior walls);
Repair and replacement of furniture, fixtures, appliances, carpeting and utensils;
Casualty and/or liability insurance on the Unit;
Capital expenditures
Utilities for the subject Unit;
Personal property, real estate, and any other applicable taxes; (By separate billing)
Any other expenses incurred in the normal operations and maintenance of the Unit which cannot be attributed to a particular Unit Week Owner. (For example - management fee)

The maintenance fee shall be prorated among all Owners of Unit Weeks. The foregoing shall not apply to any Unit Week conveyed to the Association. Resort or its designated assignee shall have the right to levy a lien for any unpaid fees, dues, and assessments and taxes.

X.
## MAINTENANCE WEEK IN UNITS COMMITTED TO INTERVAL OWNERSHIP

Upon conveying fifty (50) Unit Weeks in any Unit committed to Interval Ownership, or six (6) months from the date of the first conveyance under Interval Ownership in any Unit committed to Interval Ownership, whichever date comes first, the Resort agrees to convey and the Association agrees to accept up to two unit weeks to be used for maintenance purposes. Resort shall have the right to choose the Unit Week(s) to be so conveyed. In the event any one person, or other legal entity becomes holder of record title to all unit weeks in any one unit that person, or other legal entity, may cause the Association to convey said unit weeks conveyed to the Association to it by notifying the Association, in writing, of its desire that said unit cease being a unit committed to interval ownership. The Association shall execute the necessary papers to complete said conveyance no later than sixty (60) days after notice. All expenses of said conveyance, including state stamps and recording fees, shall be borne by the person, or other legal entity, desiring such conveyance.

XI.
## METHOD OF AMENDMENT OF DECLARATION

This Declaration may be amended at any regular or special meeting of the Unit Owners, called and convened in accordance with the By-Laws, by the affirmative vote of Voting Members present or by proxy casting not less than fifty-one percent (51%) of the total vote.

All Amendments shall be recorded and certified as required by the Condominium Act. Subject to the provisions of Article VIII, no Amendment shall change any Condominium Parcel, nor a Condominium Unit's proportionate share of the common expenses or common surplus, nor the voting rights appurtenant to any Unit, unless the record Owners(s) thereof, and all record Owners of mortgages or other voluntarily placed liens thereon, shall join in the execution of the Amendment. No Amendment shall be passed which shall impair or prejudice the rights and priorities of any mortgages or change the provisions of this Declaration with respect to Institutional Mortgages without the written approval of all Institutional Mortgages of record, nor shall the provisions of Article XVI of this Declaration be changed without the written approval of all Institutional Mortgages of record.

No amendment shall change the rights and privileges of Resort without the Resort's written approval.

Resort, so long as it owns more than twenty-five percent (25%) of the Condominium Units or Unit Weeks in the Condominium, reserves the right at any time to amend the Declaration, as may be required by any lending institution or public body or in such manner as Resort may determine to be necessary to carry out the purposes of the project provided that such Amendment shall not increase the proportion of common expenses nor decrease the Ownership of Common Elements borne by the Condominium Owners.

XII.
## BY-LAWS

The operation of the Condominium's property shall be governed by the By-Laws of the Association.

No modification of or Amendment to the By-Laws of said Association shall be valid unless set forth in or annexed to a duly recorded Amendment to this Declaration. The By-Laws may be amended in the manner provided for therein, but no Amendment to said By-Laws shall be adopted which would affect or impair the validity or priority of any mortgage covering any Condominium Parcel, or which would change the provision of the By-Laws with respect to Institutional Mortgages without the

211
(3)

Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection   Page 27 of 66

Ex. 4-4

written approval of all Institutional Mortgagees of record. No Amendment shall change the rights and privileges of the Resort without the Resort's written approval. Any Amendment to the By-Laws, as provided herein, shall be executed by the parties as required in this Article and in Article XI above.

XIII.
THE OPERATING ENTITY

The operating entity of the Condominium shall be the Association, which has been designated pursuant to the Condominium Act. The said association upon agreement of its board of directors shall have the right to assign its obligations of management, maintenance and collection of common expenses and all the other management functions of the association to an acceptable management agent. The said association, or its designated assignee shall have all the powers and duties granted to or imposed upon it by this Declaration and the By-Laws of the Association, and all of the powers and duties necessary to operate the Condominium, as set forth in this Declaration and the By-Laws, and as they may be amended from time to time.

XIV.
Maintenance Fees, Assessments, Membership Fees
Maintenance Fees.

The Association, through its Board of Directors, shall have the power to fix and determine from time to time the sum or sums necessary and adequate as maintenance fees to provide for the common expenses of the Condominium property. The maintenance fees shall be levied against each Condominium Parcel Owner as provided for in Article VIII of this Declaration. The maintenance fee shall be due and payable annually (if the interval ownership is not financed by seller). Maintenance fees are due and payable monthly on installment transactions. Due dates shall be determined by the Board of Directors of Hiawatha Association or its designated assignee. Maintenance fees that are unpaid for over ten (10) days after due shall bear interest at the rate of ten percent (10%) per annum from due date until paid, and at the sole discretion of the Board of Directors, a late charge of twenty five dollars shall be due and payable. Monthly bills for the same shall not be mailed and delivered to Unit owners. Maintenance fees for units committed to interval ownership shall be due and payable annually or as determined by the association.

Assessments.

Assessments for emergency purposes upon showing of good cause, may also be levied by the association through its Board of Directors. This assessment shall be due and payable as determined by the Board of Directors of Hiawatha Association or as designated assignee.

Assessments that are unpaid for over ten (10) days after due shall bear interest at the rate of ten percent (10%) per annum from due date until paid, and at the sole discretion of the Board of Directors, a late charge of twenty five dollars shall be due and payable. Assessments for emergency purposes may also be levied by the Association by its Board of Directors. The assessments shall be due and payable as determined by the Board of Directors of the Association.

Membership Fee.

The membership fee is that fee levied against the interval owner in exchange for the use of any amenities controlled by Lake Tansi Property Owners Association. This fee is due and payable annually, in advance, (if the interval ownership is not financed by seller).

The Association, or its designated assignee shall have a lien on each Condominium Parcel for unpaid assessments, maintenance fee and membership fee together with interest thereon, against the Unit Owner of such Condominium parcel, together with a lien on all tangible personal property located within said Unit, except that such lien upon the aforesaid tangible personal property shall be subordinate to prior bona fide liens of record. Reasonable attorneys' fees incurred by the Association incident to the collection of such assessments, maintenance fee and membership fee or the enforcement of such lien, together with all sums advanced and paid by the Association for taxes and payments on account of superior mortgages, liens or encumbrances which may be required to be advanced by the Association, in order to preserve and protect its lien, shall be payable by the Unit Owner and secured by such lien. The Board of Directors, may take such action as it deems necessary to collect assessments, maintenance fee and membership fee by personal action or by enforcing and foreclosing said lien, and may settle and compromise the same if deemed in its best interest. Said lien shall be effective as and in the manner provided for by the Condominium Act, and shall have the priorities established by said Act. The Association, shall be entitled to bid at any sale held pursuant to a suit to foreclose such lien, and to apply as a cash credit against its bid, all sums due, as provided herein, covered by the lien enforced. In case of such foreclosure, the Unit Owner shall be required to pay a reasonable rental for the Condominium Parcel for the period of time said Parcel is occupied by the Unit Owner or anyone by, through or under said Unit Owner, and Plaintiff in such foreclosure shall be entitled to the appointment of a Receiver to collect same from the Unit Owner and/or Occupant.

In the case of a lien against an Owner of Unit Weeks in a Unit committed to Interval Ownership, said lien shall be limited to the Unit Weeks owned by said Owner and shall not encumber the property, real or personal, of any other Owner of Unit Weeks in said Unit.

Where the Mortgagee of an Institutional First Mortgage of record, or other purchaser of a Condominium Unit, obtains title to a Condominium Parcel as a result of foreclosure of the Institutional First Mortgage, or when an Institutional First Mortgagee of record accepts a Deed to said Condominium Parcel in lieu of foreclosure, such acquirer of title, its successors and assigns, shall not be liable for the shares of maintenance fees or assessment by the Association pertaining to such Condominium Parcel, or chargeable to the former Unit Owner of such Parcel, which became due prior to acquisition of title as a result of the foreclosure or the acceptance of such Deed in lieu of foreclosure. Such unpaid share of maintenance fees or assessments shall be deemed to be common expenses collectible from all of the Unit Owners, including such acquirer, his successors and assigns.

Failure of an interval owner to pay any fee or assessment may preclude said interval owner from the use of any recreational facilities.

2/2

(4)

Any person who acquires an interest in an Unit, except through foreclosure of an Institutional First Mortgage of record, or by virtue of an Institutional First Mortgage accepting a Deed to a Condominium Parcel in lieu of foreclosure, as specifically provided hereinabove including, without limitation, persons acquiring title by operation of law, including purchasers at judicial sales, shall not be entitled to occupancy of the Unit or enjoyment of the Common Elements until such time as all unpaid assessments and maintenance fee due and owing by the former Unit Owners have been paid. The Association, acting through its Board of Directors, shall have the right to assign its claim and lien rights for the recovery of any unpaid assessments and maintenance fee to Resort, or to any Unit Owner or group of Unit Owners, or to any third party.

## XV.
## INSURANCE PROVISIONS

I. Insurance

A. Purchase of Insurance: The Association shall obtain fire and extended coverage insurance and vandalism and malicious mischief insurance insuring all of the insurable improvements within the Condominium, together with such other insurance as the Association deems necessary in and for the interest of the Association, all Unit Owners and their Mortgagees, as their interest may appear, in an amount which shall be equal to the maximum insurable replacement value as determined annually; and the premiums for such coverage and other expenses in connection with said insurance shall be assessed against the Unit Owners as part of the common expense. The named insured shall be the Association, individually and as Agent for the Unit Owners, without naming them, and as Agent for their Mortgagees.

Provision shall be made for the issuance of Mortgagee endorsements and memoranda of insurance to the Mortgagees of Unit Owners. Such policies shall provide that payments for losses thereunder by the insurer shall be made to the insurance trustee hereinafter designated, and all policies and endorsements thereon shall be deposited with the insurance trustee. Unit Owners may obtain insurance coverage at their own expense upon their own personal property and for their personal liability and living expense.

B. Coverage:

(1) Casualty. All buildings and improvements upon the Condominium property shall be insured in an amount equal to the maximum insurable replacement value, excluding foundation and excavation costs, and all personal property included in the Common Elements shall be insured for its value, all as determined annually by the Board of Directors of the Association. Such coverage shall afford protection against:

(a) Loss or damage by fire and other hazards covered by a standard extended coverage endorsement; and

(b) Such other risks as from time to time shall be customarily covered with respect to buildings similar in construction, location and use as the buildings on the Condominium Parcel; including but not limited to vandalism and malicious mischief.

(2) Public Liability in such amounts and with such coverage as shall be required by the Board of Directors of the Association and with cross liability and endorsement to cover liabilities of the Unit Owners as a group to a Unit Owner.

(3) Insurance on Units Committed to Interval Ownership. The Board of Directors of the Association, shall obtain casualty and liability insurance, as needed, on all Units committed to Interval Ownership. Each such policy shall reflect the respective interest of the Association, and all Owners of Unit Weeks in each Unit. Casualty insurance shall be in an amount equal to the maximum insurable replacement value of the Unit and the personal property therein without deduction for depreciation as determined annually by the Board of Directors of the Association. The premiums shall be a part of the maintenance fee. All losses thereunder shall be payable to the Insurance Trustee hereinafter designated. All such proceeds shall be used for the purpose of repair or replacement of any loss, or in the event such loss is not to be repaired or replaced, as determined elsewhere, to be divided among all Owners of Unit Weeks in such Unit in accordance with their percentage interest in remainder. Any deficit or overage in such proceeds, after repair or replacement, shall be divided among all such Owners of Unit Weeks in that Unit. Deficits shall be treated as a prorated assessment and billed to each Unit Owner.

(4) Workmen's Compensation policy to meet the requirements of law.

(5) Such Other Insurance as the Board of Directors of the Association shall determine from time to time desirable.

C. Premiums: Premiums upon insurance policies purchased by the Association shall be paid by the Association as a common expense.

D. Insurance Trustee; Shares of Proceeds: All insurance policies purchased by the Association shall be for the benefit of the Association and the Unit Owners and their Mortgagees, as their interests may appear, and shall provide that all proceeds covering property losses shall be paid to the insurance trustee, which shall be designated by the Board of Directors and which shall be any bank or trust company in Tennessee. The insurance trustee shall not be liable for payment of premiums nor for the renewal of the policies, nor for the failure to collect any insurance proceeds. The duty of the insurance trustee shall be to receive such proceeds as are paid and to hold the same in trust for the purposes elsewhere stated herein and for the benefit of the Unit Owners and their Mortgagees in the following shares, but which shares need not be set forth on the records of the insurance trustee:

(1) Common Elements. Proceeds on account of damage to Common Elements - an undivided share for each Unit Owner, such share being the same as the undivided share in the Common Elements appurtenant to his Unit.

(2) Condominium Units. Proceeds on account of damage to Units shall be held in the following undivided shares:

(a) When the Building is to be Restored - For the Owners of damaged Units in proportion to the cost of repairing the damage suffered by each Unit Owner, which cost shall be determined by the Association.

(b) When the Building is Not to be Restored - An undivided share for each Unit Owner, such share being the same as the undivided share in the Common Elements appurtenant to his Unit.

(3) Mortgagees. In the event a mortgage endorsement has been issued as to a Unit, the share of the Unit Owner shall be held in trust for the Mortgagee and the Unit Owner as their interests may appear; provided, however, that no Mortgagee shall have any right to determine or participate in the determination as to whether or not any damaged property shall be reconstructed or repaired, and no Mortgagee shall have any right to apply or have applied to the reduction of a mortgage debt any insurance proceeds except distributions thereof made to the Unit Owner and Mortgagee pursuant to the provisions of this Declaration.

213

(5)

**Ex. 4-6**

Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection   Page 29 of 66

E. **Distribution of Proceeds:** Proceeds of insurance policies received by the insurance trustee shall be distributed to or for the benefit of the beneficial Owners in the following Manner:

(1) **Expense of the Trust.** All expenses of the insurance trustee shall be first paid or provision made therefor.

(2) **Reconstruction or Repair.** If the damage for which the proceeds are paid is to be repaired or reconstructed, the remaining proceeds shall be paid to defray the cost thereof as elsewhere provided. Any proceeds remaining after defraying such costs shall be distributed to the beneficial Owners. Remittance to Unit Owners and their Mortgagees being payable jointly to them. This is a covenant for the benefit of any Mortgage of a Unit and may be enforced by such Mortgagee.

~~(3) Failure to Reconstruct or Repair. If it is determined in the manner elsewhere provided that the damage for which the proceeds are paid shall not be reconstructed or repaired, the remaining proceeds shall be distributed to the beneficial~~ Owners, remittances to Unit Owners and their Mortgagees being payable jointly to them. This is a covenant for the benefit of any Mortgagee of a Unit and may be enforced by such Mortgagee.

(4) **Certificate.** In making distribution to Unit Owners and their Mortgagees, the insurance trustee may rely upon a certificate of the Association made by its President and Secretary as to the names of the Unit Owners and their respective shares of the distribution.

F. **Association as Agent:** The Association is hereby irrevocably appointed Agent for each Unit Owner and for each Owner of a mortgage or other lien upon a Unit and for each Owner of any other interest in the Condominium property to adjust all claims arising under insurance policies purchased by the Association and to execute and deliver releases upon the payment of claims.

G. **Notice of Insurance Coverage:** In any legal action in which the Association may be exposed to liability in excess of insurance coverage protecting it and the Unit Owners, the Association will give Notice of the exposure within a reasonable time to all Unit Owners who may be exposed to the liability and they shall have the right to intervene and defend.

H. **Inspection of Insurance Policy.** A copy of each insurance policy obtained by the Association shall be made available for inspection by Unit Owners at reasonable times.

II. **RECONSTRUCTION OR REPAIR AFTER CASUALTY**

A. **Determination to Reconstruct or Repair:** If any part of the Condominium property shall be damaged by casualty, whether it shall be reconstructed or repaired shall be determined in the following manner:

(1) **Common Element.** If the damaged improvement is a Common Element, the damaged property shall be reconstructed or repaired, unless it is determined in the manner elsewhere provided that the Condominium shall be terminated.

(2) **Condominium Units.**

(a) **Lesser Damage** - If the damaged improvement is a building containing Condominium Units, and if Units to which 50% of the Common Elements are appurtenant are found by the Board of Directors of the Association to be tenantable, the damaged property shall be reconstructed or repaired unless within 60 days after the casualty, it is determined by Agreement in the manner elsewhere provided that the Condominium shall be terminated.

(b) **Major Damage** - If the damaged improvement is a building containing Condominium Units, and if Units to which more than 50% of the Common Elements are appurtenant are found by the Board of Directors to be not tenantable, then the damaged Property will not be reconstructed or repaired and the Condominium will be terminated without Agreement as elsewhere provided, unless within 60 days after the casualty, the Owners of 75% of the Common Elements agree in writing to such reconstruction or repair.

(3) **Certificate.** The insurance trustee may rely upon a certificate of the Association made by its President and Secretary to determine whether or not the damaged property is to be reconstructed or repaired.

B. **Plans and Specifications:** Any reconstruction or repair must be substantially in accordance with the plans and specifications for the original building, portions of which are attached hereto as Exhibits; or if not, then according to plans and specifications approved by the Board of Directors of the Association and if the damaged property is a building containing Condominium Units by the Owners of not less than 75% of the Common Elements, including the Owners of all damaged Units, which approval shall not be unreasonably withheld.

C. **Responsibility:** If the damage is only to those parts of one Unit for which the responsibility of maintenance and repair is that of the Unit Owner, then the Unit Owner shall be responsible for reconstruction and repair after casualty. In all other instances, the responsibility of reconstruction and repair after casualty shall be that of the Association.

D. **Estimates of Costs:** Immediately after a determination is made to rebuild or repair damage to property for which the Association has the responsibility of reconstruction and repair, the Association shall obtain reliable detailed estimates of the cost to rebuild or repair.

E. **Assessments:** The amount by which an award of insurance proceeds to the insurance trustee is reduced on account of a deductible clause in an insurance policy shall be assessed against all Unit Owners in proportion to their shares in the Common Elements. If the proceeds of such assessments and of the insurance are not sufficient to defray the estimated costs of reconstruction and repair by the Association, or if any any time during reconstruction and repair or upon completion of reconstruction and repair, the funds for the payment of the costs of reconstruction and repair are insufficient, assessments shall be made against the Unit Owners, in the case of damage to Common Elements, in sufficient amounts to provide funds for the payment of such costs. Such assessments amount to provide funds for damage to Units shall be in proportion to the cost of reconstruction and repair of their respective Units. Such assessments on account of damage to Common Elements shall be in proportion to the Owner's share in the Common Elements.

F. **Construction Funds:** The funds for payment of costs of reconstruction and repair after casualty, which shall consist of proceeds of insurance held by the insurance trustee and funds collected by the Association from assessments against Unit Owners, shall be disbursed in payment of such costs in the following manner:

214

(6)

Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection   Page 30 of 66

**Ex. 4-7**

(1) Association. If the total assessments made by the Association in order to provide funds for payment of costs of reconstruction and repair which is the responsibility of the Association is more than $5,000.00, then the sums paid upon such assessments shall be deposited by the Association with the insurance trustee. In all other cases, the Association shall hold the sums paid upon such assessments and disburse the same in payment of the costs of reconstruction and repair.

(2) Insurance Trustee. The proceeds of insurance collected on account of a casualty, and the sums deposited with the insurance trustee by the Association from collections of assessment against Unit Owners on account of such Casualty, shall constitute a construction fund which shall be disbursed in payment of the costs of reconstruction and repair in the following manner and order:

(a) Association - Lesser Damage - If the amount of the estimated costs of reconstruction and repair which is the responsibility of the Association is less than $5,000.00, then the construction fund shall be disbursed in payment of such costs upon the order of the Association; provided, however, that upon request to the insurance trustee by a Mortgagee which is a beneficiary of an insurance policy, the proceeds of which are included in the construction fund. Such fund shall be disbursed in the manner hereafter provided for the reconstruction and repair of major damage.

(b) Association - Major Damage - If the amount of the estimated costs of reconstruction and repair which is the responsibility of the Association is more than $5,000.00, then the construction fund shall be disbursed in payment of such costs in the manner required by the Board of Directors of the Association or upon approval of an architect qualified to practice in Tennessee and employed by the Association to supervise the work.

(c) Unit Owner - The portion of insurance proceeds representing damage for which the responsibility of reconstruction and repair lies with a Unit Owner shall be paid by the insurance trustee to the Unit Owner, or if there is a mortgage endorsement as to such Unit, then to the Unit Owner and Mortgagee jointly, who may use such proceeds as they may be advised.

(d) Surplus - It shall be presumed that the first monies disbursed in payment of costs and reconstruction and repair shall be from insurance proceeds. If there is a balance in a construction fund after payment of all costs of the reconstruction and repair for which the fund is established, such balance shall be distributed to the beneficial Owners of the fund in the manner elsewhere stated; 

(e) Except, however, that the part of a distribution to a beneficial Owner which is not in excess of assessments paid by such Owner into the construction fund shall not be made payable to any Mortgagee.

(e) Certificate - Notwithstanding the provisions herein, the insurance trustee shall not be required to determine whether or not sums paid by Unit Owners upon assessments shall be deposited by the Association with the insurance trustee, nor to determine whether the disbursements from the construction fund are to be upon the order of the Association or upon approval of an architect or otherwise, nor whether a disbursement is to be made from the construction fund, nor to determine whether surplus funds to be distributed are less than the assessments paid by Owners. Instead, the insurance trustee may rely upon a certificate of the Association, made by its President and Secretary, as to any or all of such matters and stating that the sums to be paid are due and properly payable, and stating the name of the payee and the amount to be paid; provided, that when a Mortgagee is herein required to be named as payee, the insurance trustee shall also name the Mortgagee as a payee of any distribution of insurance proceeds to a Unit Owner; and further provided that if the Association or a Mortgagee which is the beneficiary of an insurance policy, the proceeds of which are included in the construction fund, so requires, the approval of an architect named by the Association shall be first obtained by the Association upon disbursements in payment of costs of reconstruction and repair.

## XVI.
## USE AND OCCUPANCY

A. Residential Use Restriction: The Owner of a Unit shall occupy and use his Unit as a single family private dwelling for himself and the members of his family, his social guests, lessees licensees and invitees. Notwithstanding the foregoing, nothing in this Declaration shall be construed to restrict Resort, or any successor in interest to the Resort, from selling and/or conveying any unit under a plat of Interval Ownership, or any person, group of persons, corporation, partnership, or other entity, from selling, reconveying, or any other way, transferring same, at any time under said plan of Interval Ownership.

B. Prohibited Acts: The Unit Owner shall not permit or suffer anything to be done or kept in his Unit which will increase the rate of insurance in the Condominium property, or which will obstruct or interfere with the rights of other Unit Owners, or annoy them by unreasonable noises, or otherwise, nor shall the Unit Owners commit or permit any nuisance, immoral or illegal acts in or about the Condominium property.

C. Animals or Pets: No animals or pets of any kind shall be kept in any unit or on any property of the Condominium except subect to some Rules and Regulations as may be adopted by the Board of Directors for the keeping of said pets; provided that such house pets causing or creating a nuisance or unreasonable disturbance shall be permanently removed from the property subject to these restrictions upon three (3) days written notice from the Management Firm or the Board of Directors of the Association. Once permission is granted, as provided in this paragraph, it may not be withdrawn or terminated unless such house pet is caused or created a nuisance or unreasonable disturbance as provided in this paragraph.

D. Restrictions on Alterations: The Owner of a Unit shall not cause anything to be affixed or attached to, hung, displayed or placed, on the exterior walls, doors or windows of the Units nor the limited Common Elements or the Common Elements, nor shall they cause any type of ground coverage to be installed nor shall they grow any type of plant, shrubbery, flower, vine or grass outside their Unit, nor shall they cause awnings or storm shutters, screens, enclosures and the like to be affixed or attached to any Units, limited Common Elements or Common Elements; nor shall they place any furniture or equipment outside their Unit except with the prior written consent of the Board of Directors and further, when approved, subject to the Rules and Regulations adopted by the Board of Directors. No clothes lines or similar device shall be allowed on any portion of the Condominium property, nor shall clothes be hung anywhere except when designated by the Board of Directors of the Association.

215

(7)

Case 2:25-ap-90051    Doc 48-2    Filed 03/03/26    Entered 03/03/26 16:33:47    Desc
Exhibit Exhibits 1-4 to Objection    Page 31 of 66

**Ex. 4-8**

E. **Common Elements:** No person shall use the Common Elements and limited Common Elements or any part thereof, or a Condominium Unit, or the Condominium property, or any part thereof, in any manner contrary to or not in accordance with such Rules and Regulations promulgated thereto, as from time to time promulgated by the Association.

F. **Holdover Interval Owners:** In the event any Owner of a Unit Week in a Unit committed to Interval Ownership fails to vacate his Unit at the expiration of his period of Ownership each year, or at such earlier time as may be fixed by the Rules and Regulations adopted by the Association from time to time, he shall be deemed a "holdover owner". It shall be the responsibility of the Association to take such steps as may be necessary to remove such holdover Owner from the Unit, and to assist the Owner of any subsequent Unit Week, who may be affected by the holdover Owner's failure to vacate, to find alternate accommodations during such holdover period.

In addition to such other remedies as may be available to it, the Association or its designated assignee shall secure, at its expense, alternate accommodations for any Owner who may not occupy his Unit due to the failure to vacate of any holdover Owner. Such accommodations shall be as near in value to the Owner's own Unit as possible. The holdover Owner shall be charged a sum equal to three times the cost of such alternate accommodations, any other costs incurred due to his failure to vacate, and an administrative fee of $50.00 per day during his period of holding over. In the event it is necessary that the Association contract for a period greater than the actual period of holding over, in order to secure alternate accommodations as set forth above, the entire period shall be the responsibility of the holdover Owner, although the $50.00 per day administrative fee shall cease upon actual vacating by the holdover Owner.

The Association shall submit a bill to the holdover Owner in accordance with this paragraph. In the event the holdover Owner fails to pay same within ten (10) days of the date of same, a lien shall be filed against said holdover Owner's Unit Weeks in accordance with the provisions of Article XIV hereof.

The above provisions of Article XVI, E, shall not abridge the Association's right to take such other action as is provided by law including, but not limited to, eviction proceedings.

## XVII.
## MAINTENANCE AND ALTERATIONS

A. The Board of Directors of the Association may enter into a Contract with any firm, person or Corporation, or may join with other Condominium or Property Owner Associations and entitles in contracting for the maintenance and repair of the Condominium property and other type properties, and may contract or may join with other Condominium or Property Owner Associations in contracting for the management of the Condominium property and other type properties, and may delegate to the Contractor or Manager all the powers and duties of the Association, except such as are specifically required by this Declaration, or by the By-Laws, to have the approval of the Board of Directors or the membership of the Association. The Contractor or Manager may be authorized to determine the budget, recommend assessments for emergency purposes and collect maintenance fee, as provided by this Declaration, By-Laws, and exhibits to the Declaration.

B. Each Owner of a Unit not committed to Interval Ownership agrees as follows:

(1) To maintain in good condition and repair his Unit and all interior surfaces within or surrounding his Unit (such as the surfaces of the walls, ceilings, floors) whether or not a part of the Unit or Common Elements, and maintain and repair the fixtures therein and pay for any utilities which are separately metered to his Unit.

(2) Not to make or cause to be made any structural addition, alteration, decoration, repair, replacement or change of the Common Elements or to any outside or exterior portion of the building whether within a Unit or part of the limited Common Elements without the prior written consent of the Board of Directors of the Association.

C. Each Owner of Unit Weeks in a Unit committed to Interval Ownership agrees:

(1) To pay his proportionate share of the cost of the maintenance and repair of all interior and exterior components of said Unit, the cost of maintenance, repair and replacement of all appliances, furniture, carpeting, fixtures, equipment, utensils, and other personal property within said Unit, and such other cost of repair, maintenance, upkeep and operation of the Unit as is necessary to the continued enjoyment of said Unit by all said Owners of Unit Weeks therein.

(2) Not to make, cause, or allow to be made, any repairs, modifications, alterations, or replacements to the Common Elements, limited Common Elements, outside or exterior portion of the buildings whether within a Unit or part of the limited Common Elements or Common Elements, exterior or interior of his unit, or of the furnishings, appliances, personal property or decor thereof, without the prior written consent of the Board of Directors of the Association, and all other Owners of Unit Weeks therein.

(3) Expenses of repairs or replacements to the Unit or its components, furnishing, carpeting, appliances, or other property, real, personal, or mixed, occasioned by the specific use or abuse of any Owner of Unit Weeks in any Unit, or any licensee or tenant of said Owner, shall be borne in their entirety by said Owner.

(4) The Association, shall determine the interior color scheme, decor and furnishing, of each such Unit, as well as the proper time for redecorating and replacements thereof.

D. All Owners of Units, including Owners of Unit Weeks in Units committed to Interval Ownership, agree as follows:

(1) To allow the Board of Directors, or the agents or employees of any Management Firm or the Association, to enter into any Unit for the purpose of maintenance, inspection, repair, replacement of the improvements within the Units, limited Common Elements or the Common Elements, or to determine in case of emergency, circumstances threatening Units, limited Common Elements or the Common Elements, or to determine compliance with the provisions of this Declaration and the By-Laws of the Association.

(2) To show no signs, advertisements or Notices of any type on the Common Elements, limited Common Elements, or his Unit, and to erect no exterior antenna or aerials, except as consented to by the Board of Directors of the Association.

E. In the event the Owner of a Unit fails to maintain the said Unit and limited Common Elements, as required herein, or makes any alterations or additions without the required written consent, or otherwise violates or threatens to violate the provisions hereof, the Association, shall have the right to proceed in a Court of equity for an injunction to seek compliance with the provisions hereof. In lieu thereof and in addition thereto, the Association shall have the right to levy an assessment against the Owner of a Unit, and the Unit, for such necessary sums to remove any unauthorized addition or alteration and to restore the

216

(8)

**Ex. 4-9**

property to good condition and repair. Where said failure, alteration, addition, or other violation is attributable to an Owner of Unit Weeks in a Unit committed to Interval Ownership, any such levy of an assessment shall be limited to the Unit Weeks owned by said Owner of Unit Weeks and shall be of no force and effect as to any other Owner of Unit Weeks in said Unit.

Said assessment shall have the same force and effect as all other special assessments. The Association, shall have the further right to have its employees or agents, or any subcontractors appointed by it, enter a Unit at all reasonable times to do such work as is deemed necessary by the Board of Directors of the Association, to enforce compliance with the provisions hereof.

F. The Association, shall determine the exterior color scheme of the Buildings and all exteriors, and interior color scheme of the Common Elements, and shall be responsible for the maintenance thereof, and no Owner shall paint an exterior wall, door, window, or any exterior surface, or replace anything thereon or affixed thereto, without the written consent of the Board of Directors of the Association.

G. The Association shall be responsible for the maintenance, repair and replacement of the Common Elements, including but not limited to all recreation facilities, and all property not required to be maintained, repaired and/or replaced by the Unit Owners. Notwithstanding the Unit Owner's duty of maintenance, repair, replacement and the other responsibilities as to his Unit, as is provided in this Declaration and Exhibits attached thereto, the Association, may enter into an Agreement with such firms or companies as it may determine to provide certain services and/or maintenance and service are provided on a regularly scheduled basis for air conditioning maintenance and service and appurtenances thereto, exterminating services and other types of maintenance and services as the Association deems advisable and for such period of time and on such basis as it determines. Said Agreements shall be on behalf of all Unit Owners and the monthly assessment due from each Unit Owner for common expenses shall be increased by such sum as the Association deems fair and equitable under the circumstances in relation to the monthly charge for said maintenance or service. Each Unit Owner shall be deemed a party to said Unit Owner have all executed said Agreement as the Agent for the Unit Owners. The aforesaid Assessment shall be deemed to be an assessment under the provisions of Article XIV of this Declaration.

### XVIII.
### LIMITED COMMON ELEMENTS

Those areas reserved for the use of certain Unit Owners or a certain Unit Owner, to the exclusion of other Unit Owners, are designated as "Limited Common Elements", and are shown and located on the Surveys annexed hereto as "Exhibit No. 1". Any expense for the maintenance, repair or replacement relating to limited Common Elements shall be treated as and paid for as part of the common expenses of the Association unless otherwise specifically provided in this Declaration and Exhibits attached hereto.

### XIX.
### TERMINATION

A. If all Unit Owners and holders of all liens and mortgages affecting any of the Condominium Parcels execute and duly record an instrument terminating the Condominium property, or if under, said property shall be deemed to be subject to termination and thereafter owned in common by the Unit Owners. The undivided interest in the property owned in common by each Unit Owner shall then become the percentage of the undivided interest previously owned by such Owner in the Common Elements upon termination of the Condominium.

B. It is understood that in the year 2029, the purchasers of Units committed to Interval Ownership shall become tenants in common. The Board of Directors of the Association shall, no less than 30 days, nor more than 60 days prior to the actual date of such conversion to tenancy in common, call a meeting of all Owners of Unit Weeks in Units committed to Interval Ownership. At such meeting, a vote shall be taken to decide the disposition of the Units committed to Interval Ownership. A quorum at such meeting shall be a majority of the total outstanding votes of all Owners of Unit Weeks in Units committed to Interval Ownership. At such meeting the owners, or proxy votes of owners by a majority vote, may vote to continue their intervals, in which case the restrictive covenants set forth below will be adopted as covenants running with the land for a period of ten (10) years. The Board of Directors of the Association shall, no less than 30 days, nor more than 60 days prior to the actual expiration of said ten year period, call a meeting of all Owners of Unit Weeks in Units committed to Interval Ownership. A quorum at such meeting shall be a majority of the total outstanding votes of all Owners of Unit Weeks in Units committed to Interval Ownership. The Owners may then vote to continue the intervals for an additional 10 year period. This process shall be repeated as the end of each successive 10 year period approaches. Should less than a majority of the Owners vote to continue the intervals at any such meeting, then the Board of Directors of the Association shall file suit in a Court of competent jurisdiction in Cumberland County, Tennessee, for partition of the Units.

In the event the Owners vote to continue their Unit Weeks as provided above, then each Owner shall have the exclusive right to occupy his Unit, and as between Owners to use and enjoy the Common Elements of the Condominium, and the rights and easements appurtenant to his Unit during his Unit Weeks (and, in the case of Developer, during all Unit Weeks not heretofore conveyed, and to authorized others so to do, together with the non-exclusive right in common with all other Owners, but only when acting through the Association) to maintain and repair the Units during maintenance weeks. No Owner shall occupy his Unit, or exercise any other rights of Ownership in respect of his Unit other than the rights herein provided to him, during any other Unit Weeks unless expressly so authorized by the Owner entitled to occupy the Unit during such Unit Weeks or during any maintenance week except when acting through the Association. Each Owner shall keep his Unit and all furnishings in good condition and repair during his Unit Weeks, vacate the Unit at the expiration of his Unit Weeks, remove all persons and property therefrom excluding only furnishing, leave the Unit in good and sanitary condition and repair, and otherwise comply with such reasonable checkout and other procedures as may from time to time be contained in rules promulgated by the Association.

No Owner or other person or entity acquiring any right, title or interest in an Unit shall seek or obtain through any legal procedures, judicial partition of the Unit or sale of the Unit in lieu of partition at any date prior to the expiration of each successive ten (10) year period voted by a majority of Owners. If, however, any Unit Weeks shall be owned by two or more persons as tenants-in-common or as joint tenants, nothing herein contained shall prohibit a judicial sale of the Unit Weeks in lieu of partition as between such co-tenants or joint tenants.

217

(9)

**Ex. 4-10**

Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection   Page 33 of 66

## XX.
## USE OF COMMON ELEMENTS

The Association, its members, the Resort and its successors and assigns and all parties who own an interest in and to the aforesaid Common Elements agree that they shall not have any right to bring any action for partition or division of the real property that constitutes said Common Elements and said parties do hereby waive said rights of partition or division of said facilities. The initial Rules and Regulations, and all Amendments thereof and revision thereof pertaining to use of the Common Elements shall be posted in conspicuous places on the Condominium Property. The Unit Owners hereby covenant and agree to be bound by all of such Rules and Regulations and said parties shall obey same and be responsible for their being obeyed by the said Unit Owners, their family, guests, invitees, lessees and servants. Should a Unit Owner fail to pay maintenance fees or assessment as required under the terms of this Declaration of Condominium for the period of time specified herein whereby said assessment and maintenance fee become delinquent, the Association may deny the Unit Owner and/or the authorized user of the Common Elements the use and enjoyment of same until such time as all assessments and maintenance fees are paid. The Association shall further have the right in it sole discretion to suspend any Unit Owner and/or authorized user of said Common Elements from the use of same for a period not to exceed thirty (30) days for any infraction of the promulgated Rules and Regulations pertaining to said Common Elements, and in the case of a Unit committed to Interval Ownership for a period not to exceed seven (7) days. Should the Unit Owner or the authorized user of said Common Elements rights to use same be suspended, there shall be no reduction in the assessments and maintenance fees due and payable by said Unit Owner or authorized user. In the case of a Condominium Unit committed to Interval Ownership, all sanctions, as outlined above, shall be limited to the delinquent Unit Week Owner and shall be of no force and effect against non-delinquent Owners of Unit Weeks in such Condominium Unit committed to Interval Ownership.

Any person who is a Owner of a Condominium Parcel, together with members of his family, social guests, lessees, invitees and licensees, may use the facilities. Where a Corporation is a Parcel Owner, the use of said Common Elements shall be limited to any one time to such Officer, Director or employee of said Corporation who is in actual residence and such individual shall be deemed to be the Condominium Parcel Owner for the purposes of this paragraph. Where a party owns one Condominium Unit and leases same, the lessee shall be entitled to the use of the Common facilities and said lessee's rights thereto shall be the same as though said lessee were the Unit Owner and during the term of said lease, the Unit Owner and his family shall not be entitled to the use of the Common facilities. Use of the Common facilities by Owners of Unit Weeks in Units committed to Interval Ownership, or any other person using the Common Elements through said Owner, shall be unlimited to the period of Ownership each year of said Owner of Unit Weeks in such Unit.

## XXI.
## MANAGEMENT AGREEMENT

**A.** The Hiawatha Manor Association has entered into a Management Agreement.

The association has delegated to the management firm the power of the Association, through its Board of Directors, to determine the budget, levy and collect the maintenance fee for common expenses; assess and collect assessment; and monitor the collection of membership fees. Each Unit Owner, his heirs, successors and assigns, shall be bound by said Management Agreement for the purposes therein expressed, including, but not limited to:

(1) Adopting, ratifying, confirming and consenting to the execution of said Management Agreement by the Association.

(2) Covenanting and promising to perform each and every of the covenants, promises and undertakings to be performed by Unit Owners in the cases provided therefor in said management agreement.

(3) Ratifying, confirming and approving each and every provision of said Agreement, and acknowledging that all of the terms and provisions thereof are reasonable.

(4) Agreeing that the persons acting as Directors and Officers of the Association entering into such an Agreement have not breached any of their duties or obligations to the Association.

(5) It is specifically recognized that some or all of the persons comprising the original Board of Directors of the Association, are or may be stockholders, Officers and Directors of the Management Firm, and that such circumstances shall not and cannot be construed or considered as a breach of their duties and obligations to the Association, nor as possible grounds to invalidate such Management Agreement, in whole or in part.

(6) The act of the Board of Directors and Officers of the Association in entering into the Management Agreement be and the same are hereby ratified, approved, confirmed and adopted.

## XXII.
## MISCELLANEOUS PROVISIONS

**A.** The Owners of the respective Condominium Units shall not be deemed to own the undecorated and/or unfinished surfaces of the perimeter walls, floors and ceilings surrounding their respective Condominium Units, nor shall the Unit Owner be deemed to own pipes, wires, conduits, or other public utility lines running through said respective Condominium Units which are utilized for or serve more than One Condominium Unit, which item are, by these presents, hereby made a part of the Common Elements. Said Unit Owners, however, shall be deemed to own the walls and partitions which are contained in said Unit Owner's Condominium Unit, and shall also be deemed to own the inner decorated and/or finished surfaces of the perimeter walls, floors, and ceilings, including plaster, paint, wallpaper, etc.; however, all non walls and, where applicable, the floor between the first ground floor and second floor located within a Condominium Unit and, where applicable, the floor between any subsequent higher floors located within a Condominium Unit, and the floor of the first ground floor within a Condominium Unit, are a part of the Common Elements to the unfinished surface of said walls and floors.

**B.** The Owners of the respective Condominium Units agree that if any portion of a Condominium Unit or Common Element or limited Common Element encroaches upon another, a valid easement for the encroachment and encroaches upon another, a valid easement for the encroachment and maintenance of same, so long as it stands, shall and does exist. In the event a Condominium building or buildings are partially or totally destroyed and then rebuilt, the Owners of the Condominium Parcels agree that encroachments on parts of the Common Elements or limited Common Elements of Condominium Units, as aforedescribed, due to construction, shall be permitted, and that a valid easement for said encroachments and the maintenance thereof shall exist.

218

(10)

Case 2:25-ap-90051    Doc 48-2    Filed 03/03/26    Entered 03/03/26 16:33:47    Desc
Exhibit Exhibits 1-4 to Objection    Page 34 of 66

Ex. 4-11

C.  No Owner of a Condominium Parcel may exempt himself from liability for his contribution toward the common expenses or, in the case of an Owner of Unit Weeks in a Condominium Unit committed to Interval Ownership, the maintenance fee, by waiver of the use and enjoyment of any of the Common Elements or the recreation facilities, or by the abandonment of his Condominium Unit.

D.  The Owners of each and every Condominium Parcel shall return the same for the purpose of ad valorem taxes with the Tax Assessor of the County wherein the Condominium is situate, or for such other future legally authorized governmental Officer or authority having jurisdiction over same. Nothing herein shall be construed, however, as giving to any Unit Owner the right of contribution or any right of adjustment against any other Unit Owner on account of any deviation by the taxing authorities from the valuation herein prescribed, each Unit Owner to pay ad valorem taxes and special assessments as are separately assessed against his Condominium Parcel.

In the event the Tax Assessor does not break down ad valorem taxes on a unit committed to interval ownership among the various owners of Unit Weeks therein, or it is determined by the Association, that it is in the best interests of said owners to do so, the Association, shall return the same and prorate the ad valorem taxes among the various owners of unit weeks in each particular unit, on the same basis as the maintenance fee, collecting said taxes as part of the maintenance fee, and paying same to the Tax Assessor. Should any owner fail to pay his share of the ad valorem taxes through the maintenance fee, the Association, shall have the right and the power to pay same and to levy an assessment against the owner for the unit weeks owned by said owner, which assessment shall have the same force and effects as all other special assessments.

For this purpose of ad valorem taxation, the interest of the Owner of a "Condominium Parcel" in his "Condominium Unit" and in the "Common Elements", shall be considered a Unit. The value of said Unit shall be equal to the percentage of the value of the entire Condominium, including land and improvements, as has been assigned to said Unit in this Condominium Declaration. The total of all of said percentages equals 100% of the value of all of the land and improvements thereon.

E.  All provisions of this Declaration and Exhibits attached hereto, and Amendments, thereof, shall be construed as covenants with the land, and of every part thereof and interest therein, including but not limited to every Unit and the appurtenances thereto, and every Unit Owner and Occupant of the property, or any part thereof, or of any interest therein and his heirs, executors, administrators, successors and assigns, shall be bound by all of the provisions of said Declaration and Exhibits hereto and any Amendments thereof.

F.  If any of the provisions of this Declaration or of the By-Laws, or of the Condominium Act, or any section, clause, phrase, word, or the application thereof, in any circumstance, is held invalid the validity of the remainder of this Declaration, the by-Laws, or the Condominium Act, and of the application thereof, in any circumstance, is held invalid the validity of the remainder of this Declaration, the By-Laws, or the Condominium Act, and of the application of any such provision, action, sentence, clause, phrase or word, in other circumstances, shall not be affected thereby.

G.  Whenever Notices are required to be sent hereunder, the same may be delivered to Unit Owners either personally or by mail, addressed to such Unit Owners at their place or residence on file with the Condominium Association from time to time. Proof of such mailing or personal delivery by the Association or any Management Firm shall be given by the Affidavit of the person mailing or personally delivering said Notices. Notices to the Association shall be delivered by mail to the Secretary of the Association, or the President of the Association, or to any member of the Board of Directors of the Association. The change of the mailing address of any party as specified herein shall not require an Amendment to this Declaration.

Notices to the Resort shall be delivered by mail at: P.O. Box 727, Crossville, Tennessee 38555.

All Notices shall be deemed and considered sent when mailed. Any party may change his or its mailing address by written Notice, duly receipted for. Notices required to be given the personal representatives of a deceased Owner or devisee, when there is not personal representative, may be delivered either personally or by mail to such party at his or its address appearing in the records of the Court wherein the Estate of such deceased Owner is being administered. The change of the mailing address of any party, as specified herein shall not require an Amendment to the Declaration.

H.  Resort shall have the right to use a portion of the Common Elements for the purpose of aiding in the sale of Condominium Units including the right to use portions of the Condominium property for parking for prospective purchasers and such other parties as Resort determines. The foregoing right shall mean and include the right to display and erect signs, billboards and placards and store, keep and exhibit same and distribute audio and visual promotional materials upon the Common Elements.

I.  Each unit owner and the Association shall be governed by and shall comply with this Declaration and the By-Laws attached hereto, and the Condominium Act of the State of Tennessee, as it may exist from time to time. Failure to do so shall entitle the Association or any unit owner to recover sums due for damages or injunctive relief or both. Such actions may be maintained by or against a unit owner or the Association in a proper case by or against one or more unit owners, and the prevailing party shall be entitled to receive reasonable attorney's fees. Such relief shall not be exclusive of other remedies provided by law.

J.  Subsequent to the filing of this Declaration of Condominium, the Condominium Association, when authorized by a vote of the majority of the total vote of the members of the Association, and approved by the Owners and holders of Institutional First Mortgages encumbering Condominium Parcels who represent a majority of the dollar institutionally mortgaged indebtedness against this Condominium may, together with other Condominium or Property Owner Associations and others, purchase and/or acquire and enter into Agreements, from time to time, whereby it acquires leaseholds, memberships, and other possessory of use interests in lands or facilities, whether or not contiguous to the lands of the Condominium intended to provide for the enjoyment, recreation and other use of benefit of the Unit Owners. The expense of Ownership, rental membership fees, replacements, and other undertakings in connection therewith shall be common expenses, together with all other expenses and cost herein or by law defined as common expenses.

K.  Whenever the context so requires, the use of any gender shall be deemed to include all genders, and the use of the singular shall include the plural, and plural shall include the singular. The provisions of the Declaration shall be liberally construed to effectuate its purpose of creating a uniform plan for the operation of the Condominium.

L.  The captions used in this Declaration of Condominium and Exhibits annexed hereto are inserted solely as a matter of convenience and shall not be relied upon and/or used in construing the effect or meaning of any of the text of this Declaration or Exhibits hereto annexed.

2/9

(11)

Case 2:25-ap-90051    Doc 48-2    Filed 03/03/26    Entered 03/03/26 16:33:47    Desc

**Ex. 4-12**

Exhibit Exhibits 1-4 to Objection    Page 35 of 66

M.  Where an Institutional First Mortgage, by some circumstances, fails to be a First Mortgage, but it is evident that it is intended to be a First Mortgage, it shall, nevertheless, for the purpose of this Declaration and Exhibits annexed, be deemed to be an Institutional First Mortgage.

N.  Resort specifically disclaims any intent to have made any warranty or representation in connection with the property or the Condominium documents, except as specifically set forth therein, and no person shall rely upon any warranty or representation not so specifically made therein unless otherwise stated. Maintenance fees, common expenses, taxes or other charges are estimates only, and no warranty, guaranty or representation is made or intended, nor may one be relied upon.

O.  Condominium Association, by its execution of this Declaration of the Condominium, approves the foregoing and all of the covenants, terms and conditions, duties and obligations of this Declaration of Condominium and Exhibits attached thereto. The Condominium Unit Owners, by virtue of their acceptance of the Deed of Conveyance as to their Condominium Unit, and other parties by virtue of their occupancy of Units hereby approve the foregoing and all of the terms and conditions, duties and obligations of this Declaration of Condominium and Exhibits attached thereto.

P.  No Condominium Parcel Owner shall bring, or have any right to bring, any action for partition or division of the Condominium property, nor shall any Owner of Unit Weeks within any Condominium Unit committed to Interval Ownership have any right to bring such action with reference to other Owners of Unit Weeks in such Condominium Unit.

The Interval Conveyance consists of an estate for years, together with a remainder over as tenants in common with all other purchasers of Unit Weeks, in each such Condominium Unit as set forth in the Deed of Conveyance. No Owner of Unit Weeks in a Unit committed to Interval Ownership, shall have the right to separate the estate for years from the remainder interest.

Q.  The real property submitted to Condominium Ownership herewith is subject to conditions, limitations, restrictions, reservations, all matter of record, taxes, applicable zoning ordinances now existing or which may hereafter exist, easements for ingress and egress for pedestrian and vehicular purposes, easements for utility service and drainage now existing or hereafter granted by Resort for the benefit of such persons as the Resort designates, and the said Resort shall have the right to grant such easements and designate the beneficiaries thereof for such time as it determines in its sole discretion, and thereafter, the Association shall be empowered to grant such easements on behalf of its members. During the period of time that Resort has the right to grant the foregoing easements, the consent and approval of the Association and its members shall not be required. The right to grant the foregoing easements shall be subject to said easements not structurally weakening the buildings and improvements on the Condominium property nor unreasonably interfering with the enjoyment of the Condominium property by the Association's members.

R.  In order to insure the Condominium and the Complex with adequate and uniform water service the Resort shall hereby reserves the exclusive right to contract for the servicing of said Condominium and the Unit Owners therein with said services. Pursuant to the foregoing, the Resort has, will or may contract with a utility company which may include a municipal or governmental agency or authority for the furnishing of said services and the Association and Unit Owners agree to pay the charges therefor pursuant to and to comply with all of the terms and conditions of said utility Agreement.

S.  Notwithstanding the fact that the present provisions of the Condominium Act of the State of Tennessee are incorporated by reference and included herein thereby, the provisions of this Declaration and Exhibits attached hereto shall be paramount to the Condominium Act as to those provisions where permissive variances are permitted; otherwise, the provisions of said Condominium Act shall prevail and shall be deemed incorporated therein.

T.  Leasing or renting of a Condominium Unit or Unit Weeks within a Condominium Unit committed to Interval Ownership is not prohibited.

U.  Owners of units shall have as an appurtenance thereto a perpetual easement for ingress and egress to and from their units over stairs, terraces, balconies, walks and other Common Elements.

V.  The Owner of a unit shall have an easement for ingress and egress, over such streets, walks and other rights-of-way serving the units within the Condominium as a part of the "Common Elements" as may be necessary to provide reasonable access to said public ways, and such easement shall extend to the invitees and licensees of said unit owner. In the event that any of said easements for ingress and egress shall be encumbered by an leasehold or lien, other than those on the Condominium parcels, such leaseholds or liens shall hereby be subordinate to the use rights of any Condominium unit owner or owners whose Condominium parcel is not also encumbered by said lien or leasehold.

W.  An interval owner shall have access to the amenities controlled by Lake Tansi Property Owners Association, provided said interval owner is current in such membership fees as provided in Article XIV. An interval owner is automatically a member of Lake Tansi Property Owners Association and thus is subject to the rules, regulations and By-Laws of Lake Tansi Property Owners Association.

IN WITNESS WHEREOF, TANSI RESORT, INC. has executed this instrument on this the _11th_ day of _July_, 1979.

TANSI RESORT, INC.

BY _____
(President)

STATE OF MISSISSIPPI
COUNTY OF JACKSON

Personally appeared before me, the undersigned authority, a Notary Public, in and for said State and County, LAWRENCE E. STEELMAN, who upon oath, acknowledged himself to be PRESIDENT of Tansi Resort, Inc. (Crossville, Tennessee), a corporation, the within named bargainor, with whom I am personally acquainted, and who acknowledged that he executed the within and foregoing instrument for the purposes therein contained by signing the name of the corporation by himself, as President, he being authorized to do so as President of said Corporation.

WITNESS my hand and official seal of office on this the 11th day of July, 1979.

_____
Notary Public

My Commission expires: 7-27-82.

220

(12)

Ex. 4-13

Case 2:25-ap-90051    Doc 48-2    Filed 03/03/26    Entered 03/03/26 16:33:47    Desc
Exhibit Exhibits 1-4 to Objection    Page 36 of 66



site plan

EXHIBIT I    221

Ex. 4-14

Case 2:25-ap-90051    Doc 48-2    Filed 03/03/26    Entered 03/03/26 16:33:47    Desc
Exhibit Exhibits 1-4 to Objection    Page 37 of 66

EXHIBIT III

HIAWATHA MANOR:  PROJECT PHASING OF CLUSTERS

Phase I of this multi-phase time sharing project consists of that property described in Exhibit One, attached as part of the Declaration of Horizontal Property Regime, as clusters B, C, D and E.  Clusters B, C, D, and E each contain four (4) condominium units.

The unit week of clusters B, C, D and E shall commence on the first Friday of each calendar year at 5:00 P.M. and will terminate on the following Friday at 10:00 A.M..

Phase II, III or IV or whatever number of phases as may be described and reflected on any amendment to this document in the time sharing project may consist of such number of clusters as may be deemed appropriate by Tansi Resort, Inc..

A unit week may commence and terminate on different days from the days set forth in Phase I.  This may be accomplished by amendment of this exhibit by Tansi Resort, Inc..

227

Ex. 4-15

# BY-LAWS
## OF
## HIAWATHA MANOR ASSOCIATION

All present and future Co-Owners, Mortgagees, Lessees and occupants of Apartments and their employees, and any other persons who may use the facilities of the Condominium property in any manner are subject to the Master Deed, these By-Laws and Rules and Regulations made pursuant hereto any amendment to the Master Deed and these By-Laws upon the same being passed and duly recorded.

The acceptance of a deed or conveyance or the entering into of a lease or the act of occupancy of an Apartment shall constitute an agreement that these By-Laws (and any Rules and Regulations, made pursuant hereto) and the provisions of the Master Deed, as they may be amended from time to time, are accepted, ratified, and will be complied with.
**ARTICLE I.**

### IDENTITY

The following By-Laws shall govern the operation of the Condominium created by the Declaration of Horizontal Property Regime, (hereinafter referred to as "The Declaration").

The Association of Co-Owners is organized and existing for the purpose of administering the Condominium created by the Declaration to which these By-Laws are created.

**SECTION 1.** The office of the Association shall be at the Condominium property, or at such other place as may be subsequently designated by the Board of Directors of the Association.

**SECTION 2.** As used herein, the word, "Association" shall be as defined in the Declaration. All other words, as used herein, shall have the same definitions as attributed to them in the Declaration.
**ARTICLE II.**

### MEMBERSHIP AND VOTING PROVISIONS

**SECTION 1.** Membership in the Association shall be limited to Owners of the Condominium Units in Condominiums wherein this Association has been designated to operate and administer said Condominium by virtue of the Declaration of said Condominium. Transfer of Unit Ownership, either voluntary or by operation of law, shall terminate membership in the Association, and said membership is to become vested in the transferee. If Unit Ownership is vested in more than one person, then all of the persons owning said Unit shall be members eligible to hold office, attend meeting, etc., but, as hereinafter indicated, the vote of a Unit shall be cast by the "voting member". If Unit Ownership is vested in a Corporation said Corporation may designate an individual officer or employee of the Corporation as its "voting member". Notwithstanding the foregoing, each Owner of Unit Weeks in a Condominium Unit committed to Interval Ownership shall be entitled to cast his vote of the Unit in which he owns his Unit Weeks. "Unit committed to Interval Ownership" and "Interval Ownership" are defined in the Declaration.

**SECTION 2.** Voting.

(a) The Owner of each Unit Week shall be entitled to one (1) vote. If an Owner owns more than one (1) Unit, he shall be entitled to one (1) vote for each Unit Week owned. The Association shall not have a vote for any Unit Weeks conveyed to it.

(b) A majority of the Unit Owners' total votes present in person or in proxy at any regular or special meeting shall decide any question, unless the Declaration, By-Laws or Articles of Incorporation of the Association, if any, provide otherwise.

**SECTION 3.** QUORUM: Unless otherwise provided in these By-Laws, or the Declaration of Horizontal Property Regime the presence in person or by proxy of one-tenth (1/10) of the Unit Owners' total votes shall constitute a quorum.

**SECTION 4.** PROXIES: Votes may be cast in person or by proxy. All proxies shall be writing and signed by the person entitled to vote (as set forth below in Section 5). Where a Unit is owned jointly by a husband and wife, and if they have not designated one of them as a voting member, a proxy must be signed by both husband and wife where a third person is designated.

**SECTION 5.** DESIGNATION OF VOTING MEMBER: If a Condominium Unit is owned by one person, his right to vote shall be established by the recorded title to the Unit. If a Condominium is owned by more than one (1) person, the person entitled to cast the vote for the Unit shall be designated in a Certificate, signed by all of the recorded Owners of the Unit and filed with the Secretary of the Association. If a Condominium Unit is owned by a Corporation, the officer or employee thereof entitled to cast the vote of the Unit for the Corporation shall be designated in a Certificate for this purpose, signed by the President or Vice-President, attested to by the Secretary or Assistant Secretary of the Corporation, and filed with the Secretary of the Association. The person designated in such Certificate who is entitled to cast the vote for a Unit shall be known as the "voting member". If such a Certificate is not on file with the Secretary of the Association for a Unit owned by more than one person or by a Corporation, the vote of the Unit concerned shall not be considered in determining the requirement for a quorum, or for any purpose requiring the approval of a person entitled to cast the vote for the Unit, except if said Unit is owned by a husband and wife. Such Certificate shall be valid until revoked or until superseded by a subsequent Certificate, or until a change in the Ownership of the Unit concerned. If a Condominium Unit is owned jointly by a husband and wife, the following three provisions are applicable thereto:

(a) They may, but they shall not be required to, designate a voting member.

(b) If they do not designate a voting member and if both are present at a meeting and are unable to concur in their decision upon any subject requiring a vote, they shall lose their right to vote on that subject at that meeting (As previously provided, the vote of a Unit is not divisible).

(c) Where they do not designate a voting member, and only one is present at a meeting, the person present may cast the Unit vote, just as though he or she owned the Unit individually, and without establishing the concurrence of the absent person.

*233*

EXHIBIT 6

(1)

Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection   Page 39 of 66

**Ex. 4-16**

**SECTION 6. UNITS COMMITTED TO INTERVAL OWNERSHIP:**
Notwithstanding any other provisions in these By-Laws, each Owner of Unit Weeks in a Unit committed to Interval Ownership shall be entitled to cast the vote(s) attributable to his unit Week(s) owned. In any event the total number of votes which may be cast for each Unit shall be equal to 50 votes. In the case of a Unit committed to Interval Ownership, the provisions of Section 5, Designation of Voting Member, shall apply to each Unit Week owned.
ARTICLE III.

### MEETING OF THE MEMBERSHIP

**SECTION 1. PLACE:** All meetings of the Association membership shall be held at the Condominium(s) property, or at such other place and at such time as shall be designated by the Board of Directors of the Association and stated in the Notice of the meeting, and shall be open to all Unit Owners.

**SECTION 2. NOTICES:** It shall be the duty of the Secretary to mail or deliver a Notice of each annual or special meeting, stating the time and place thereof, to each Unit or Interval Owner of record at least ten (10) but not more than sixty (60) days prior to such meeting. Notice of any special meeting shall state the purpose thereof. All Notices shall be mailed to or served at the address of the Unit or Interval Owner as it appears on the books of the Association.

**SECTION 3. ANNUAL MEETING:** The annual meeting shall be held at 1:00 P.M., Central Standard Time, on the Saturday following Labor Day each year for the purpose of electing Directors and transacting any other business authorized to be transacted by the members. At the annual meeting, the members shall elect by plurality vote (cumulative voting prohibited), a Board of Directors, and shall transact such other business as may properly be brought before the meeting.

**SECTION 4. SPECIAL MEETING:** Special meetings of the members for any purpose or purposes, unless otherwise prescribed by statute, may be called by the President, and shall be called by the President or Secretary at the request, in writing, of a majority of the Board of Directors, or at the request, in writing, of voting members representing ten percent (10%) of the members' total votes, which request shall state the purpose or purposes of the proposed meeting. Business transacted at all special meetings shall be confined to the objects stated in the Notice thereof.

**SECTION 5. WAIVER AND CONSENT:** Whenever the vote of members at a meeting is required or permitted by any provision of these By-Laws to be taken in connection with any action of the Association, the meeting and vote of members may be dispensed with if not less than a majority of the members who would have been entitled to vote upon the action if such meeting were held, shall consent in writing to such action being taken; however, notice of such action shall be given to all members, unless all members approve such action.

**SECTION 6. ADJOURNED MEETING:** If any meeting of members cannot be organized because of a quorum of voting members is not present, either in person or by proxy, the meeting may be adjourned from time to time until a quorum is present.

**SECTION 7. APPROVAL OR DISAPPROVAL:** Approval or disapproval of a Unit Owner upon any matter, whether or not the subject of an Association meeting, shall be by the voting members provided, however, that where a Unit is owned jointly by a husband and wife, their joint approval or disapproval shall be required where they are both present, or in the event only one is present, the person present may cast the vote without establishing the concurrence of the absent person.

**SECTION 8. THE MANAGEMENT FIRM:** The Management Firm, as long as any Management Agreement remains in effect, shall be entitled to Notice of all Association meetings, and shall be entitled to attend the Association's meetings, and it may designate such person(s) as it desires to attend such meetings on its behalf.
ARTICLE IV.

### DIRECTORS

**SECTION 1. NUMBER, TERM AND QUALIFICATIONS:** Subject to Section 2 of this Article, the affairs of the Association shall be governed by a Board of Directors composed of not less than three (3) nor more than seven (7) persons, as is determined from time to time by the members. All Directors, except those designated by the Tansi Resort, shall be members of the Association. All officers of a Corporate Unit Owner shall be deemed to be members of the Association so as to qualify as a Director herein. The term of each Director's service shall extend until the next annual meeting of the members and thereafter until his successor is duly elected and qualified, or until he is removed in the manner provided in Section 3 below.

**SECTION 2. TANSI RESORT TO ACT AS BOARD OF DIRECTORS:** All of the affairs of the Association of Co-Owners shall be conducted by Tansi Resort, or its agents, appointees or assignees, for a period of five (5) years from the effective date of this Declaration. The Tansi Resort, at its sole discretion, shall have the right and option to extend this period of two (2) additional five (5) year periods. Until the expiration of any such period, all of the rights, duties, discretions, functions and powers otherwise vested in the Board of Directors, hereinafter set out or referred to in the Master Deed, shall be exercised solely by Tansi Resort, its agents, assignees or appointees. All references to the Board of Directors in this Declaration shall mean and refer to Tansi Resort, its agents, appointees or assignees, from the effective date of this Declaration, or until such time during any aforesaid five (5) year periods, Tansi Resort should at its sole option, turn over to the Association of Co-Owners the responsibility of establishing and electing all of the members of the Board of Directors. This provision may not be changed, altered or amended by the Association of Co-Owners. Tansi Resort may within its sole discretion also appoint the Management Firm as provided in these By-Laws and receive reasonable compensation therefore as provided in these By-Laws.

**SECTION 3. REMOVAL OF DIRECTORS:** At any time after the first annual meeting of the membership at any duly convened regular or special meeting, any one or more of the Directors may be removed, with or without cause, by the affirmative vote of the voting members casting not less than two-thirds (2/3rds) of the total votes present at said meeting, and a successor may then and there be elected to fill the vacancy thus created. Should the membership fail to elect said successor, the Board of Directors may fill the vacancy in the manner provided in Section 4 below.

**SECTION 4. VACANCIES ON DIRECTORATE:** If the office of any Director or Directors becomes vacant by reason of death, resignation, retirement, disqualification, removal from office or otherwise, a majority of the remaining Directors, though less than a quorum, shall choose a successor or successors, who shall hold office for the balance of the unexpired term in respect to which such vacancy occurred. The election held for the purpose of filling said vacancy may be held at any regular or special meeting of the Board of Directors.

234

(2)

Ex. 4-17

**SECTION 5. DISQUALIFICATION AND RESIGNATION OF DIRECTORS:** Any Director may resign at any time by sending a written Notice of such resignation to the office of the Corporation, delivered to the Secretary. Unless otherwise specified therein, such resignation shall take effect upon receipt thereof by the Secretary. Commencing with the Directors elected at such first annual meeting of the membership, the Directors elected at such first annual meeting shall automatically constitute a resignation, effective when such resignation is accepted by the Board of Directors. No member shall continue to serve on the Board should he be more than thirty (30) days delinquent in the payment of an assessment and said delinquency shall automatically constitute a resignation, effective when such resignation is accepted by the Board of Directors.

**SECTION 6. REGULAR MEETINGS:** The Board of Directors may establish a schedule of regular meetings to be held at such time and place as the Board of Directors may designate. Notice of such regular meetings shall nevertheless, be given to each Director personally or by mail, telephone or telegraph at least five (5) days prior to the day named for such meeting. All meetings of the Board of Directors, including special meetings in accordance with Section 7 below, shall be open to all Unit Owners.

**SECTION 7. SPECIAL MEETINGS:** Special meetings of the Board of Directors may be called by the President, and in his absence, by the Vice-President, or by a majority of the members of the Board of Directors, by giving five (5) days Notice, in writing, to all of the members of the Board of Directors of the time and place of said meeting. All Notices of special meetings shall state the purpose of the meeting.

**SECTION 8. DIRECTORS' WAIVER OF NOTICE:** Before or at any meeting of the Board of Directors, any Director may waive Notice of such meeting and such waiver shall be deemed equivalent to the giving of Notice. Attendance by a Director at any meeting of the Board shall be a waiver of Notice by him of the time and place thereof. If all the Directors are present at any meeting of the Board, no Notice shall be required and any business may be transacted at such meeting.

**SECTION 9. QUORUM:** At all meetings of the Board of Directors, a majority of the Directors shall constitute a quorum for the transaction of business, and the acts of the majority of the Directors present at such meetings at which a quorum is present, shall be the acts of the Board of Directors. If, at any meeting of the Board of Directs there be less than a quorum present, the majority of those present may adjourn the meeting from time to time. At each such adjourned meeting, any business which might have been transacted without further notice. The joinder of a Director in the action of a meeting by signing and concurring in the Minutes thereof, shall constitute the presence of such Director for the purpose of determining a quorum.

**SECTION 10. COMPENSATION:** The Directors' fees, if any, shall be determined by the voting members.

**SECTION 11. THE MANAGEMENT FIRM:** The Management Firm, as long as any Management Agreement remains in effect, shall be entitled to Notice of all Directors' meetings and shall be entitled to attend the Directors' meetings and it may be designate such a person(s) as it desires to attend such meetings on its behalf.

**SECTION 12. POWERS AND DUTIES:** The Board of Directors of the Association shall have the powers and duties necessary for the administration of the affairs of the Association and may do all such acts and things as are not by law or by the Declaration of Condominium, this Association's Articles of Incorporation, or these By-Laws, directed to be exercised and done by Unit Owners. The Board of Directors may delegate the said powers and duties to the management firm. These powers shall specifically include, but shall not be limited to the following:

(a) To exercise all powers specifically set forth in the Declaration , this Association's Articles of Incorporation, if any, in these By-Laws, and in the Horizontal Property Act, and all powers incidental thereto.

(b) To make assessments, collect said assessments, and use and expend the assessments to carry out the purposes and powers of the Association.

(c) To employ, dismiss and control the personnel necessary for the maintenance and operation of the project, and the common areas and facilities including the right and power to employ attorneys, accountants, contractors, and other professionals as the need arises.

(d) To make and amend regulations respecting the operation and use of the Common Elements and Condominium property, and the use and maintenance of the Condominium Units therein.

(e) To contract for the management of the Condominium and to delegate to such contractor all of the powers and duties of the Association, except those which may be required by the Declaration to have approval of the Board of Directors or membership of the Association. To contract for the management or operation of portions of the Common Elements susceptible to the separate management or operation thereof, and to lease or concession such portions.

(f) The further improvement of the Condominium property, both real and personal, and the right to purchase realty and items of furniture, furnishing, fixtures and equipment for the foregoing, and the right to acquire and enter into Agreements pursuant to the Horizontal Property Act, and as amended, subject to the provisions of the applicable Declaration, this Association's Articles of Incorporation, if any, and any exhibits attached thereto.

(g) Designate one or more committees which, to the extent provided in the resolution designating said committee, shall have the powers of the Board of Directors in the management and affairs and business of the Association. Such committee shall consist of at least three (3) members of the Association. The committee or committees shall have such name or names as may be determined from time to time by the Board of Directors, and said committee(s) shall keep regular Minutes of their proceedings and report the same to the Board of Directors, as required. The foregoing powers shall be exercised by the Board of Directs or its contractor or employees, subject only to approval by Unit Owners when such is specifically required.

(h) To enter into and terminate or ratify existing Agreements with organizations providing Owners of Unit Weeks to trade their time periods with Owners of time periods at other resorts.

**ARTICLE V.**

**OFFICERS**

**SECTION 1. ELECTIVE OFFICERS:** The principal officers of the Association shall be a President, a Vice-President, a Secretary and a Treasurer, all of whom shall be elected by the Board of Directors.

**SECTION 2. ELECTION:** The officers of the Association designated in Section 1 above shall be elected annually by the Board of Directors at the organizational meeting of each new Board following the meeting of the members.

*235*

(3)

Ex. 4-18

**SECTION 3.** **APPOINTIVE OFFICERS:** The Board may appoint Assistant Secretaries and Assistant Treasurers, and such other officers as the Board of Directors deems necessary.

**SECTION 4.** **TERM:** The officers of the Association shall hold office until their successors are chosen and qualify in their stead. Any officer elected or appointed by the Board of Directors may be removed at any time, with or without cause, by the Board of Directors, provided however, that no officer shall be removed except by the affirmative vote for removal by a majority of the whole Board of Directors. If the office of any officer becomes vacant for any reason, the vacancy shall be filled by the Board of Directors.

**SECTION 5.** **THE PRESIDENT:** He shall be the chief executive officer of the Association; he shall preside at all meetings of the Unit Owners and of the Board of Directors. He shall have executive powers and general supervision over the affairs of the Association and other officers. He shall sign all written contracts to perform all of the duties incident to his office and which may be delegated to him from time to time by the Board of Directors.

**SECTION 6.** **THE VICE-PRESIDENT:** He shall perform all of the duties of the President in his absence, and such other duties as may be required of him from time to time by the Board of Directors of the Association.

**SECTION 7.** **THE SECRETARY:** He shall issue Notices of all Board of Directors' meetings and all meetings of the Unit Owners; he shall attend and keep the Minutes of same; he shall have charge of all of the Association's books, records and papers, except those kept by the Treasurer. The Assistant Secretary shall perform the duties of the Secretary when the Secretary is absent.

**SECTION 8.** **THE TREASURER:**

(a) He shall have custody of the Association's funds and securities, except the funds payable to any Management Firm, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Association, and shall deposit all monies and other valuable effects in the name of and to the credit of the Association, in such depositories as may be designated from time to time by the Board of Directors. The books shall reflect an account for each Unit.

(b) He shall disburse the funds of the Association as may be ordered by the Board of Directors in accordance with these By-Laws, making proper vouchers for such disbursements, and shall render to the President and Board of Directors at the regular meetings of the Board of Directors, or whenever they may require it, an account of all of his transactions as the Treasurer and of the financial condition of the Association.

(c) He shall collect the assessments and maintenance fees and shall promptly report the status of collections and of all delinquencies to the Board of Directors.

(d) He shall give status reports to potential transferees on which reports the transferees may rely.

(e) The Assistant Treasurer shall perform the duties of the Treasurer when the Treasurer is absent.

(f) The duties of the Treasurer may be fulfilled by a Management Firm employed by the Association, and said Management Firm shall fulfill the duties of the Treasurer, and shall have custody of such books of the Association as it determines in its sole discretion and the foregoing shall include any books required to be kept by the Secretary of the Association.

ARTICLE VI.

## FINANCES, ASSESSMENTS AND MAINTENANCE FEES

**SECTION 1.** **Depositories:** The funds of the Association shall be deposited in such banks and depositories as may be determined by the Board of Directors from time to time upon resolutions approved by the Board of Directors, and shall be withdrawn only upon checks and demands for money signed by such officer or officers of the Association as may be designated by the Board of Directors. Obligations of the Association shall be signed by at least two officers of the Association; provided, however, that the provisions of any Management Agreement between the Association and a Management Firm relative to subject matter in this Section shall supersede the provisions hereof.

**SECTION 2.** **FIDELITY BONDS:** The Treasurer and all officers who are authorized to sign checks, and all officers and employees of the Association, and any contractor handling or responsible for Association funds shall be bonded in such amount as may be determined by the Board of Directors. The premiums on such Bonds shall be paid by the Association. The Bond shall be in an amount sufficient to equal the monies an individual handles or has control of via a signatory or a bank account or other depository account; however, notwithstanding the foregoing, the Management Firm, under the terms Management Agreement, attached to the Declaration, as to funds in its possession and/or control, shall determine, in its sole discretion, the amount of and who is to be bonded, if any, among its employees.

**SECTION 3.** **FISCAL YEAR:** The fiscal year for the Association shall begin on the first day of January of each year provided, however, that the Board of Directors is expressly authorized to change to a different fiscal year in accordance with the provisions and regulations from time to time prescribed by the Internal Revenue Code of the United States of America, at such time as the Board of Directors deems it advisable.

**SECTION 4.** **DETERMINATION OF MAINTENANCE FEES AND ASSESSMENTS:**

(a) The Board of Directors of the Association shall fix and determine from time to time, the sum or sums necessary and adequate for the common expenses of the Condominium. Common expenses shall include expenses for the operation, maintenance, repair or replacement of the Common Elements and the limited Common Elements, costs of carrying out the powers and duties of the Association, all insurance premiums and expenses relating thereto, including fire insurance and extended coverage, and any other expenses designated as common expenses from time to time by the Board of Directors of the Association, or under the provisions of the Declaration. The Board of Directors is specifically empowered, on behalf of the Association to make and collect maintenance fees and assessments and to lease, maintain, repair and replace the Common Elements and limited Common Elements of the Condominium. Funds for the payment of common expenses shall be assessed against the Unit Owners in the proportions or percentages of sharing common expenses, as provided in the Declaration. Assessments, should such be required by the Board of Directors, shall be levied in the same manner as hereinbefore provided for maintenance fees, and shall be payable in the manner determined by the Board of Directors. All funds due under these By-Laws, and the Declaration are common expenses of this Condominium. . . . are attached and said Declaration of Condominium are common expenses of this Condominium.

Ex. 4-19

Case 2:25-ap-90051    Doc 48-2    Filed 03/03/26    Entered 03/03/26 16:33:47    Desc
Exhibit Exhibits 1-4 to Objection    Page 42 of 66

(b)  A copy of the proposed annual budget of common expenses shall be mailed to the Unit Owners not less than thirty (30) days prior to the meeting at which the budget will be considered, together with a Notice of that meeting. The Unit Owners shall be given written notice of the time and place at which the meeting of the Board of Directors shall be held to consider the proposed annual budget of common expenses, and such meeting shall be open to the Unit Owners. In the event the Board of Directors fails to set dues for any year or the membership fails to ratify dues set by the Board, the dues for the ensuing calendar year shall be the same as for the prior year, adjusted to reflect the percentage of change in the average Consumer Price Index (all items—city average) as published by the United States Department of Labor, Bureau of Labor Statistics, between the two (2) years preceding July 1 of the year in which the adjustment is made. In the event such Consumer Price Index is for any reason not available, such adjustment shall be based on some other measure of economic change published by the United States Government which, in the judgment of the Board of Directors, is comparable to the Consumer Price of a majority of the Unit Owners. When the Board of Directors has determined the amount of any maintenance fee or assessment, the Treasurer of the Association or his designee shall mail or present to each Unit Owner a statement of said Unit Owner's assessment. All maintenance fees or assessments shall be payable to the Treasurer of the Association or his designee and, upon request, said Treasurer or designee shall give a receipt for each payment made to him.

**SECTION 5.  DETERMINATION OF MAINTENANCE FEE:**

(a)  The Board of Directors of the Association shall fix and determine from time to time, the sums necessary and adequate for the maintenance fee on Condominium Units committed to Interval Ownership. The maintenance fee on such Units shall include the items specified in the Declaration.

(b)  When the Board of Directors has determined the amount of any maintenance fee, the Treasurer of the Association shall mail or present to each Owner of Unit Weeks within all Units committed to Interval Ownership a statement of said maintenance fee. All maintenance fees shall be payable to the Treasurer of the Association or his designee and, upon request, said Treasurer or his designee shall give a receipt for each payment made to him, if requested by the Unit Owner.

**SECTION 6.  APPLICATION OF PAYMENTS AND CO-MINGLING OF FUNDS:** All sums collected by the Association from assessments and maintenance fees may be co-mingled into a single fund or divided into more than one fund, as determined by the Board of Directors of the Association. All assessment payments and maintenance by a Unit Owner shall be applied as to interest delinquencies, cost and attorney's fees, other charges, expenses and advances as provided herein and in the Declaration and assessments, in such manner and amounts as the Board of Directors determines in its sole discretion.

**SECTION 7.  ACCELERATION OF ASSESSMENT INSTALLMENTS UPON DEFAULT:** If a Unit Owner shall be in default in the payment of an installment upon any assessment or maintenance fee the Board of Directors may accelerate the remaining monthly installments for the fiscal year upon Notice thereof to the Unit Owner and, thereupon, the unpaid balance of the assessment shall become due upon the date stated in the Notice, but not less than fifteen (15) days after delivery of or the mailing of such Notice to the Unit Owner.

**SECTION 8.  AUDITS:**  An audit of the accounts of the Association shall be made annually. Said audit shall be prepared by such accountant as the Board of Directors determines, and a copy of said report shall be available to the members of the Association in the office of said Association and with the Treasurer of the Association. Such report shall be available not later than six (6) months after the end of the year for which the report is made.

**SECTION 9.  APPLICATION OF SURPLUS:**  Any payments or receipts to the Association, whether from Unit Owners or otherwise, paid during the year in excess of the operating expenses and other common expenses of the Association shall be kept by the Association and applied against the Association's expenses for the following year.

**ARTICLE VII.**

**ADDITIONS OR ALTERATIONS**

There shall be no additions or alterations to the Common Elements or limited Common Elements of the Condominium(s) which this Association operates and maintains except as specifically provided for in said Condominium's Declaration of Condominium.

**ARTICLE VIII.**

**COMPLIANCE AND DEFAULT**

**SECTION 1.  VIOLATIONS:**  In the event of a violation (other than the nonpayment of an assessment) by the Unit Owner in any of the provisions of the Declaration, of these By-Laws, or of the applicable portions of the Horizontal Property Act, the Association, by direction of the Board of Directors may notify the Unit Owner by written notice of said breach, transmitted by mail, and if such violation shall continue for a period of seven (7) days from date of Notice, the Association, through its Board of Directors, shall have the right to treat such violation as an intentional and inexcusable and material breach of the Declaration, of the By-Laws, or of the pertinent provisions of the Horizontal Property Act, and the Association may then, at its option, have the following elections:

(a)  An action at law to recover for its damage, on behalf of the Association or on behalf of the other Unit Owners.

(b)  An action in equity to enforce performance on the part of the Unit Owner; or

(c)  An action in equity for such equitable relief as may be necessary under the circumstances, including injunctive relief.

Any violations which are deemed by the Board of Directors to be a hazard to public health may be corrected immediately as an emergency matter by the Association and the cost thereof shall be charged to the Unit Owner as a specific item, which shall be a lien against said Unit with the same force and effect as if the charge were a part of the common expenses.

**SECTION 2.  NEGLIGENCE OR CARELESSNESS OF UNIT OWNER, ETC.:** All Unit Owners shall be liable for the expense of any maintenance, repair or replacement rendered necessary by his act, neglect or carelessness, or by that of any member of his family, or his or their guests, employees, agents or lessees, but only to the extent that such expense is not met by the proceeds of insurance carried by the Association. Such liability shall include any increase in insurance rates occasioned by use, misuse, occupancy or abandonment of any Unit or its appurtenances. Nothing herein contained, however, shall be construed so as to modify any waiver by an insurance company of its rights of subrogation. The expense for any maintenance, repair or replacement required, as provided in this Section, shall be charged to said Unit Owner as a specific item which shall be a lien against said Unit with the same force and effect if the charge were a part of the common expense.

237

(5)

**Ex. 4-20**

Case 2:25-ap-90051    Doc 48-2    Filed 03/03/26    Entered 03/03/26 16:33:47    Desc
Exhibit Exhibits 1-4 to Objection    Page 43 of 66

**SECTION 3. COST AND ATTORNEYS' FEES:** In any proceeding arising because of an alleged default by a Unit Owner, the prevailing party shall be entitled to recover costs of the proceeding and such reasonable attorneys' fees as may be determined by the Court.

**SECTION 4. NO WAIVER OF RIGHTS:** The failure of the Association or of a Unit Owner to enforce any right, provision, covenant or condition which may be granted by Condominium documents shall not constitute a waiver of the right of the Association or Unit Owner to enforce such right, provision, covenant or condition in the future.

**SECTION 5. ELECTION OF REMEDIES:** All rights, remedies and privileges granted to the Association or Unit Owner, pursuant to any terms, provisions, covenants or contents of the Condominium documents, shall be deemed to be cumulative and the exercise of any one or more shall not be deemed to constitute an election of remedies, nor shall it preclude the party thus exercising the same from exercising such other and additional rights, remedies, or privileges as may be granted to such other party by Condominium documents, or at law or in equity.

**SECTION 6. UNITS COMMITTED TO INTERVAL OWNERSHIP:** Any liens or sanctions against an Owner of Unit Weeks in a Unit committed to Interval Ownership for an alleged default as set forth in this Article VIII shall be limited to the Unit Weeks owned by such Owner and shall be of no force and effect as to any other Unit Weeks or Owner thereof. The "Unit Owner" as used throughout this article shall be deemed to include Owners of Unit Weeks in Units committed to Interval Ownership.

ARTICLE IX.

## ACQUISITION OF UNITS ON FORECLOSURE

**SECTION 1. ACQUISITION ON UNITS ON FORECLOSURE:** At any foreclosure sale of a Unit, the Board of Directors may, with the authorization and approval by the affirmative vote of voting members casting not less than sixty percent (60%) of the total votes of the members present at any regular or special meeting of the members wherein said matter is voted upon, acquire in the name of the Association, or its designee, a Condominium parcel being foreclosed. The term "foreclosure", as used in this Section, shall mean and include any foreclosure of any lien, excluding the Association's lien for assessments. The power of the Board of Directors to acquire a Condominium parcel at any foreclosure sale at any requirement or obligation on the part of the said Board of Directors or of the Association to do so at any foreclosure sale, the provisions hereof being permissive in nature and for the purpose of setting forth the power in the Board of Directors to do so should the requisite approval of the voting members be obtained. The Board of Directors shall not be required to obtain the approval of Unit Owners at the foreclosure sale of a Unit, due to the foreclosure of the Association's lien for assessments under the provisions of the Declaration notwithstanding the sum the Board of Directors determines to bid at such foreclosure sale.

**SECTION 2. TRANSFER OF UNITS:** All Owners of Units or Units Weeks in a Unit committed to Interval Ownership shall notify the Association, of any transfer, by sale or otherwise, of said Unit or Unit Week within ten (10) days of the date of same. Said Notice shall include such information and be in the form that the Association shall prescribe from time to time. The Association may send all necessary Notices to the person shown as Owner of said Unit or Unit Weeks in its records, and said Notice shall be binding as to any other Owner of said Unit or Unit Weeks where the Association has not been notified as provided herein.

ARTICLE X.

## AMENDMENTS TO THE BY-LAWS

The By-Laws may be altered, amended or added to at any duly called meeting of the Unit Owners, provided:

(1) Notice of the meeting shall contain a statement of the proposed Amendment.

(2) If the Amendment has received the unanimous approval of the full Board of Directors, then it shall be approved upon the affirmative vote of the voting members casting a majority of the total votes of the members of the Association.

(3) If the Amendment has not been approved by the unanimous vote of the Board of Directors, then the Amendment shall be approved by the affirmative vote of the voting members present or by proxy, casting not less than three-fourths (3/4ths) of the total vote; and,

(4) Said Amendment shall be recorded and certified as required by the Horizontal Property Act.

(5) Notwithstanding the foregoing, these By-Laws may only be amended with the written approval when required of the parties specified in the Declaration.

ARTICLE XI.

## NOTICES

Whatever Notices are required to be sent hereunder shall be delivered or sent in accordance with the applicable provisions for Notices as set forth in the Declaration.

ARTICLE XII.

## INDEMNIFICATIONS

The Association shall indemnify every Director and every officer, his heirs, executors, and administrators, against all loss, cost and expense reasonably incurred by him in connection with any action, suit or proceeding to which he may be made a party by reason of his being or having been a Director or Officer of the Association, except as to matters wherein he shall be finally adjudged in such action, suit or proceeding, to be liable for or guilty of gross negligence or willful misconduct. The foregoing rights shall be in addition to and not exclusive of all other rights to which such Director or Officer may be entitled.

ARTICLE XIII.

## LIABILITY SURVIVES TERMINATION OF MEMBERSHIP

The termination of membership in the Condominium shall not relieve or release any such former Owner or member from any liability or obligations incurred under or in any way connected with the Condominium during the period of such ownership and Membership, or impair any rights or remedies which the Association may have against such former Owner and member arising out of or in any way connected with such ownership and membership, and the covenants and obligations incident thereto.

238

(6)

ARTICLE XIV.

### LIMITATION OF LIABILITY

Notwithstanding the duty of the Association to maintain and repair parts of the Condominium property, the Association shall not be liable for injury or damage caused by a latent condition in the property, nor for injury or damage caused by the elements or by other Owners or persons.

ARTICLE XV.

### LIENS

**SECTION 1. PROTECTION OF PROPERTY:** All liens against a Condominium Unit, other than for mortgages, taxes or special assessments, shall be satisfied or otherwise removed within thirty (30) days of the date of the lien attached. All taxes and special assessments upon a Condominium Unit shall be paid before becoming delinquent, as provided in these Condominium documents or by law, which ever is sooner.

**SECTION 2. NOTICE OF LIEN:** A Unit Owner shall give Notice to the Association of every lien upon his Unit, other than for mortgages, taxes and special assessments within five (5) days after the attaching of the lien.

**SECTION 3. NOTICE OF SUIT:** Unit Owners shall give Notice to the Association of every suit or other proceeding which will or may affect title to his Unit or any part of the property, such Notice to be given within five (5) days after the Unit Owner receives Notice thereof.

**SECTION 4. FAILURE TO COMPLY:** Failure to comply with this article concerning liens will not affect the validity of any judicial sale.

**SECTION 5. UNITS COMMITTED TO INTERVAL OWNERSHIP:** In the case of a Unit committed to Interval Ownership, an Owner of Unit Weeks in such Unit shall be required to give Notices under Section 2 and 3 of this Article XVI only as to liens, suits, and proceedings affecting title to the Unit Weeks which he owns. Any lien against an Owner of Unit Weeks in a Unit committed to Interval Ownership, or against the Unit Weeks owned by him, shall be limited to the Unit Weeks owned by him and shall not encumber the property, real or personal, or any other Owner of Unit Weeks in said Unit.

ARTICLE XVII.

### RULES AND REGULATIONS

**SECTION 1.** The Board of Directors may, from time to time, adopt or amend previously adopted administrative Rules and Regulations governing the details of the operation, use, maintenance, management and control of the Common Elements and limited Common Elements of the Condominiums and any facilities or services made available to the Unit Owners. A copy of the Rules and Regulations adopted from time to time as herein provided shall from time to time be posted in a conspicuous place and/or copies of same shall be furnished to each Unit Owners.

**SECTION 2. AS TO CONDOMINIUM UNITS:** The Board of Directors, may from time to time adopt or amend previously adopted Rules and Regulations governing and restricting the use and maintenance of the Condominium Unit(s) provided, however, that copies of such become effective, shall be posted in a conspicuous place and/or copies of same shall be furnished to each Unit Owner.

**SECTION 3. CONFLICT:** In the event of any conflict between the Rules and Regulations adopted, or from time to time amended, and the Condominium documents, or the Horizontal Property Act, the latter shall prevail. If any unreconciled conflict should exist or hereafter arise with respect to the interpretation of these By-Laws and the Declaration, the provisions of said Declaration shall prevail.

STATE OF TENNESSEE, CUMBERLAND COUNTY

The foregoing instrument and certificate were noted in Note Book *R*, Page *351* At *8.30* o'clock *A* .M *Aug 28, 79*

recorded in *Deed* Book *96*, Series _____ Page *209* State Tax Paid $ _____ Fee _____ Recording Fee *3.00* Total *93.00*

Witness My hand

Receipt No *10480*

*Rhoda Roe Davis*

Register

By *Margaret Nadewell*

Dep. Reg.

*239*

(7)

Ex. 4-22

Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection   Page 45 of 66

## DECLARATION OF HORIZONTAL PROPERTY REGIME
## MASTER DEED
### HIAWATHA MANOR I
### LAKE TANSI VILLAGE
### CROSSVILLE, TENNESSEE

This Master Deed and By-Laws which are attached hereto and made a part hereof, is made and executed this 27th day of October, 1980, by TANSI RESORT, INC., a Tennessee corporation, hereinafter referred to as "Resort", for itself, its successors, grantees and assigns, pursuant to the provisions of the "Tennessee Horizontal Property Act". (Title 64, Chapter 27 of Tennessee Code Annotated)

### WITNESSETH:

WHEREAS, Resort is the owner of record of the fee simple title to the real property located in Cumberland County, Tennessee as more particularly described and set forth as the Condominium property in the Survey Exhibits attached hereto as "Exhibit No. 1", which are made a part hereof as though fully set forth herein, said Condominium property hereinafter referred to as the "Land"; and,

WHEREAS, Resort is the owner of the apartment units now under construction or to be constructed which will exist upon the land, all of which is hereafter called "Property" (hereinafter defined); and,

WHEREAS, it is the intention of the Resort to submit the Property to a Horizontal Property (condominium) Regime and sell and convey the same to various purchasers, subject to the covenants, conditions, restrictions and By-Law provisions herein provided and reserved to be kept and observed; and,

WHEREAS, Resort desires and intends by filling this Master Deed and the Exhibits attached hereto to submit the Property to the provisions of the Horizontal Property Act as a condominium property and to impose upon said Property mutually beneficial restrictions under a general plan of improvement for the benefit of said Property and the owners thereof.

NOW THEREFORE, Resort does hereby publish and declare that all of the property referred to above and as set out and described on the Exhibits attached hereto is held and shall be held, conveyed, encumbered, leased, rented, used, occupied and improved subject to the following covenants, conditions, restrictions, uses, limitations, declarations and obligations, all of which are declared and agreed to be in furtherance of a plan for the improvement of said property and the division thereof into Condominiums (hereinafter defined), and same shall be deemed to run with the land and shall be a burden and a benefit to Resort, its successors, grantees, and assigns, and any persons acquiring or owning an interest in the property, their grantees, successors, heirs, devisees, assigns and personal representatives.

### DEFINITIONS

As used in this Declaration of Condominium and By-Laws and Exhibits attached hereto, and all Amendments thereof, unless the context otherwise requires, the following definitions shall prevail:

A. Declaration, or Declaration of Condominium, means this instrument, as it may be from time to time amended.

B. Association, means Hiawatha Manor Association and it is responsible for the operation of the Condominium. During any period when a Management Agreement is in effect, any rights or responsibilities of the Association shall also be the rights and responsibilities of the Management Firm under said Management Agreement.

C. By-Laws, means the By-Laws of the Association, as they exist from time to time.

D. Common Elements, means the portions of the Condominium property not included in the Units. Common elements shall include the tangible personal property required for maintenance and operation of the Condominium, even though owned by the Association.

E. Limited Common Elements, means and includes those common elements which are reserved for the use of a certain unit or units, to the exclusion of all other units.

F. Condominium, means that form of ownership of Condominium property under which units of improvements are subject to ownership by one or more owners, and there is appurtenant to each unit, as part thereof, an undivided share in the common elements.

G. Condominium Act, means and refers to the Condominium Act of the State of Tennessee (Title 64, Chapter 27, T.C.A.)

H. Common expenses, mean the expenses for which the unit owners are liable as designated by the association, including but not limited to membership fees, assessments, maintenance fees which may include capital replacement improvements, taxes, insurance, utilities, maid service, operational costs, sinking fund and other related expenses.

I. Common Surplus, means the excess of all receipts of the Association including, but not limited to, assessments, rents, profits and revenues on account of the common elements, over and above the amount of common expenses.

J. Condominium Property, means and includes the land in a Condominium, whether or not contiguous, and all improvements thereon, and all easements and rights appurtenant thereto, intended for use in connection with the Condominium.

K. Assessment, means a share of the funds required for the payment of emergency expenses which, from time to time, are assessed against the unit owners.

L. Condominium Parcel or Parcel means a unit, together with the undivided share in the common elements which are appurtenant to the unit.

M. Condominium Unit, or Unit, refers therein to each of the separate and identified units delineated in the Survey attached to the Declaration as Exhibit No. 1, and when the context permits, the Condominium parcel includes such unit, including its share of the common elements appurtenant thereto. The boundary lines of each unit are the undecorated and/or unfinished interior surfaces of its perimeter walls, bearing walls, lowermost floors, uppermost ceilings, windows and window frames, door and door frames, and trim. Each unit includes both the portions of the Building within such boundary lines and the space so encompassed, with a direct exit to a common area walkway leading to a public right-a-way.

This instrument prepared by:
Richard W. Brock
National American Corporation
P.O. Box 26
Gautier, Mississippi 39553

(1)

Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection   Page 46 of 66

Exc 4-23

N. Unit Owner, or Owner of a Unit, or Parcel Owner, means the owner of a Condominium parcel.

O. Resort, means Tansi Resort, Inc., a Tennessee corporation, its successors and assigns. .

P. Institutional Mortgagee, means a Bank, Savings and Loan Association, Insurance Company or Union Pension Fund authorized to do business in the United States of America, an Agency of the United States Government, a real estate or mortgage investment trust, or a lender generally recognized in the community as an Institutional type lender.

Q. Mortgage shall mean a deed of trust as well as a mortgage and a Mortgagee shall mean the beneficiary under or holder of a deed of trust as well as a mortgage.

R. Occupant means the person or persons, other than the unit owner, in possession of the unit.

S. Condominium Documents, means this Declaration, the By-Laws and all Exhibits annexed hereto, as the same may be amended from time to time.

T. Board of Administration, or Board of Directors, means the representative body responsible for administration of the Association.

U. Unless the context otherwise requires, all other items used in this Declaration shall be assumed to have the meaning attributed to said term by Section 64-2702 of the Condominium Act as of the date of this Declaration.

V. "Interval Ownership" is a concept whereby units and the share of the common elements assigned to the unit are conveyed for periods of time, the purchaser receiving a stated time period for a period of years, together with a remainder over in fee simple as tenant in common with all other purchasers of "Unit Weeks" in such Condominium Unit in the year 2029.

W. "Unit Week" means a period of ownership in a Unit committed to Interval Ownership. .

"Unit Weeks" are computed as follows:

Unit Week No. 1 is the seven (7) days commencing on the first day in each year as delineated in Exhibit No. 2 attached hereto. Unit Week No. 2 is the seven (7) days succeeding. Additional weeks up to and including Unit Week No. 52 are computed in a like manner. Unit Week No. 52 contains the seven (7) days succeeding the end of Unit Week No. 51 without regard to the month or year. Unit week No. 53 contains any excess days. Unit weeks run from 5:00 P.M. on the first day of the period to 10:00 A.M. on the last day of the period or as otherwise amended by Exhibit No. two (2).

## II.
## NAME

The name by which this Condominium is to be identified shall be "Hiawatha Manor I".

## III.
## COMMITTING A UNIT TO INTERVAL OWNERSHIP

A unit shall become a unit committed to Interval Ownership upon the recording of a declaration by Resort which commits said unit to interval ownership. No unit may be committed to Interval Ownership by any person, or other entity other than Resort. A unit will no longer be committed to Interval Ownership any time all unit weeks are owned by the same legal entity. Notwithstanding the above, Resort may assign its rights to commit units to any other entity to which it conveys substantially all units which it owns in the Condominium property.

## IV.
## IDENTIFICATION OF UNITS

The Condominium property consists essentially of all units and other improvements as set forth in Exhibit No. 1 attached hereto and for purpose of identification, all units located on said Condominium property are given identifying numbers and are delineated on the Survey Exhibits, collectively identified as "Exhibit No. 1", hereto attached and made a part of this Declaration. No unit bears the same identifying number as does any other unit. The aforesaid identifying number as to the unit is also the identifying number as to the Condominium parcel. The said Exhibit No. 1 also contains a survey of the land, graphic description of the improvements, and a plot plan and, together with this Declaration, they are in sufficient detail to identify the location, dimensions and size of the common elements and of each unit, as evidenced by the Certificate of the Registered Land Surveyor hereto attached. The legend and notes contained within the said Exhibit are incorporated herein and made a part hereof by reference. .

## V.
## IDENTIFICATION OF UNITS COMMITTED TO INTERVAL OWNERSHIP

Wherever the term "Unit Owner" or "Unit Owners" is used anywhere within the context of this Declaration or any Amendment or Supplementary Declaration hereto, it shall be construed to include all owners of unit weeks within any unit committed to interval ownership as one unit owner. The respective interests of each owner of unit weeks within such unit committed to interval ownership with respect to each other shall be delineated on Exhibit No. 3 which is annexed to this Declaration and made a part hereof.

## VI.
## OWNERSHIP OF COMMON ELEMENTS ·

Each of the Unit Owners of the Condominium shall own an undivided interest in the Common Elements and limited Common Elements, which undivided interest, as set forth as Exhibit 4, which exhibit may be amended by Resort and is annexed to this declaration and made a part hereof.

The fee title to each Condominium Parcel shall include both the Condominium Unit and the above respective undivided interest in the Common Elements, said undivided interest in the Common Elements to be deemed to be conveyed or encumbered with its respective Condominium Unit. Any attempt to separate the fee title to a Condominium Unit from the undivided interest in the Common Elements appurtenant to each Unit shall be null and void. The term "Common Elements" when used throughout this declaration shall mean both Common Elements and limited Common Elements unless otherwise specifically stated.

**Ex. 4-24**

## VII.
## VOTING RIGHTS

Each interval owner shall be entitled to one vote for each Unit Week owned. An interval owner may vote by means of a proxy.

## VIII.
## COMMON EXPENSE AND COMMON SURPLUS

The common expenses of the Condominium, including the obligation of each unit owner under the Management Agreement attached to this Declaration, shall be shared by the unit owners, as specified and set forth in Exhibit 5. The foregoing ratio of sharing common expenses and assessments shall remain, regardless of the purchase price of the Condominium parcels, their location, or the building square footage included in each Condominium unit.

Any common surplus of the Association shall be owned by each of the unit owners in the same proportion as their percentage ownership interest in the common elements - any common surplus being the excess of all receipts of the Association from this Condominium, including but not limited to, assessments, rents, profits and revenues on account of the common elements of the Condominium, over the amount of the common expenses of the Condominium.

## IX.
## MAINTENANCE FEE FOR UNITS COMMITTED TO INTERVAL OWNERSHIP

All owners of Unit Weeks in Units committed to Interval Ownership shall pay a "maintenance fee". The maintenance fee shall include the following:

The particular Unit Week Owner's share of common expenses, as set forth in Paragraph VIII above;
Repair and upkeep of Units for normal wear and tear (example - repainting interior walls);
Repair and replacement of furniture, fixtures, appliances, carpeting and utensils;
Casualty and/or liability insurance on the Unit;
Capital expenditures
Utilities for the subject Unit;
Personal property, real estate, and any other applicable taxes; (By separate billing)
Any other expenses incurred in the normal operations and maintenance of the Unit which cannot be attributed to a particular Unit Week Owner. (For example - management fee)

The maintenance fee shall be prorated among all Owners of Unit Weeks. The foregoing shall not apply to any Unit Week conveyed to the Association. Resort or its designated assignee shall have the right to levy a lien for any unpaid fees, dues, and assessments and taxes.

## X.
## MAINTENANCE WEEK IN UNITS COMMITTED TO INTERVAL OWNERSHIP

Upon conveying fifty (50) Unit Weeks in any Unit committed to Interval Ownership, or six (6) months from the date of the first conveyance under Interval Ownership in any Unit committed to Interval Ownership, whichever date comes first, the Resort agrees to convey and the Association agrees to accept up to two unit weeks to be used for maintenance purposes. Resort shall have the right to choose the Unit Week(s) to be so conveyed. In the event any one person, or other legal entity becomes holder of record title to all unit weeks in any one unit that person, or other legal entity, may cause the Association to convey said unit weeks conveyed to the Association to it by notifying the Association, in writing, of its desire that said unit cease being a unit committed to interval ownership. The Association shall execute the necessary papers to complete said conveyance no later than sixty (60) days after notice. All expenses of said conveyance, including state stamps and recording fees, shall be borne by the person, or other legal entity, desiring such conveyance.

## XI.
## METHOD OF AMENDMENT OF DECLARATION

This Declaration may be amended at any regular or special meeting of the Unit Owners, called and convened in accordance with the By-Laws, by the affirmative vote of Voting Members present or by proxy casting not less than fifty-one percent (51%) of the total vote.

All Amendments shall be recorded and certified as required by the Condominium Act. Subject to the provisions of Article VIII, no Amendment shall change any Condominium Parcel, nor a Condominium Unit's proportionate share of the common expenses or common surplus, nor the voting rights appurtenant to any Unit, unless the record Owners(s) thereof, and all record Owners of mortgages or other voluntarily placed liens thereon, shall join in the execution of the Amendment. No Amendment shall be passed which shall impair or prejudice the rights and priorities of any mortgages or change the provisions of this Declaration with respect to Institutional Mortgages without the written approval of all Institutional Mortgagees of record, nor shall the provisions of Article XVI of this Declaration be changed without the written approval of all Institutional Mortgagees of record.

No amendment shall change the rights and privileges of Resort without the Resort's written approval.

Resort, so long as it owns more than twenty-five percent (25%) of the Condominium Units or Unit Weeks in the Condominium, reserves the right at any time to amend the Declaration, as may be required by any lending institution or public body or in such manner as Resort may determine to be necessary to carry out the purposes of the project provided that such Amendment shall not increase the proportion of common expenses nor decrease the Ownership of Common Elements borne by the Condominium Owners.

## XII.
## BY-LAWS

The operation of the Condominium's property shall be governed by the By-Laws of the Association.

No modification of or Amendment to the By-Laws of said Association shall be valid unless set forth in or annexed to a duly recorded Amendment to this Declaration. The By-Laws may be amended in the manner provided for therein, but no Amendment to said By-Laws shall be adopted which would affect or impair the validity or priority of any mortgage covering any Condominium Parcel, or which would change the provision of the By-Laws with respect to Institutional Mortgages without the

(3)    217

Case 2:25-ap-90051    Doc 48-2    Filed 03/03/26    Entered 03/03/26 16:33:47    Desc
Exhibit Exhibits 1-4 to Objection    Page 48 of 66

Ex. 4-25

written approval of all Institutional Mortgagees of record. No Amendment shall change the rights and privileges of the Resort without the Resort's written approval. Any Amendment to the By-Laws, as provided herein, shall be executed by the parties as required in this Article and in Article XI above.

## XIII.
### THE OPERATING ENTITY

The operating entity of the Condominium shall be the Association, which has been designated pursuant to the Condominium Act. The said association upon agreement of its board of directors shall have the right to assign its obligations of management, maintenance and collection of common expenses and all the other management functions of the association to an acceptable management agent. The said association, or its designated assignee shall have all the powers and duties granted to or imposed upon it by this Declaration and the By-Laws of the Association, and all of the powers and duties necessary to operate the Condominium, as set forth in this Declaration and the By-Laws, and as they may be amended from time to time.

## XIV.
### Maintenance Fees, Assessments, Membership Fees
#### Maintenance Fees.

The Association, through its Board of Directors, shall have the power to fix and determine from time to time the sum or sums necessary and adequate as maintenance fees to provide for the common expenses of the Condominium property. The maintenance fees shall be levied against each Condominium Parcel Owner as provided for in Article VIII of this Declaration. The maintenance fee shall be due and payable annually (if the interval ownership is not financed by seller). Maintenance fees are due and payable monthly on installment transactions. Due dates shall be determined by the Board of Directors of Hiawatha Association or its designated assignee. Maintenance fees that are unpaid for over ten (10) days after due shall bear interest at the rate of ten percent (10%) per annum from due date until paid, and at the sole discretion of the Board of Directors, a late charge of twenty five dollars shall be due and payable. Monthly bills for the same shall not be mailed and delivered to Unit owners. Maintenance fees for units committed to interval ownership shall be due and payable annually or as determined by the association.

#### Assessments.

Assessments for emergency purposes upon showing of good cause, may also be levied by the association through its Board of Directors. This assessment shall be due and payable as determined by the Board of Directors of Hiawatha Association or as designated assignee.

Assessments that are unpaid for over ten (10) days after due shall bear interest at the rate of ten percent (10%) per annum from due date until paid, and at the sole discretion of the Board of Directors, a late charge of twenty five dollars shall be due and payable. Assessments for emergency purposes may also be levied by the Association by its Board of Directors. The assessments shall be due and payable as determined by the Board of Directors of the Association.

#### Membership Fee.

The membership fee is that fee levied against the interval owner in exchange for the use of any amenities controlled by Lake Tansi Property Owners Association. This fee is due and payable annually, in advance, (if the interval ownership is not financed by seller).

The Association, or its designated assignee shall have a lien on each Condominium Parcel for unpaid assessments, maintenance fee and membership fee together with interest thereon, against the Unit Owner of such Condominium parcel, together with a lien on all tangible personal property located within said Unit, except that such lien upon the aforesaid tangible personal property shall be subordinate to prior bona fide liens of record. Reasonable attorneys' fees incurred by the Association incident to the collection of such assessments, maintenance fee and membership fee or the enforcement of such lien, together with all sums advanced and paid by the Association for taxes and payments on account of superior mortgages, liens or encumbrances which may be required to be advanced by the Association, in order to preserve and protect its lien, shall be payable by the Unit Owner and secured by such lien. The Board of Directors, may take such action as it deems necessary to collect assessments, maintenance fee and membership fee by personal action or by enforcing and foreclosing said lien, and may settle and compromise the same if deemed in its best interest. Said lien shall be effective as and in the manner provided for by the Condominium Act, and shall have the priorities established by said Act. The Association, shall be entitled to bid at any sale held pursuant to a suit to foreclose such lien, and to apply as a cash credit against its bid, all sums due, as provided herein, covered by the lien enforced. In case of such foreclosure, the Unit Owner shall be required to pay a reasonable rental for the Condominium Parcel for the period of time said Parcel is occupied by the Unit Owner or anyone by, through or under said Unit Owner, and Plaintiff in such foreclosure shall be entitled to the appointment of a Receiver to collect same from the Unit Owner and/or Occupant.

In the case of a lien against an Owner of Unit Weeks in a Unit committed to Interval Ownership, said lien shall be limited to the Unit Weeks owned by said Owner and shall not encumber the property, real or personal, of any other Owner of Unit Weeks in said Unit.

Where the Mortgagee of an Institutional First Mortgage of record, or other purchaser of a Condominium Unit, obtains title to a Condominium Parcel as a result of foreclosure of the Institutional First Mortgage, or when an Institutional First Mortgagee of record accepts a Deed to said Condominium Parcel in lieu of foreclosure, such acquirer of title, its successors and assigns, shall not be liable for the shares of maintenance fees or assessment by the Association pertaining to such Condominium Parcel, or chargeable to the former Unit Owner of such Parcel, which became due prior to acquisition of title as a result of the foreclosure or the acceptance of such Deed in lieu of foreclosure. Such unpaid share of maintenance fees or assessments shall be deemed to be common expenses collectible from all of the Unit Owners, including such acquirer, his successors and assigns.

Failure of an interval owner to pay any fee or assessment may preclude said interval owner from the use of any recreational facilities.

**Ex. 4-26**

Any person who acquires an interest in an Unit, except through foreclosure of an Institutional First Mortgage of record, or by virtue of an Institutional First Mortgagee accepting a Deed to a Condominium Parcel in lieu of foreclosure, as specifically provided hereinabove including, without limitation, persons acquiring title by operation of law, including purchasers at judicial sales, shall not be entitled to occupancy of the Unit or enjoyment of the Common Elements until such time as all unpaid assessments and maintenance fee due and owing by the former Unit Owners have been paid. The Association, acting through its Board of Directors, shall have the right to assign its claim and lien rights for the recovery of any unpaid assessments and maintenance fee to Resort, or to any Unit Owner or group of Unit Owners, or to any third party.

## XV.
## INSURANCE PROVISIONS

I.   Insurance

   A.   Purchase of Insurance: The Association shall obtain fire and extended coverage insurance and vandalism and malicious mischief insurance insuring all of the insurable improvements within the Condominium, together with such other insurance as the Association deems necessary in and for the interest of the Association, all Unit Owners and their Mortgagees, as their interest may appear, in an amount which shall be equal to the maximum insurable replacement value as determined annually; and the premiums for such coverage and other expenses in connection with said insurance shall be assessed against the Unit Owners as part of the common expense. The named insured shall be the Association, individually and as Agent for the Unit Owners, without naming them, and as Agent for their Mortgagees.

   Provision shall be made for the issuance of Mortgagee endorsements and memoranda of insurance to the Mortgagees of Unit Owners. Such policies shall provide that payments for losses thereunder by the insurer shall be made to the insurance trustee hereinafter designated, and all policies and endorsements thereon shall be deposited with the insurance trustee. Unit Owners may obtain insurance coverage at their own expense upon their own personal property and for their personal liability and living expense.

   B.   Coverage:

      (1) Casualty. All buildings and improvements upon the Condominium property shall be insured in an amount equal to the maximum insurable replacement value, excluding foundation and excavation costs, and all personal property included in the Common Elements shall be insured for its value, all as determined annually by the Board of Directors of the Association. Such coverage shall afford protection against:

         (a) Loss or damage by fire and other hazards covered by a standard extended coverage endorsement; and

         (b) Such other risks as from time to time shall be customarily covered with respect to buildings similar in construction, location and use as the buildings on the Condominium Parcel; including but not limited to vandalism and malicious mischief.

      (2) Public Liability in such amounts and with such coverage as shall be required by the Board of Directors of the Association and with cross liability and endorsement to cover liabilities of the Unit Owners as a group to a Unit Owner.

      (3) Insurance on Units Committed to Interval Ownership. The Board of Directors of the Association, shall obtain casualty and liability insurance, as needed, on all Units committed to Interval Ownership. Each such policy shall reflect the respective interest of the Association, and all Owners of Unit Weeks in each Unit. Casualty insurance shall be in an amount equal to the maximum insurable replacement value of the Unit and the personal property therein without deduction for depreciation as determined annually by the Board of Directors of the Association. The premiums shall be a part of the maintenance fee. All losses thereunder shall be payable to the Insurance Trustee hereinafter designated. All such proceeds shall be used for the purpose of repair or replacement of any loss, or in the event such loss is not to be repaired or replaced, as determined elsewhere, to be divided among all Owners of Unit Weeks in such Unit in accordance with their percentage interest in remainder. Any deficit or overage in such proceeds, after repair or replacement, shall be divided among all such Owners of Unit Weeks in that Unit. Deficits shall be treated as a prorated assessment and billed to each Unit Owner.

      (4) Workmen's Compensation policy to meet the requirements of law.

      (5) Such Other Insurance as the Board of Directors of the Association shall determine from time to time desirable.

   C.   Premiums: Premiums upon insurance policies purchased by the Association shall be paid by the Association as a common expense.

   D.   Insurance Trustee; Shares of Proceeds: All insurance policies purchased by the Association shall be for the benefit of the Association and the Unit Owners and their Mortgagees, as their interests may appear, and shall provide that all proceeds covering property losses shall be paid to the insurance trustee, which shall be designated by the Board of Directors and which shall be any bank or trust company in Tennessee. The insurance trustee shall not be liable for payment of premiums nor for the renewal or the sufficiency of policies, nor for the failure to collect any insurance proceeds. The duty of the insurance trustee shall be to receive such proceeds as are paid and to hold the same in trust for the purposes elsewhere stated herein and for the benefit of the Unit Owners and their Mortgagees in the following shares, but which shares need not be set forth on the records of the insurance trustee:

      (1) Common Elements. Proceeds on account of damage to Common Elements - an undivided share for each Unit Owner, such share being the same as the undivided share in the Common Elements appurtenant to his Unit.

      (2) Condominium Units. Proceeds on account of damage to Units shall be held in the following undivided shares:

         (a) When the Building is to be Restored - For the Owners of damaged Units in proportion to the cost of repairing the damage suffered by each Unit Owner, which cost shall be determined by the Association.

         (b) When the Building is Not to be Restored - An undivided share for each Unit Owner, such share being the same as the undivided share in the Common Elements appurtenant to his Unit.

      (3) Mortgagees. In the event a mortgage endorsement has been issued as to a Unit, the share of the Unit Owner shall be held in trust for the Mortgagee and the Unit Owner as their interests may appear; provided, however, that no Mortgagee shall have any right to determine or participate in the determination as to whether or not any damaged property shall be reconstructed or repaired, and no Mortgagee shall have any right to apply or have applied to the reduction of a mortgage debt any insurance proceeds except distributions thereof made to the Unit Owner and Mortgagee pursuant to the provisions of this Declaration.

(5)   *219*

Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection   Page 50 of 66

Ex. 4-27

E.   Distribution of Proceeds: Proceeds of insurance policies received by the insurance trustee shall be distributed to or for the benefit of the beneficial Owners in the following Manner:

(1) Expense of the Trust. All expenses of the insurance trustee shall be first paid or provision made therefor.

(2) Reconstruction or Repair. If the damage for which the proceeds are paid is to be repaired or reconstructed, the remaining proceeds shall be paid to defray the cost thereof as elsewhere provided. Any proceeds remaining after defraying such costs shall be distributed to the beneficial Owners. Remittance to Unit Owners and their Mortgagees being payable jointly to them. This is a covenant for the benefit of any Mortgagee of a Unit and may be enforced by such Mortgagee.

(3) Failure to Reconstruct or Repair. If it is determined in the manner elsewhere provided that the damage for which the proceeds are paid shall not be reconstructed or repaired, the remaining proceeds shall be distributed to the beneficial Owners, remittances to Unit Owners and their Mortgagees being payable jointly to them. This is a covenant for the benefit of any Mortgagee of a Unit and may be enforced by such Mortgagee.

(4) Certificate. In making distribution to Unit Owners and their Mortgagees, the insurance trustee may rely upon a certificate of the Association made by its President and Secretary as to the names of the Unit Owners and their respective shares of the distribution.

F.   Association as Agent: The Association is hereby irrevocably appointed Agent for each Unit Owner and for each Owner of a mortgage or other lien upon a Unit and for each Owner of any other interest in the Condominium property to adjust all claims arising under insurance policies purchased by the Association and to execute and deliver releases upon the payment of claims.

G.   Notice of Insurance Coverage: In any legal action in which the Association may be exposed to liability in excess of insurance coverage protecting it and the Unit Owners, the Association will give Notice of the exposure within a reasonable time to all Unit Owners who may be exposed to the liability and they shall have the right to intervene and defend.

H.   Inspection of Insurance Policy: A copy of each insurance policy obtained by the Association shall be made available for inspection by Unit Owners at reasonable times.

II.   RECONSTRUCTION OR REPAIR AFTER CASUALTY

A.   Determination to Reconstruct or Repair: If any part of the Condominium property shall be damaged by casualty, whether it shall be reconstructed or repaired shall be determined in the following manner:

(1) Common Element. If the damaged improvement is a Common Element, the damaged property shall be reconstructed or repaired, unless it is determined in the manner elsewhere provided that the Condominium shall be terminated.

(2) Condominium Units.

(a) Lesser Damage - If the damaged improvement is a building containing Condominium Units, and if Units to which 50% of the Common Elements are appurtenant are found by the Board of Directors of the Association to be tenantable, the damaged property shall be reconstructed or repaired unless within 60 days after the casualty, it is determined by Agreement in the manner elsewhere provided that the Condominium shall be terminated.

(b) Major Damage - If the damaged improvement is a building containing Condominium Units, and if Units to which more than 50% of the Common Elements are appurtenant are found by the Board of Directors to be not tenantable, then the damaged Property will not be reconstructed or repaired and the Condominium will be terminated without Agreement as elsewhere provided, unless within 60 days after the casualty, the Owners of 75% of the Common Elements agree in writing to such reconstruction or repair.

(3) Certificate. The insurance trustee may rely upon a certificate of the Association made by its President and Secretary to determine whether or not the damaged property is to be reconstructed or repaired.

B.   Plans and Specifications: Any reconstruction or repair must be substantially in accordance with the plans and specifications for the original building, portions of which are attached hereto as Exhibits; or if not, then according to plans and specifications approved by the Board of Directors of the Association and if the damaged property is a building containing Condominium Units by the Owners of not less than 75% of the Common Elements, including the Owners of all damaged Units, which approval shall not be unreasonably withheld.

C.   Responsibility: If the damage is only to those parts of one Unit for which the responsibility of maintenance and repair is that of the Unit Owner, then the Unit Owner shall be responsible for reconstruction and repair after casualty. In all other instances, the responsibility of reconstruction and repair after casualty shall be that of the Association.

D.   Estimates of Costs: Immediately after a determination is made to rebuild or repair damage to property for which the Association has the responsibility of reconstruction and repair, the Association shall obtain reliable detailed estimates of the cost to rebuild or repair.

E.   Assessments: The amount by which an award of insurance proceeds to the insurance trustee is reduced on account of a deductible clause in an insurance policy shall be assessed against all Unit Owners in proportion to their shares in the Common Elements. If the proceeds of such assessments and of the insurance are not sufficient to defray the estimated costs of reconstruction and repair by the Association, or if any any time during reconstruction and repair or upon completion of reconstruction and repair, the funds for the payment of the costs of reconstruction and repair are insufficient, assessments shall be made against the Unit Owners, in the case of damage to Common Elements, in sufficient amounts to provide funds for the payment of such costs. Such assessments amount to provide funds for damage to Units shall be in proportion to the cost of reconstruction and repair of their respective Units. Such assessments on account of damage to Common Elements shall be in proporation to the Owner's share in the Common Elements.

F.   Construction Funds: The funds for payment of costs of reconstruction and repair after casualty, which shall consist of proceeds of insurance held by the insurance trustee and funds collected by the Association from assessments against Unit Owners, shall be disbursed in payment of such costs in the following manner:

Ex. 4-28

Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection   Page 51 of 66

(1) <u>Association.</u> If the total assessments made by the Association in order to provide funds for payment of costs of reconstruction and repair which is the responsibility of the Association is more than $5,000.00, then the sums paid upon such assessments shall be deposited by the Association with the insurance trustee. In all other cases, the Association shall hold the sums paid upon such assessments and disburse the same in payment of the costs of reconstruction and repair.

(2) <u>Insurance Trustee.</u> The proceeds of insurance collected on account of a casualty, and the sums deposited with the insurance trustee by the Association from collections of assessment against Unit Owners on account of such Casualty, shall constitute a construction fund which shall be disbursed in payment of the costs of reconstruction and repair in the following manner and order:

(a) <u>Association - Lesser Damage</u> - If the amount of the estimated costs of reconstruction and repair which is the responsibility of the Association is less than $5,000.00, then the construction fund shall be disbursed in payment of such costs upon the order of the Association; provided, however, that upon request to the insurance trustee by a Mortgagee which is a beneficiary of an insurance policy, the proceeds of which are included in the construction fund. Such fund shall be disbursed in the manner hereafter provided for the reconstruction and repair of major damage.

(b) <u>Association - Major Damage</u> - If the amount of the estimated costs of reconstruction and repair which is the responsibility of the Association is more than $5,000.00, then the construction fund shall be disbursed in payment of such costs in the manner required by the Board of Directors of the Association or upon approval of an architect qualified to practice in Tennessee and employed by the Association to supervise the work.

(c) <u>Unit Owner</u> - The portion of insurance proceeds representing damage for which the responsibility of reconstruction and repair lies with a Unit Owner shall be paid by the insurance trustee to the Unit Owner, or if there is a mortgage endorsement as to such Unit, then to the Unit Owner and Mortgagee jointly, who may use such proceeds as they may be advised.

(d) <u>Surplus</u> - It shall be presumed that the first monies disbursed in payment of costs and reconstruction and repair shall be from insurance proceeds. If there is a balance in a construction fund after payment of all costs of the reconstruction and repair for which the fund is established, such balance shall be distributed to the beneficial Owners of the fund in the manner elsewhere stated;

Except, however, that the part of a distribution to a beneficial Owner which is not in excess of assessments paid by such Owner into the construction fund shall not be made payable to any Mortgagee.

(e) <u>Certificate</u> - Notwithstanding the provisions herein, the insurance trustee shall not be required to determine whether or not sums paid by Unit Owners upon assessments shall be deposited by the Association with the insurance trustee, nor to determine whether the disbursements from the construction fund are to be upon the order of the Association or upon approval of an architect or otherwise, nor whether a disbursement is to be made from the construction fund, nor to determine whether surplus funds to be distributed are less than the assessments paid by Owners. Instead, the insurance trustee may rely upon a certificate of the Association, made by its President and Secretary, as to any or all of such matters and stating that the sums to be paid are due and properly payable, and stating the name of the payee and the amount to be paid; provided, that when a Mortgagee is herein required to be named as payee, the insurance trustee shall also name the Mortgagee as a payee of any distribution of insurance proceeds to a Unit Owner; and further provided that if the Association or a Mortgagee which is the beneficiary of an insurance policy, the proceeds of which are included in the construction fund, so requires, the approval of an architect named by the Association shall be first obtained by the Association upon disbursements in payment of costs of reconstruction and repair.

## XVI.
## USE AND OCCUPANCY

A. <u>Residential Use Restriction:</u> The Owner of a Unit shall occupy and use his Unit as a single family private dwelling for himself and the members of his family, his social guests, lessees, licensees and invitees. Notwithstanding the foregoing, nothing in this Declaration shall be construed to restrict Resort, or any successor in interest to the Resort, from selling and/or conveying any unit under a plat of Interval Ownership, or any person, group of persons, corporation, partnership, or other entity, from selling, reconveying, or any other way, transferring same, at any time under said plan of Interval Ownership.

B. <u>Prohibited Acts:</u> The Unit Owner shall not permit or suffer anything to be done or kept in his Unit which will increase the rate of insurance in the Condominium property, or which will obstruct or interfere with the rights of other Unit Owners, or annoy them by unreasonable noises, or otherwise, nor shall the Unit Owners commit or permit any nuisance, immoral or illegal acts in or about the Condominium property.

C. <u>Animals or Pets:</u> No animals or pets of any kind shall be kept in any unit or on any property of the Condominium except subject to some Rules and Regulations as may be adopted by the Board of Directors for the keeping of said pets; provided that such house pets causing or creating a nuisance or unreasonable disturbance shall be permanently removed from the property subject to these restrictions upon three (3) days written notice from the Management Firm or the Board of Directors of the Association. Once permission is granted, as provided in this paragraph, it may not be withdrawn or terminated unless such house pet has caused or created a nuisance or unreasonable disturbance as provided in this paragraph.

D. <u>Restrictions on Alterations:</u> The Owner of a Unit shall not cause anything to be affixed or attached to, hung, displayed or placed, on the exterior walls, doors or windows of the Units nor the limited Common Elements or the Common Elements, nor shall they cause any type of ground coverage to be installed nor shall they grow any type of plant, shrubbery, flower, vine or grass outside their Unit, nor shall they cause awnings or storm shutters, screens, enclosures and the like to be affixed or attached to any Units, limited Common Elements or Common Elements; nor shall they place any furniture or equipment outside their Unit except with the prior written consent of the Board of Directors and further, when approved, subject to the Rules and Regulations adopted by the Board of Directors. No clothes lines or similar device shall be allowed on any portion of the Condominium property, nor shall clothes be hung anywhere except where designated by the Board of Directors of the Association.

Ex. 4-29
Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection   Page 52 of 66

E. <u>Common Elements:</u> No person shall use the Common Elements and limited Common Elements or any part thereof, or a Condominium Unit, or the Condominium property, or any part thereof, in any manner contrary to or not in accordance with such Rules and Regulations pertaining thereto, as from time to time promulgated by the Association.

F. <u>Holdover Interval Owners:</u> In the event any Owner of a Unit Week in a Unit committed to Interval Ownership fails to vacate his Unit at the expiration of his period of Ownership each year, or at such earlier time as may be fixed by the Rules and Regulations adopted by the Association from time to time, he shall be deemed a "holdover owner". It shall be the responsibility of the Association to take such steps as may be necessary to remove such holdover Owner from the Unit, and to assist the Owner of any subsequent Unit Week, who may be affected by the holdover Owner's failure to vacate, to find alternate accommodations during such holdover period.

In addition to such other remedies as may be available to it, the Association or its designated assignee shall secure, as its expense, alternate accommodations for any Owner who may not occupy his Unit due to the failure to vacate of any holdover Owner. Such accommodations shall be as near in value to the Owner's own Unit as possible. The holdover Owner shall be charged a sum equal to three times the cost of such alternate accommodations, any other costs incurred due to his failure to vacate, and an administrative fee of $50.00 per day during his period of holding over. In the event it is necessary that the Association contract for a period greater than the actual period of holding over, in order to secure alternate accommodations as set forth above, the entire period shall be the responsibility of the holdover Owner, although the $50.00 per day administrative fee shall cease upon actual vacating by the holdover Owner.

The Association shall submit a bill to the holdover Owner in accordance with this paragraph. In the event the holdover Owner fails to pay same within ten (10) days of the date of same, a lien shall be filed against said holdover Owner's Unit Weeks in accordance with the provisions of Article XIV hereof.

The above provisions of Article XVI, E, shall not abridge the Association's right to take such other action as is provided by law including, but not limited to, eviction proceedings.

## XVII.
## MAINTENANCE AND ALTERATIONS

A. The Board of Directors of the Association may enter into a Contract with any firm, person or Corporation, or may join with other Condominium or Property Owner Associations and entities in contracting for the maintenance and repair of the Condominium property and other type properties, and may contract or may join with other Condominium or Property Owner Associations in contracting for the management of the Condominium property and other type properties, and may delegate to the Contractor or Manager all the powers and duties of the Association, except such as are specifically required by this Declaration, or by the By-Laws, to have the approval of the Board of Directors or the membership of the Association. The Contractor or Manager may be authorized to determine the budget, recommend assessments for emergency purposes and collect maintenance fee, as provided by this Declaration, By-Laws, and exhibits to the Declaration.

B. Each Owner of a Unit not committed to Interval Ownership agrees as follows:

(1) To maintain in good condition and repair his Unit and all interior surfaces within or surrounding his Unit (such as the surfaces of the walls, ceilings, floors) whether or not a part of the Unit or Common Elements, and maintain and repair the fixtures therein and pay for any utilities which are separately metered to his Unit.

(2) Not to make or cause to be made any structural addition, alteration, decoration, repair, replacement or change of the Common Elements or to any outside or exterior portion of the building whether within a Unit or part of the limited Common Elements without the prior written consent of the Board of Directors of the Association.

C. Each Owner of Unit Weeks in a Unit committed to Interval Ownership agrees:

(1) To pay his proportionate share of the cost of the maintenance and repair of all interior and exterior components of said Unit, the cost of maintenance, repair and replacement of all appliances, furniture, carpeting, fixtures, equipment, utensils, and other personal property within said Unit, and such other cost of repair, maintenance, upkeep and operation of the Unit as is necessary to the continued enjoyment of said Unit by all said Owners of Unit Weeks therein.

(2) Not to make, cause, or allow to be made, any repairs, modifications, alterations, or replacements to the Common Elements, limited Common Elements, outside or exterior portion of the buildings whether within a Unit or part of the limited Common Elements or Common Elements, exterior or interior of his unit, or of the furnishings, appliances, personal property or decor thereof, without the prior written consent of the Board of Directors of the Association, and all other Owners of Unit Weeks therein.

(3) Expenses of repairs or replacements to the Unit or its components, furnishing, carpeting, appliances, or other property, real, personal, or mixed, occasioned by the specific use or abuse of any Owner of Unit Weeks in any Unit, or any licensee or tenant of said Owner, shall be borne in their entirety by said Owner.

(4) The Association, shall determine the interior color scheme, decor and furnishing, of each such Unit, as well as the proper time for redecorating and replacements thereof.

D. All Owners of Units, including Owners of Unit Weeks in Units committed to Interval Ownership, agree as follows:

(1) To allow the Board of Directors, or the agents or employees of any Management Firm or the Association, to enter into any Unit for the purpose of maintenance, inspection, repair, replacement of the improvements within the Units, limited Common Elements or the Common Elements, or to determine in case of emergency, circumstances threatening Units, limited Common Elements or the Common Elements, or to determine compliance with the provisions of this Declaration and the By-Laws of the Association.

(2) To show no signs, advertisements or Notices of any type on the Common Elements, limited Common Elements, or his Unit, and to erect no exterior antenna or aerials, except as consented to by the Board of Directors of the Association.

E. In the event the Owner of a Unit fails to maintain the said Unit and limited Common Elements, as required herein, or makes any alterations or additions without the required written consent, or otherwise violates or threatens to violate the provisions hereof, the Association, shall have the right to proceed in a Court of equity for an injunction to seek compliance with the provisions hereof. In lieu thereof and in addition thereto, the Association shall have the right to levy an assessment against the Owner of a Unit, and the Unit, for such necessary sums to remove any unauthorized addition or alteration and to restore the

Ex. 4-30

property to good condition and repair. Where said failure, alteration, addition, or other violation is attributable to an Owner of Unit Weeks in a Unit committed to Interval Ownership, any such levy of an assessment shall be limited to the Unit Weeks owned by said Owner of Unit Weeks and shall be of no force and effect as to any other Owner of Unit Weeks in said Unit.

Said assessment shall have the same force and effect as all other special assessments. The Association, shall have the further right to have its employees or agents, or any subcontractors appointed by it, enter a Unit at all reasonable times to do such work as is deemed necessary by the Board of Directors of the Association, to enforce compliance with the provisions hereof.

F.  The Association, shall determine the exterior color scheme of the Buildings and all exteriors, and interior color scheme of the Common Elements, and shall be responsible for the maintenance thereof, and no Owner shall paint an exterior wall, door, window, or any exterior surface, or replace anything thereon or affixed thereto, without the written consent of the Board of Directors of the Association.

G.  The Association shall be responsible for the maintenance, repair and replacement of the Common Elements, including but not limited to all recreation facilities, and all property not required to be maintained, repaired and/or replaced by the Unit Owners. Notwithstanding the Unit Owner's duty of maintenance, repair, replacement and the other responsibilities as to his Unit, as is provided in this Declaration and Exhibits attached thereto, the Association, may enter into an Agreement with such firms or companies as it may determine to provide certain services and/or maintenance and service are provided on a regularly scheduled basis for air conditioning maintenance and service and appurtenances thereto, exterminating services and other types of maintenance and services as the Association deems advisable and for such period of time and on such basis as it determines. Said Agreements shall be on behalf of all Unit Owners and the monthly assessment due from each Unit Owner for common expenses shall be increased by such sum as the Association deems fair and equitable under the circumstances in relation to the monthly charge for said maintenance or service. Each Unit Owner shall be deemed a party to said Unit Owner had executed said Agreement as the Agent for the Unit Owners. The aforesaid Assessment shall be deemed to be an assessment under the provisions of Article XIV of this Declaration.

XVIII.
## LIMITED COMMON ELEMENTS

Those areas reserved for the use of certain Unit Owners or a certain Unit Owner, to the exclusion of other Unit Owners, are designated as "Limited Common Elements", and are shown and located on the Surveys annexed hereto as "Exhibit No. 1". Any expense for the maintenance, repair or replacement relating to limited Common Elements shall be treated as and paid for as part of the common expenses of the Association unless otherwise specifically provided in this Declaration and Exhibits attached hereto.

XIX.
## TERMINATION

A.  If all Unit Owners and holders of all liens and mortgages affecting any of the Condominium Parcels execute and duly record an instrument terminating the Condominium property, or if under, said property shall be deemed to be subject to termination and thereafter owned in common by the Unit Owners. The undivided interest in the property owned in common by each Unit Owner shall then become the percentage of the undivided interest previously owned by such Owner in the Common Elements upon termination of the Condominium.

B.  It is understood that in the year 2029, the purchasers of Units committed to Interval Ownership shall become tenants in common. The Board of Directors of the Association shall, no less than 30 days, nor more than 60 days prior to the actual date of such conversion to tenancy in common, call a meeting of all Owners of Unit Weeks in Units committed to Interval Ownership. At such meeting, a vote shall be taken to decide the disposition of the Units committed to Interval Ownership. A quorum at such meeting shall be a majority of the total outstanding votes of all Owners of Unit Weeks in Units committed to Interval Ownership. At such meeting the owners, or proxy votes of owners by a majority vote, may vote to continue their intervals, in which case the restrictive covenants set forth below will be adopted as covenants running with the land for a period of ten (10) years. The Board of Directors of the Association shall, no less than 30 days , nor more than 60 days prior to the actual expiration of said ten year period, call a meeting of all Owners of Unit Weeks in Units committed to Interval Ownership. A quorum at such meeting shall be a majority of the total outstanding votes of all Owners of Unit Weeks in Units committed to Interval Ownership. The Owners may then vote to continue the intervals for an additional 10 year period. This process shall be repeated as the end of each successive 10 year period approaches. Should less than a majority of the Owners vote to continue the intervals at any such meeting, then the Board of Directors of the Association shall file suit in a Court of competent jurisdiction in Cumberland County, Tennessee, for partition of the Units.

In the event the Owners vote to continue their Unit Weeks as provided above, then each Owner shall have the exclusive right to occupy his Unit, and as between Owners to use and enjoy the Common Elements of the Condominium, and the rights and easements appurtenant to his Unit during his Unit Weeks (and, in the case of Developer, during all Unit Weeks not theretofore conveyed, and to authorized others so to do, together with the non-exclusive right in common with all other Owners, but only when acting through the Association) to maintain and repair the Units during maintenance weeks. No Owner shall occupy his Unit, or exercise any other rights of Ownership in respect of his Unit other than the rights herein provided to him, during any other Unit Weeks unless expressly so authorized by the Owner entitled to occupy the Unit during such Unit Weeks or during any maintenance week except when acting through the Association. Each Owner shall keep his Unit and all furnishings in good condition and repair during his Unit Weeks, vacate the Unit at the expiration of his Unit Weeks, remove all persons and property therefrom excluding only furnishing, leave the Unit in good and sanitary condition and repair, and otherwise comply with such reasonable checkout and other procedures as may from time to time be contained in rules promulgated by the Association.

No Owner or other person or entity acquiring any right, title or interest in an Unit shall seek or obtain through any legal procedures, judicial partition of the Unit or sale of the Unit in lieu of partition at any date prior to the expiration of each successive ten (10) year period voted by a majority of Owners. If, however, any Unit Weeks shall be owned by two or more persons as tenants-in-common or as joint tenants, nothing herein contained shall prohibit a judicial sale of the Unit Weeks in lieu of partition as between such co-tenants or joint tenants.

Ex. 4-31

Case 2:25-ap-90051    Doc 48-2    Filed 03/03/26    Entered 03/03/26 16:33:47    Desc
Exhibit Exhibits 1-4 to Objection    Page 54 of 66

## XX.
## USE OF COMMON ELEMENTS

The Association, its members, the Resort and its successors and assigns and all parties who own an interest in and to the aforesaid Common Elements agree that they shall not have any right to bring any action for partition or division of the real property that constitutes said Common Elements and said parties do hereby waive said rights of partition or division of said facilities. The initial Rules and Regulations, and all Amendments thereof and revision thereof pertaining to use of the Common Elements shall be posted in conspicuous places on the Common Elements. The Unit Owners hereby covenant and agree to be bound by all of such Rules and Regulations and said parties shall obey same and be responsible for their being obeyed by the said Unit Owners, their family, guests, invitees, lessees and servants. Should a Unit Owner fail to pay maintenance fees or assessment as required under the terms of this Declaration of Condominium for the period of time specified herein whereby said assessment and maintenance fee become delinquent, the Association may deny the Unit Owner and/or the authorized user of the Common Elements the use and enjoyment of same until such time as all assessments and maintenance fees are paid. The Association shall further have the right in it sole discretion to suspend any Unit Owner and/or authorized user of said Common Elements from the use of same for a period not to exceed thirty (30) days for any infraction of the promulgated Rules and Regulations pertaining to said Common Elements, and in the case of a Unit committed to Interval Ownership for a period not to exceed seven (7) days. Should the Unit Owner or the authorized user of said Common Elements rights to use same be suspended, there shall be no reduction in the assessments and maintenance fees due and payable by said Unit Owner or authorized user. In the case of a Condominium Unit committed to Interval Ownership, all sanctions, as outlined above, shall be limited to the delinquent Unit Week Owner and shall be of no force and effect against non-delinquent Owners of Unit Weeks in such Condominium Unit committed to Interval Ownership.

Any person who is a Owner of a Condominium Parcel, together with members of his family, social guests, lessees, invitees and licensees, may use the facilities. Where a Corporation is a Parcel Owner, the use of said Common Elements shall be limited to any one time to such Officer, Director or employee of said Corporation who is in actual residence and such individual shall be deemed to be the Condominium Parcel Owner for the purposes of this paragraph. Where a party owns one Condominium Unit and leases same, the lessee shall be entitled to the use of the Common facilities and said lessee's rights thereto shall be the same as though said lessee were the Unit Owner and during the term of said lease, the Unit Owner and his family shall not be entitled to the use of the Common facilities. Use of the Common facilities by Owners of Unit Weeks in Units committed to Interval Ownership, or any other person using the Common Elements through said Owner, shall be unlimited to the period of Ownership each year of said Owner of Unit Weeks in such Unit.

## XXI.
## MANAGEMENT AGREEMENT

A. The Hiawatha Manor Association has entered into a Management Agreement.

The association has delegated to the management firm the power of the Association, through its Board of Directors, to determine the budget, levy and collect the maintenance fee for common expenses; assess and collect assessment; and monitor the collection of membership fees. Each Unit Owner, his heirs, successors and assigns, shall be bound by said Management Agreement for the purposes therein expressed, including, but not limited to:

(1) Adopting, ratifying, confirming and consenting to the execution of said Management Agreement by the Association.

(2) Covenanting and promising to perform each and every of the covenants, promises and undertakings to be performed by Unit Owners in the cases provided therefor in said management Agreement.

(3) Ratifying, confirming and approving each and every provision of said Agreement, and acknowledging that all of the terms and provisions thereof are reasonable.

(4) Agreeing that the persons acting as Directors and Officers of the Association entering into such an Agreement have not breached any of their duties or obligations to the Association.

(5) It is specifically recognized that some or all of the persons comprising the original Board of Directors of the Association, are or may be stockholders, Officers and Directors of the Management Firm, and that such circumstances shall not and cannot be construed as a breach of their duties and obligations to the Association, nor as possible grounds to invalidate such Management Agreement, in whole or in part.

(6) The acts of the Board of Directors and Officers of the Association in entering into the Management Agreement be and the same are hereby ratified, approved, confirmed and adopted.

## XXII.
## MISCELLANEOUS PROVISIONS

A. The Owners of the respective Condominium Units shall not be deemed to own the undecorated and/or unfinished surfaces of the perimeter walls, floors and ceilings surrounding their respective Condominium Units, nor shall the Unit Owner be deemed to own pipes, wires, conduits, or other public utility lines running through said respective Condominium Units which are utilized for or serve more than One Condominium Unit, which item are, by these presents, hereby made a part of the Common Elements. Said Unit Owners, however, shall be deemed to own the walls and partitions which are contained in said Unit Owner's Condominium Unit, and shall also be deemed to own the inner decorated and/or finished surfaces of the perimeter walls, floors, and ceilings, including plaster, paint, wallpaper, etc.; however, all non walls and, where applicable, the floor between the first ground floor and second floor located within a Condominium Unit and, where applicable, the floor between any subsequent higher floors located within a Condominium Unit, and the floor of the first ground floor within a Condominium Unit, are a part of the Common Elements to the unfinished surface of said walls and floors.

B. The Owners of the respective Condominium Units agree that if any portion of a Condominium Unit or Common Element or limited Common Element encroaches upon another, a valid easement for the encroachment and encroaches upon another, a valid easement for the encroachment and maintenance of same, so long as it stands, shall and does exist. In the event a Condominium building or buildings are partially or totally destroyed and then rebuilt, the Owners of the Condominium Parcels agree that encroachments on parts of the Common Elements or limited Common Elements of Condominium Units, as aforedescribed, due to construction, shall be permitted, and that a valid easement for said encroachments and the maintenance thereof shall exist.

**Ex. 4-32**

Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection   Page 55 of 66

C. No Owner of a Condominium Parcel may exempt himself from liability for his contribution toward the common expenses or, in the case of an Owner of Unit Weeks in a Condominium Unit committed to Interval Ownership, the maintenance fee, by waiver of the use and enjoyment of any of the Common Elements or the recreation facilities, or by the abandonment of his Condominium Unit.

D. The Owners of each and every Condominium Parcel shall return the same for the purpose of ad valorem taxes with the Tax Assessor of the County wherein the Condominium is situate, or for such other future legally authorized governmental Officer or authority having jurisdiction over same. Nothing herein shall be construed, however, as giving to any Unit Owner the right of contribution or any right of adjustment against any other Unit Owner on account of any deviation by the taxing authorities from the valuation herein prescribed, each Unit Owner to pay ad valorem taxes and special assessments as are separately assessed against his Condominium Parcel.*

In the event the Tax Assessor does not break down ad valorem taxes on a unit committed to interval ownership among the various owners of Unit Weeks therein, or it is determined by the Association, that it is in the best interests of said owners to do so, the Association, shall return the same and prorate the ad valorem taxes among the various owners of unit weeks in each particular unit, on the same basis as the maintenance fee, collecting said taxes as part of the maintenance fee, and paying same to the Tax Assessor. Should any owner fail to pay his share of the ad valorem taxes through the maintenance fee, the Association, shall have the right and the power to pay same and to levy an assessment against the owner for the unit weeks owned by said owner, which assessment shall have the same force and effects as all other special assessments.

For this purpose of ad valorem taxation, the interest of the Owner of a "Condominium Parcel" in his "Condominium Unit" and in the "Common Elements", shall be considered a Unit. The value of said Unit shall be equal to the percentage of the value of the entire Condominium, including land and improvements, as has been assigned to said Unit in this Condominium Declaration. The total of all of said percentages equals 100% of the value of all of the land and improvements thereon.

E. All provisions of this Declaration and Exhibits attached hereto, and Amendments, thereof, shall be construed as covenants with the land, and of every part thereof and interest therein, including but not limited to every Unit and the appurtenances thereto, and every Unit Owner and Occupant of the property, or any part thereof, or of any interest therein and his heirs, executors, administrators, successors and assigns, shall be bound by all of the provisions of said Declaration and Exhibits hereto and any Amendments thereof.

F. If any of the provisions of this Declaration or of the By-Laws, or of the Condominium Act, or any section, clause, phrase, word, or the application thereof, in any circumstance, is held invalid the validity of the remainder of this Declaration, the By-Laws, or the Condominium Act, and of the application thereof, in any circumstance, is held invalid the validity of the remainder of this Declaration, the By-Laws, or the Condominium Act, and of the application of any such provision, action, sentence, clause, phrase or word, in other circumstances, shall not be affected thereby.

G. Whenever Notices are required to be sent hereunder, the same may be delivered to Unit Owners either personally or by mail, addressed to such Unit Owners at their place or residence on file with the Condominium Association from time to time. Proof of such mailing or personal delivery by the Association or any Management Firm shall be given by the Affidavit of the person mailing or personally delivering said Notices. Notices to the Association shall be delivered by mail to the Secretary of the Association, or the President of the Association, or to any member of the Board of Directors of the Association. The change of the mailing address of any party as specified herein shall not require an Amendment to this Declaration.

Notices to the Resort shall be delivered by mail at: P.O. Box 727, Crossville, Tennessee 38555.

All Notices shall be deemed and considered sent when mailed. Any party may change his or its mailing address by written Notice, duly receipted for. Notices required to be given the personal representatives of a deceased Owner or devisee, when there is not personal representative, may be delivered either personally or by mail to such party at his or its address appearing in the records of the Court wherein the Estate of such deceased Owner is being administered. The change of the mailing address of any party, as specified herein shall not require an Amendment to the Declaration.

H. Resort shall have the right to use a portion of the Common Elements for the purpose of aiding in the sale of Condominium Units including the right to use portions of the Condominium property for parking for prospective purchasers and such other parties as Resort determines. The foregoing right shall mean and include the right to display and erect signs, billboards and placards and store, keep and exhibit same and distribute audio and visual promotional materials upon the Common Elements.

I. Each unit owner and the Association shall be governed by and shall comply with this Declaration and the By-Laws attached hereto, and the Condominium Act of the State of Tennessee, as it may exist from time to time. Failure to do so shall entitle the Association or any unit owner to recover sums due for damages or injunctive relief or both. Such actions may be maintained by or against a unit owner or the Association in a proper case by or against one or more unit owners, and the prevailing party shall be entitled to receive reasonable attorney's fees. Such relief shall not be exclusive of other remedies provided by law.

J. Subsequent to the filing of this Declaration of Condominium, the Condominium Association, when authorized by a vote of the majority of the total vote of the members of the Association, and approved by the Owners and holders of Institutional First Mortgages encumbering Condominium Parcels who represent a majority of the dollar institutionally mortgaged indebtedness against this Condominium may, together with other Condominium or Property Owner Associations and others, purchase and/or acquire and enter into Agreements, from time to time, whereby it acquires leaseholds, memberships, and other possessory of use interests in lands or facilities, whether or not contiguous to the lands of the Condominium intended to provide for the enjoyment, recreation and other use of benefit of the Unit Owners. The expense of Ownership, rental membership fees, operations, replacements and other undertakings in connection therewith shall be common expenses, together with all other expenses and cost herein or by law defined as common expenses.

K. Whenever the context so requires, the use of any gender shall be deemed to include all genders, and the use of the singular shall include the plural, and plural shall include the singular. The provisions of the Declaration shall be liberally construed to effectuate its purpose of creating a uniform plan for the operation of the Condominium.

L. The captions used in this Declaration of Condominium and Exhibits annexed hereto are inserted solely as a matter of convenience and shall not be relied upon and/or used in construing the effect or meaning of any of the text of this Declaration or Exhibits hereto annexed.

225

Ex. 4-33

M. Where an Institutional First Mortgage, by some circumstances, fails to be a First Mortgage, but it is evident that it is intended to be a First Mortgage, it shall, nevertheless, for the purpose of this Declaration and Exhibits annexed, by deemed to be an Institutional First Mortgage.

N. Resort specifically disclaims any intent to have made any warranty or representation in connection with the property or the Condominium documents, except as specifically set forth therein, and no person shall rely upon any warranty or representation not so specifically made therein unless otherwise stated. Maintenance fees, common expenses, taxes or other charges are estimates only, and no warranty, guaranty or representation is made or intended, nor may one be relied upon.

O. Condominium Association, by its execution of this Declaration of the Condominium, approves the foregoing and all of the covenants, terms and conditions, duties and obligations of this Declaration of Condominium and Exhibits attached thereto. The Condominium Unit Owners, by virtue of their acceptance of the Deed of Conveyance as to their Condominium Unit, and other parties by virtue of their occupancy of Units hereby approve the foregoing and all of the terms and conditions, duties and obligations of this Declaration of Condominium and Exhibits attached thereto.

P. No Condominium Parcel Owner shall bring, or have any right to bring, any action for partition or division of the Condominium property, nor shall any Owner of Unit Weeks within any Condominium Unit committed to Interval Ownership have any right to bring such action with reference to other Owners of Unit Weeks in such Condominium Unit.

The Interval Conveyance consists of an estate for years, together with a remainder over as tenants in common with all other purchasers of Unit Weeks, in each such Condominium Unit as set forth in the Deed of Conveyance. No Owner of Unit Weeks in a Unit committed to Interval Ownership, shall have the right to separate the estate for years from the remainder interest.

Q. The real property submitted to Condominium Ownership herewith is subject to conditions, limitations, restrictions, reservations, all matter of record, taxes, applicable zoning ordinances now existing or which may hereafter exist, easements for ingress and egress for pedestrian and vehicular purposes, easements for utility service and drainage now existing or hereafter granted by Resort for the benefit of such persons as the Resort designates, and the said Resort shall have the right to grant such easements and designate the beneficiaries thereof for such time as it determines in its sole discretion, and thereafter, the Association shall be empowered to grant such easements on behalf of its members. During the period of time that Resort has the right to grant the foregoing easements, the consent and approval of the Association and its members shall not be required. The right to grant the foregoing easements shall be subject to said easements not structurally weakening the buildings and improvements upon the Condomin.ium property nor unreasonably interfering with the enjoyment of the Condominium property by the Association's members.

R. In order to insure the Condominium and the Complex with adequate and uniform water service the Resort shall and hereby reserves the exclusive right to contract for the servicing of said Condominium and the Unit Owners therein with said services. Pursuant to the foregoing, the Resort has, will or may contract with a utility company which may include a municipal or governmental agency or authority for the furnishing of said services and the Association and Unit Owners agree to pay the charges therefor pursuant to and to comply with all of the terms and conditions of said utility Agreement.

S. Notwithstanding the fact that the present provisions of the Condominium Act of the State of Tennessee are incorporated by reference and included herein thereby, the provisions of this Declaration and Exhibits attached hereto shall be paramount to the Condominium Act as to those provisions where permissive variances are permitted; otherwise, the provisions of said Condominium Act shall prevail and shall be deemed incorporated therein.

T. Leasing or renting of a Condominium Unit or Unit Weeks within a Condominium Unit committed to Interval Ownership is not prohibited.

U. Owners of units shall have as an appurtenance thereto a perpetual easement for ingress and egress to and from their units over stairs, terraces, balconies, walks and other Common Elements.

V. The Owner of a unit shall have an easement for ingress and egress, over such streets, walks and other rights-of-way serving the units within the Condominium as a part of the "Common Elements" as may be necessary to provide reasonable access to said public ways, and such easement shall extend to the invitees and licensees of said unit owner. In the event that any of said easements for ingress and egress shall be encumbered by a leasehold or lien, other than those on the Condominium parcels, such leaseholds or liens shall hereby be subordinate to the use rights of any Condominium unit owner or owners whose Condominium parcel is not also encumbered by said lien or leasehold.

W. An interval owner shall have access to the amenities controlled by Lake Tansi Property Owners Association, provided said interval owner is current in such membership fees as provided in Article XIV. An interval owner is automatically a member of Lake Tansi Property Owners Association and thus in subject to the rules, regulations and By-Laws of Lake Tansi Property Owners Association.

IN WITNESS WHEREOF, TANSI RESORT, INC. has executed this instrument on this the 27th day of October, 1980.

TANSI RESORT, INC.

BY _____

LAWRENCE E. STEELMAN (PRESIDENT)

STATE OF MISSISSIPPI
COUNTY OF JACKSON

Personally appeared before me, the undersigned authority, a Notary Public, in and for said State and County, LAWRENCE E. STEELMAN, who upon oath, acknowledged himself to be PRESIDENT of Tansi Resort, Inc. (Crossville, Tennessee), a corporation, the within named bargainor, with whom I am personally acquainted, and who acknowledged that he executed the within and foregoing instrument for the purposes therein contained by signing the name of the corporation, by himself, as President, he being authorized to do so as President of said Corporation.

WITNESS my hand and official seal of office on this the 27th day of October, 1980.

_____
Notary Public

My commission expires: 7-27-82.

226

(12)



# site plan

EXHIBIT I.

*227*

Ex. 4-35

Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection   Page 58 of 66

EXHIBIT III

HIAWATHA MANOR I:   PROJECT PHASING OF CLUSTERS

Hiawatha Manor I is a multi-phase time sharing project which consists of that property described in Exhibit I, and attached as part of the declaration of Horizontal Property Regime.

By this exhibit the unit week of clusters K,L,M,N,O and P shall commence on the first Friday of each calendar year at 5:00 P.M. and will terminate on the following Friday at 10:00 A.M..

Phase II, III or IV or whatever number of phases as may be described and reflected on any amendment to this document in the time sharing project may consist of such number of clusters as may be deemed appropriate by Tansi Resort, Inc..

A unit week may commence and terminate on different days from the days set forth in Phase I.  This may be accomplished by amendment of this exhibit by Tansi Resort, Inc..

*234*

EXHIBIT III.

## BY-LAWS
## OF
## HIAWATHA MANOR ASSOCIATION

All present and future Co-Owners, Mortgagees, Lessees and occupants of Apartments and their employees, and any other persons who may use the facilities of the Condominium property in any manner are subject to the Master Deed, these By-Laws and Rules and Regulations made pursuant hereto any amendment to the Master Deed and these By-Laws upon the same being passed and duly recorded.

The acceptance of a deed or conveyance or the entering into of a lease or the act of occupancy of an Apartment shall constitute an agreement that these By-Laws (and any Rules and Regulations, made pursuant hereto) and the provisions of the Master Deed, as they may be amended from time to time, are accepted, ratified, and will be complied with.

ARTICLE I.

### IDENTITY

The following By-Laws shall govern the operation of the Condominium created by the Declaration of Horizontal Property Regime, (hereinafter referred to as "The Declaration").

The Association of Co-Owners is organized and existing for the purpose of administering the Condominium created by the Declaration to which these By-Laws are created.

SECTION 1. The office of the Association shall be at the Condominium property, or at such other place as may be subsequently designated by the Board of Directors of the Association.

SECTION 2. As used herein, the word, "Association" shall be as defined in the Declaration. All other words, as used herein, shall have the same definitions as attributed to them in the Declaration.

ARTICLE II.

### MEMBERSHIP AND VOTING PROVISIONS

SECTION 1. Membership in the Association shall be limited to Owners of the Condominium Units in Condominiums wherein this Association has been designated to operate and administer said Condominium by virtue of the Declaration of said Condominium. Transfer of Unit Ownership, either voluntary or by operation of law, shall terminate membership in the Association, and said membership is to become vested in the transferee. If Unit Ownership is vested in more than one person, then all of the persons owning said Unit shall be members eligible to hold office, attend meeting, etc., but, as hereinafter indicated, the vote of a Unit shall be cast by the "voting member". If Unit Ownership is vested in a Corporation said Corporation may designate an individual officer or employee of the Corporation as its "voting member". Notwithstanding the foregoing, each Owner of Unit Weeks in a Condominium Unit committed to Interval Ownership shall be entitled to cast his vote of the Unit in which he owns his Unit Weeks. "Unit committed to Interval Ownership" and "Interval Ownership" are defined in the Declaration.

SECTION 2. Voting.

(a) The Owner of each Unit Week shall be entitled to one (1) vote. If an Owner owns more than one (1) Unit, he shall be entitled to one (1) vote for each Unit Week owned. The Association shall not have a vote for any Unit Weeks conveyed to it.

(b) A majority of the Unit Owners' total votes present in person or in proxy at any regular or special meeting shall decide any question, unless the Declaration, By-Laws or Articles of Incorporation of the Association, if any, provide otherwise.

SECTION 3. QUORUM: Unless otherwise provided in these By-Laws or the Declaration of Horizontal Property Regime the presence in person or by proxy of one-tenth (1/10) of the Unit Owners' total votes shall constitute a quorum.

SECTION 4. PROXIES: Votes may be cast in person or by proxy. All proxies shall be in writing and signed by the person entitled to vote (as set forth below in Section 5). Where a Unit is owned jointly by a husband and wife, and if they have not designated one of them as a voting member, a proxy must be signed by both husband and wife where a third person is designated.

SECTION 5. DESIGNATION OF VOTING MEMBER: If a Condominium Unit is owned by one person, his right to vote shall be established by the recorded title to the Unit. If a Condominium is owned by more than one (1) person, the person entitled to cast the vote for the Unit shall be designated in a Certificate, signed by all of the recorded Owners of the Unit and filed with the Secretary of the Association. If a Condominium Unit is owned by a Corporation, the officer or employee thereof entitled to cast the vote of the Unit for the Corporation shall be designated in a Certificate for this purpose, signed by the President or Vice-President, attested to by the Secretary or Assistant Secretary of the Corporation, and filed with the Secretary of the Association. The person designated in such Certificate who is entitled to cast the vote for a Unit shall be known as the "voting member". If such a Certificate is not on file with the Secretary of the Association for a Unit owned by more than one person or by a Corporation, the vote of the Unit concerned shall not be considered in determining the requirement for a quorum, or for any purpose requiring the approval of a person entitled to cast the vote for the Unit, except if said Unit is owned by a husband and wife. Such Certificate shall be valid until revoked or until superseded by a subsequent Certificate, or until a change in the Ownership of the Unit concerned. If a Condominium Unit is owned jointly by a husband and wife, the following three provisions are applicable thereto:

(a) They may, but they shall not be required to, designate a voting member.

(b) If they do not designate a voting member and if both are present at a meeting and are unable to concur in their decision upon any subject requiring a vote, they shall lose their right to vote on that subject at that meeting (As previously provided, the vote of a Unit is not divisible).

(c) Where they do not designate a voting member, and only one is present at a meeting, the person present may cast the Unit vote, just as though he or she owned the Unit individually, and without establishing the concurrence of the absent person.

**SECTION 6. UNITS COMMITTED TO INTERVAL OWNERSHIP:**

Notwithstanding any other provisions in these By-Laws, each Owner of Unit Weeks in a Unit committed to Interval Ownership shall be entitled to cast the vote(s) attributable to his unit Week(s) owned. In any event the total number of votes which may be cast for each Unit shall be equal to 50 votes. In the case of a Unit committed to Interval Ownership, the provisions of Section 5, Designation of Voting Member, shall apply to each Unit Week owned.

ARTICLE III.

## MEETING OF THE MEMBERSHIP

**SECTION 1. PLACE:** All meetings of the Association membership shall be held at the Condominium(s) property, or at such other place and at such time as shall be designated by the Board of Directors of the Association and stated in the Notice of the meeting, and shall be open to all Unit Owners.

**SECTION 2. NOTICES:** It shall be the duty of the Secretary to mail or deliver a Notice of each annual or special meeting, stating the time and place thereof, to each Unit or Interval Owner of record at least ten (10) but not more than sixty (60) days prior to such meeting. Notice of any special meeting shall state the purpose thereof. All Notices shall be mailed to or served at the address of the Unit or Interval Owner as it appears on the books of the Association.

**SECTION 3. ANNUAL MEETING:** The annual meeting shall be held at 1:00 P.M., Central Standard Time, on the Saturday following Labor Day each year for the purpose of electing Directors and transacting any other business authorized to be transacted by the members. At the annual meeting, the members shall elect by plurality vote -(cumulative voting prohibited), a Board of Directors, and shall transact such other business as may properly be brought before the meeting.

**SECTION 4. SPECIAL MEETING:** Special meetings of the members for any purpose or purposes, unless otherwise prescribed by statute, may be called by the President, and shall be called by the President or Secretary at the request, in writing, of a majority of the Board of Directors, or at the request, in writing, of voting members representing ten percent (10%) of the members' total votes, which request shall state the purpose or purposes of the proposed meeting. Business transacted at all special meetings shall be confined to the objects stated in the Notice thereof.

**SECTION 5. WAIVER AND CONSENT:** Whenever the vote of members at a meeting is required or permitted by any provision of these By-Laws to be taken in connection with any action of the Association, the meeting and vote of members may be dispensed with if not less than a majority of the members who would have been entitled to vote upon the action if such meeting were held, shall consent in writing to such action being taken; however, notice of such action shall be given to all members, unless all members approve such action.

**SECTION 6. ADJOURNED MEETING:** If any meeting of members cannot be organized because of a quorum of voting members is not present, either in person or by proxy, the meeting may be adjourned from time to time until a quorum is present.

**SECTION 7. APPROVAL OR DISAPPROVAL:** Approval or disapproval of a Unit Owner upon any matter, whether or not the subject of an Association meeting, shall be by the voting members provided, however, that where a Unit is owned jointly by a husband and wife, their joint approval or disapproval shall be required where they are both present, or in the event only one is present, the person present may cast the vote without establishing the concurrence of the absent person.

**SECTION 8. THE MANAGEMENT FIRM:** The Management Firm, as long as any Management Agreement remains in effect, shall be entitled to Notice of all Association meetings, and shall be entitled to attend the Association's meetings, and it may designate such person(s) as it desires to attend such meetings on its behalf.

ARTICLE IV.

## DIRECTORS

**SECTION 1. NUMBER, TERM AND QUALIFICATIONS:** Subject to Section 2 of this Article, the affairs of the Association shall be governed by a Board of Directors composed of not less than three (3) nor more than seven (7) persons, as is determined from time to time by the members. All Directors, except those designated by the Tansi Resort, shall be members of the Association. All officers of a Corporate Unit Owner shall be deemed to be members of the Association so as to qualify as a Director herein. The term of each Director's service shall extend until the next annual meeting of the members and thereafter until his successor is duly elected and qualified, or until he is removed in the manner provided in Section 3 below.

**SECTION 2. TANSI-RESORT TO ACT AS BOARD OF DIRECTORS:** All of the affairs of the Association of Co-Owners shall be conducted by Tansi Resort, or its agents, appointees or assignees, for a period of five (5) years from the effective date of this Declaration. The Tansi Resort, at its sole discretion, shall have the right and option to extend this period of two (2) additional five (5) year periods. Until the expiration of any such period, all of the rights, duties, discretions, functions and powers otherwise vested in the Board of Directors, hereinafter set out or referred to in the Master Deed, shall be exercised solely by Tansi Resort, its agents, assignees or appointees. All references to the Board of Directors in this Declaration shall mean and refer to Tansi Resort, its agents, appointees or assignees, from the effective date of this Declaration, or until such time during any aforesaid five (5) year periods, Tansi Resort should at its sole option, turn over to the Association of Co-Owners the responsibility of establishing and electing all of the members of the Board of Directors. This provision may not be changed, altered or amended by the Association of Co-Owners. Tansi Resort may within its sole discretion also act the Management Firm as provided in these By-Laws and receive reasonable compensation therefore as provided in these By-Laws.

**SECTION 3. REMOVAL OF DIRECTORS:** At any time after the first annual meeting of the membership at any duly convened regular or special meeting, any one or more of the Directors may be removed, with or without cause, by the affirmative vote of the voting members casting not less than two-thirds (2/3rds) of the total votes present at said meeting, and a successor may then and there be elected to fill the vacancy thus created. Should the membership fail to elect said successor, the Board of Directors may fill the vacancy in the manner provided in Section 4 below.

**SECTION 4. VACANCIES ON DIRECTORATE:** If the office of any Director or Directors becomes vacant by reason of death, resignation, retirement, disqualification, removal from office or otherwise, a majority of the remaining Directors, though less than a quorum, shall choose a successor or successors, who shall hold office for the balance of the unexpired term in respect to which such vacancy occurred. The election held for the purpose of filling said vacancy may be held at any regular or special meeting of the Board of Directors.

Ex. 4-38

SECTION 5.   DISQUALIFICATION AND RESIGNATION OF DIRECTORS:   Any Director may resign at any time by sending a written Notice of such resignation to the office of the Corporation, delivered to the Secretary. Unless otherwise specified therein, such resignation shall take effect upon receipt thereof by the Secretary. Commencing with the Directors elected at such first annual meeting of the membership, the Directors elected at such first annual meeting shall automatically constitute a resignation, effective when such resignation is accepted by the Board of Directors. No member shall continue to serve on the Board should he be more than thirty (30) days delinquent in the payment of an assessment and said delinquency shall automatically constitute a resignation, effective when such resignation is accepted by the Board of Directors.

SECTION 6.   REGULAR MEETINGS:   The Board of Directors may establish a schedule of regular meetings to be held at such time and place as the Board of Directors may designate. Notice of such regular meetings shall nevertheless, be given to each Director personally or by mail, telephone or telegraph at least five (5) days prior to the day named for such meeting. All meetings of the Board of Directors, including special meetings in accordance with Section 7 below, shall be open to all Unit Owners.

SECTION 7.   SPECIAL MEETINGS:   Special meetings of the Board of Directors may be called by the President, and in his absence, by the Vice-President, or by a majority of the members of the Board of Directors, by giving five (5) days Notice, in writing, to all of the members of the Board of Directors of the time and place of said meeting. All Notices of special meetings shall state the purpose of the meeting.

SECTION 8.   DIRECTORS' WAIVER OF NOTICE:   Before or at any meeting of the Board of Directors, any Director may waive Notice of such meeting and such waiver shall be deemed equivalent to the giving of Notice. Attendance by a Director at any meeting of the Board shall be a waiver of Notice by him of the time and place thereof. If all the Directors are present at any meeting of the Board, no Notice shall be required and any business may be transacted at such meeting.

SECTION 9.   QUORUM:   At all meetings of the Board of Directors, a majority of the Directors shall constitute a quorum for the transaction of business, and the acts of the majority of the Directors present at such meetings at which a quorum is present, shall be the acts of the Board of Directors. If, at any meeting of the Board of Directs there be less than a quorum present, the majority of those present may adjourn the meeting from time to time. At each such adjourned meeting, any business which might have been transacted without further notice. The joinder of a Director in the action of a meeting by signing and concurring in the Minutes thereof, shall constitute the presence of such Director for the purpose of determining a quorum.

SECTION 10.   COMPENSATION:   The Directors' fees, if any, shall be determined by the voting members.

SECTION 11.   THE MANAGEMENT FIRM:   The Management Firm, as long as any Management Agreement remains in effect, shall be entitled to Notice of all Directors' meetings and shall be entitled to attend the Directors' meetings and it may be designate such a person(s) as it desires to attend such meetings on its behalf.

SECTION 12.   POWERS AND DUTIES:   The Board of Directors of the Association shall have the powers and duties necessary for the administration of the affairs of the Association and may do all such acts and things as are not by law or by the Declaration of Condominium, this Association's Articles of Incorporation, or these By-Laws, directed to be exercised and done by Unit Owners. The Board of Directors may delegate the said powers and duties to the management firm. These powers shall specifically include, but shall not be limited to the following:

(a)   To exercise all powers specifically set forth in the Declaration , this Association's Articles of Incorporation, if any, in these By-Laws, and in the Horizontal Property Act, and all powers incidental thereto.

(b)   To make assessments, collect said assessments, and use and expend the assessments to carry out the purposes and powers of the Association.

(c)   To employ, dismiss and control the personnel necessary for the maintenance and operation of the project, and of the common areas and facilities including the right and power to employ attorneys, accountants, contractors, and other professionals as the need arises.

(d)   To make and amend regulations respecting the operation and use of the Common Elements and Condominium property, and the use and maintenance of the Condominium Units therein.

(e)   To contract for the management of the Condominium and to delegate to such contractor all of the powers and duties of the Association, except those which may be required by the Declaration to have approval of the Board of Directors or membership of the Association. To contract for the management or operation of portions of the Common Elements susceptible to the separate management or operation thereof, and to lease or concession such portions.

(f)   The further improvement of the Condominium property, both real and personal, and the right to purchase realty and items of furniture, furnishing, fixtures and equipment for the foregoing, and the right to acquire and enter into Agreements pursuant to the Horizontal Property Act, and as amended, subject to the provisions of the applicable Declaration, this Association's Articles of Incorporation, if any, and any exhibits attached thereto.

(g)   Designate one or more committees which, to the extent provided in the resolution designating said committee, shall have the powers of the Board of Directors in the management and affairs and business of the Association. Such committee shall consist of at least three (3) members of the Association. The committee or committees shall have such name or names as may be determined from time to time by the Board of Directors, and said committee(s) shall keep regular Minutes of their proceedings and report the same to the Board of Directors, as required. The foregoing powers shall be exercised by the Board of Directs or its contractor or employees, subject only to approval by Unit Owners when such is specifically required.

(h)   To enter into and terminate or ratify existing Agreements with organizations providing Owners of Unit Weeks to trade their time periods with Owners of time periods at other resorts.

ARTICLE V.

## OFFICERS

SECTION 1.   ELECTIVE OFFICERS:   The principal officers of the Association shall be a President, a Vice-President, a Secretary and a Treasurer, all of whom shall be elected by the Board of Directors.

SECTION 2.   ELECTION:   The officers of the Association designated in Section 1 above shall be elected annually by the Board of Directors at the organizational meeting of each new Board following the meeting of the members.

242

Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection   Page 62 of 66

Ex. 4-39

SECTION 3. APPOINTIVE OFFICERS: The Board may appoint Assistant Secretaries and Assistant Treasurers, and such other officers as the Board of Directors deems necessary.

SECTION 4. TERM: The officers of the Association shall hold office until their successors are chosen and qualify in their stead. Any officer elected or appointed by the Board of Directors may be removed at any time, with or without cause, by the Board of Directors, provided however, that no officer shall be removed except by the affirmative vote for removal by a majority of the whole Board of Directors. If the office of any officer becomes vacant for any reason, the vacancy shall be filled by the Board of Directors.

SECTION 5. THE PRESIDENT: He shall be the chief executive officer of the Association; he shall preside at all meetings of the Unit Owners and of the Board of Directors. He shall have executive powers and general supervision over the affairs of the Association and other officers. He shall sign all written contracts to perform all of the duties incident to his office and which may be delegated to him from time to time by the Board of Directors.

SECTION 6. THE VICE-PRESIDENT: He shall perform all of the duties of the President in his absence, and such other duties as may be required of him from time to time by the Board of Directors of the Association.

SECTION 7. THE SECRETARY: He shall issue Notices of all Board of Directors' meetings and all meetings of the Unit Owners; he shall attend and keep the Minutes of same; he shall have charge of all of the Association's books, records and papers, except those kept by the Treasurer. The Assistant Secretary shall perform the duties of the Secretary when the Secretary is absent.

SECTION 8. THE TREASURER:

(a) He shall have custody of the Association's funds and securities, except the funds payable to any Management Firm, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Association, and shall deposit all monies and other valuable effects in the name of and to the credit of the Association, in such depositories as may be designated from time to time by the Board of Directors. The books shall reflect an account for each Unit.

(b) He shall disburse the funds of the Association as may be ordered by the Board of Directors in accordance with these By-Laws, making proper vouchers for such disbursements, and shall render to the President and Board of Directors at the regular meetings of the Board of Directors, or whenever they may require it, an account of all of his transactions as the Treasurer and of the financial condition of the Association.

(c) He shall collect the assessments and maintenance fees and shall promptly report the status of collections and of all delinquencies to the Board of Directors.

(d) He shall give status reports to potential transferees on which reports the transferees may rely.

(e) The Assistant Treasurer shall perform the duties of the Treasurer when the Treasurer is absent.

(f) The duties of the Treasurer may be fulfilled by a Management Firm employed by the Association, and said Management Firm shall fulfill the duties of the Treasurer, and shall have custody of such books of the Association as it determines in its sole discretion and the foregoing shall include any books required to be kept by the Secretary of the Association.

ARTICLE VI.

## FINANCES, ASSESSMENTS AND MAINTENANCE FEES

SECTION 1. Depositories: The funds of the Association shall be deposited in such banks and depositories as may be determined by the Board of Directors from time to time upon resolutions approved by the Board of Directors, and shall be withdrawn only upon checks and demands for money signed by such officer or officers of the Association as may be designated by the Board of Directors. Obligations of the Association shall be signed by at least two officers of the Association; provided, however, that the provisions of any Management Agreement between the Association and a Management Firm relative to the subject matter in this Section shall supersede the provisions hereof.

SECTION 2. FIDELITY BONDS: The Treasurer and all officers who are authorized to sign checks, and all officers and employees of the Association, and any contractor handling or responsible for Association funds shall be bonded in such amount as may be determined by the Board of Directors. The premiums on such Bonds shall be paid by the Association. The Bond shall be in an amount sufficient to equal the monies an individual handles or has control of via a signatory or a bank account or other depository account; however, notwithstanding the foregoing, the Management Firm, under the terms Management Agreement, attached to the Declaration, as to funds in its possession and/or control, shall determine, in its sole discretion. the amount of and who is to be bonded, if any, among its employees.

SECTION 3. FISCAL YEAR: The fiscal year for the Association shall begin on the first day of January of each year provided, however, that the Board of Directors is expressly authorized to change to a different fiscal year in accordance with the provisions and regulations from time to time prescribed by the Internal Revenue Code of the United States of America, at such time as the Board of Directors deems it advisable.

SECTION 4. DETERMINATION OF MAINTENANCE FEES AND ASSESSMENTS:

(a) The Board of Directors of the Association shall fix and determine from time to time, the sum or sums necessary and adequate for the common expenses of the Condominium. Common expenses shall include expenses for the operation, maintenance, repair or replacement of the Common Elements and the limited Common Elements, costs of carrying out the powers and duties of the Association, all insurance premiums and expenses relating thereto, including fire insurance and extended coverage, and any other expenses designated as common expenses from time to time by the Board of Directors of the Association, or under the provisions of the Declaration. The Board of Directors is specifically empowered, on behalf of the Association to make and collect maintenance fees and assessments and to lease, maintain, repair and replace the Common Elements and limited Common Elements of the Condominium. Funds for the payment of common expenses shall be assessed against the Unit Owners in the proportions or percentages of sharing common expenses, as provided in the Declaration. Assessments, should such be required by the Board of Directors, shall be levied in the same manner as hereinbefore provided for maintenance fees, and shall be payable in the manner determined by the Board of Directors. All funds due under these By-Laws, which are attached to the Declaration of Condominium, are common expenses of this Condominium.

243

Ex. 4-40

Case 2:25-ap-90051    Doc 48-2    Filed 03/03/26    Entered 03/03/26 16:33:47    Desc
Exhibit Exhibits 1-4 to Objection    Page 63 of 66

(b) A copy of the proposed annual budget of common expenses shall be mailed to the Unit Owners not less than thirty (30) days prior to the meeting at which the budget will be considered, together with a Notice of that meeting. The Unit Owners shall be given written notice of the time and place at which the meeting of the Board of Directors shall be held to consider the proposed annual budget of common expenses, and such meeting shall be open to the Unit Owners. In the event the Board of Directors fails to set dues for any year or the membership fails to ratify dues set by the Board, the dues for the ensuing calendar year shall be the same as for the prior year, adjusted to reflect the percentage of change in the average Consumer Price Index (all items--city average) as published by the United States Department of Labor, Bureau of Labor Statistics, between the two (2) years preceding July 1 of the year in which the adjustment is made. In the event such Consumer Price Index is for any reason not available, such adjustment shall be based on some other measure of economic change published by the United States Government which, in the judgment of the Board of Directors, is comparable to the Consumer Price of a majority of the Unit Owners. When the Board of Directors has determined the amount of any maintenance fee or assessment, the Treasurer of the Association or his designee shall mail or present to each Unit Owner a statement of said Unit Owner's assessment. All maintenance fees or assessments shall be payable to the Treasurer of the Association or his designee and, upon request, said Treasurer or designee shall give a receipt for each payment made to him.

SECTION 5.  DETERMINATION OF MAINTENANCE FEE:

(a)  The Board of Directors of the Association shall fix and determine from time to time, the sums necessary and adequate for the maintenance fee on Condominium Units committed to Interval Ownership. The maintenance fee on such Units shall include the items specified in the Declaration.

(b)  When the Board of Directors has determined the amount of any maintenance fee, the Treasurer of the Association shall mail or present to each Owner of Unit Weeks within all Units commited to Interval Ownership a statement of said maintenance fee. All maintenance fees shall be payable to the Treasurer of the Association or his designee and, upon request, said Treasurer or his designee shall give a receipt for each payment made to him, if requested by the Unit Owner.

SECTION 6.  APPLICATION OF PAYMENTS AND CO-MINGLING OF FUNDS: All sums collected by the Association from assessments and maintenance fees may be co-mingled in a single fund or divided into more than one fund, as determined by the Board of Directors of the Association. All assessment payments and maintenance fees by a Unit Owner shall be applied as to interest delinquencies, cost and attorney's fees, other charges, expenses and advances as provided herein and in the Declaration and assessments, in such manner and amounts as the Board of Directors determines in its sole discretion.

SECTION 7.  ACCELERATION OF ASSESSMENT INSTALLMENTS UPON DEFAULT: If a Unit Owner shall be in default in the payment of an installment upon any assessment or maintenance fee the Board of Directors may accelerate the remaining monthly installments for the fiscal year upon Notice thereof to the Unit Owner and, thereupon, the unpaid balance of the assessment shall become due upon the date stated in the Notice, but not less than fifteen (15) days after delivery of or the mailing of such Notice to the Unit Owner.

SECTION 8.  AUDITS:  An audit of the accounts of the Association shall be made annually. Said audit shall be prepared by such accountant as the Board of Directors determines, and a copy of said report shall be available to the members of the Association in the office of said Association and with the Treasurer of the Association. Such report shall be available not later than six (6) months after the end of the year for which the report is made.

SECTION 9.  APPLICATION OF SURPLUS:  Any payments or receipts to the Association, whether from Unit Owners or otherwise, paid during the year in excess of the operating expenses and other common expenses of the Association shall be kept by the Association and applied against the Association's expenses for the following year.

ARTICLE VII.

## ADDITIONS OR ALTERATIONS

There shall be no additions or alterations to the Common Elements or limited Common Elements of the Condominium(s) which this Association operates and maintains except as specifically provided for in said Condominium's Declaration of Condominium.

ARTICLE VIII.

## COMPLIANCE AND DEFAULT

SECTION 1.  VIOLATIONS:  In the event of a violation (other than the nonpayment of an assessment) by the Unit Owner in any of the provisions of the Declaration, of these By-Laws, or of the applicable portions of the Horizontal Property Act, the Association, by direction of its Board of Directors may notify the Unit Owner by written notice of said breach, transmitted by mail, and if such violation shall continue for a period of seven (7) days from date of Notice, the Association, through its Board of Directors, shall have the right to treat such violation as an intentional and inexcusable and material breach of the Declaration, of the By-Laws, or of the pertinent provisions of the Horizontal Property Act, and the Association may then, at its option, have the following elections:

(a)  An action at law to recover for its damage, on behalf of the Association or on behalf of the other Unit Owners.

(b)  An action in equity to enforce performance on the part of the Unit Owner; or

(c)  An action in equity for such equitable relief as may be necessary under the circumstances, including injunctive relief.

Any violations which are deemed by the Board of Directors to be a hazard to public health may be corrected immediately as an emergency matter by the Association and the cost thereof shall be charged to the Unit Owner as a specific item, which shall be a lien against said Unit with the same force and effect as if the charge were a part of the common expenses.

SECTION 2.  NEGLIGENCE OR CARELESSNESS OF UNIT OWNER, ETC.: All Unit Owners shall be liable for the expense of any maintenance, repair or replacement rendered necessary by his act, neglect or carelessness, or by that of any member of his family, or his or their guests, employees, agents or lessees, but only to the extent that such expense is not met by the proceeds of insurance carried by the Association. Such liability shall include any increase in insurance rates occasioned by use, misuse, occupancy or abandonment of any Unit or its appurtenances. Nothing herein contained, however, shall be construed so as to modify any waiver by an insurance company of its rights of subrogation. The expense for any maintenance, repair or replacement required, as provided in this Section, shall be charged to said Unit Owner as a specific item which shall be a lien against said Unit with the same force and effect if the charge were a part of the common expense.

*244*

(5)

Case 2:25-ap-90051   Doc 48-2   Filed 03/03/26   Entered 03/03/26 16:33:47   Desc
Exhibit Exhibits 1-4 to Objection   Page 64 of 66

Ex. 4-41

SECTION 3.   COST AND ATTORNEYS' FEES:   In any proceeding arising because of an alleged default by a Unit Owner, the prevailing party shall be entitled to recover costs of the proceeding and such reasonable attorneys' fees as may be determined by the Court.

SECTION 4.   NO WAIVER OF RIGHTS:   The failure of the Association or of a Unit Owner to enforce any right, provision, covenant or condition which may be granted by Condominium documents shall not constitute a waiver of the right of the Association or Unit Owner to enforce such right, provision, covenant or condition in the future.

SECTION 5.   ELECTION OF REMEDIES:   All rights, remedies and privileges granted to the Association or Unit Owner, pursuant to any terms, provisions, covenants or contents of the Condominium documents, shall be deemed to be cumulative and the exercise of any one or more shall not be deemed to constitute an election of remedies, nor shall it preclude the party thus exercising the same from exercising such other and additional rights, remedies, or privileges as may be granted to such other party by Condominium documents, or at law or in equity.

SECTION 6.   UNITS COMMITTED TO INTERVAL OWNERSHIP:   Any liens or sanctions against an Owner of Unit Weeks in a Unit committed to Interval Ownership for an alleged default as set forth in this Article VIII shall be limited to the Unit Weeks owned by such Owner and shall be of no force and effect as to any other Unit Weeks or Owner thereof. The "Unit Owner" as used throughout this article shall be deemed to include Owners of Unit Weeks in Units committed to Interval Ownership.

ARTICLE IX.

## ACQUISITION OF UNITS ON FORECLOSURE

SECTION 1.   ACQUISITION ON UNITS ON FORECLOSURE:   At any foreclosure sale of a Unit, the Board of Directors may, with the authorization and approval by the affirmative vote of voting members casting not less than sixty percent (60%) of the total votes of the members present at any regular or special meeting of the members wherein said matter is voted upon, acquire in the name of the Association, or its designee, a Condominium parcel being foreclosed. The term "foreclosure", as used in this Section, shall mean and include any foreclosure of any lien, excluding the Association's lien for assessments. The power of the Board of Directors to acquire a Condominium parcel at any foreclosure sale shall never be interpreted as any requirement or obligation on the part of the said Board of Directors or of the Association to do so at any foreclosure sale, the provisions hereof being permissive in nature and for the purpose of setting forth the power in the Board of Directors to do so should the requisite approval of the voting members be obtained. The Board of Directors shall not be required to obtain the approval of Unit Owners at the foreclosure sale of a Unit, due to the foreclosure of the Association's lien for assessments under the provisions of the Declaration notwithstanding the sum the Board of Directors determines to bid at such foreclosure sale.

SECTION 2.   TRANSFER OF UNITS:   All Owners of Units or Unit Weeks in a Unit committed to Interval Ownership shall notify the Association, of any transfer, by sale or otherwise, of said Unit or Unit Week within ten (10) days of the date of same. Said Notice shall include such information and be in the form that the Association shall prescribe from time to time. The Association may send all necessary Notices to the person shown as Owner of said Unit or Unit Weeks in its records, and said Notice shall be binding as to any other Owner of said Unit or Unit Weeks where the Association has not been notified as provided herein.

ARTICLE X.

## AMENDMENTS TO THE BY-LAWS

The By-Laws may be altered, amended or added to at any duly called meeting of the Unit Owners, provided:

(1)   Notice of the meeting shall contain a statement of the proposed Amendment.

(2)   If the Amendment has received the unanimous approval of the full Board of Directors, then it shall be approved upon the affirmative vote of the voting members casting a majority of the total votes of the members of the Association.

(3)   If the Amendment has not been approved by the unanimous vote of the Board of Directors, then the Amendment shall be approved by the affirmative vote of the voting members present or by proxy, casting not less than three-fourths (3/4ths) of the total vote; and,

(4)   Said Amendment shall be recorded and certified as required by the Horizontal Property Act.

(5)   Notwithstanding the foregoing, these By-Laws may only be amended with the written approval when required of the parties specified in the Declaration.

ARTICLE XI.

## NOTICES

Whatever Notices are required to be sent hereunder shall be delivered or sent in accordance with the applicable provisions for Notices as set forth in the Declaration.

ARTICLE XII.

## INDEMNIFICATIONS

The Association shall indemnify every Director and every officer, his heirs, executors, and administrators, against all loss, cost and expense reasonably incurred by him in connection with any action, suit or proceeding to which he may be made a party by reason of his being or having been a Director or Officer of the Association, except as to matters wherein he shall be finally adjudged in such action, suit or proceeding, to be liable for or guilty of gross negligence or willful misconduct. The foregoing rights shall be in addition to and not exclusive of all other rights to which such Director or Officer may be entitled.

ARTICLE XIII.

## LIABILITY SURVIVES TERMINATION OF MEMBERSHIP

The termination of membership in the Condominium shall not relieve or release any such former Owner or member from any liability or obligations incurred under or in any way connected with the Condominium during the period of such ownership and Membership, or impair any rights or remedies which the Association may have against such former Owner and member arising out of or in any way connected with such ownership and membership, and the covenants and obligations incident thereto.

*245*

ARTICLE XIV. 

## LIMITATION OF LIABILITY

Notwithstanding the duty of the Association to maintain and repair parts of the Condominium property, the Association shall not be liable for injury or damage caused by a latent condition in the property, nor for injury or damage caused by the elements or by other Owners or persons.

ARTICLE XV.

## LIENS

SECTION 1.  PROTECTION OF PROPERTY:  All liens against a Condominium Unit, other than for mortgages, taxes or special assessments, shall be satisfied or otherwise removed within thirty (30) days of the date of the lien attached. All taxes and special assessments upon a Condominium Unit shall be paid before becoming delinquent, as provided in these Condominium documents or by law, which ever is sooner.

SECTION 2.  NOTICE OF LIEN:  A Unit Owner shall give Notice to the Association of every lien upon his Unit, other than for mortgages, taxes and special assessments within five (5) days after the attaching of the lien.

SECTION 3.  NOTICE OF SUIT:  Unit Owners shall give Notice to the Association of every suit or other proceeding which will or may affect title to his Unit or any part of the property, such Notice to be given within five (5) days after the Unit Owner receives Notice thereof.

SECTION 4.  FAILURE TO COMPLY:  Failure to comply with this article concerning liens will not affect the validity of any judicial sale.

SECTION 5.  UNITS COMMITTED TO INTERVAL OWNERSHIP: In the case of a Unit committed to Interval Ownership, an Owner of Unit Weeks in such Unit shall be required to give Notices under Section 2 and 3 of this Article XVI only as to liens, suits, and proceedings affecting title to the Unit Weeks which he owns. Any lien against an Owner of Unit Weeks in a Unit committed to Interval Ownership, or against the Unit Weeks owned by him, shall be limited to the Unit Weeks owned by him and shall not encumber the property, real or personal, or any other Owner of Unit Weeks in said Unit.

ARTICLE XVII.

## RULES AND REGULATIONS

SECTION 1.  The Board of Directors may, from time to time, adopt or amend previously adopted administrative Rules and Regulations governing the details of the operation, use, maintenance, management and control of the Common Elements and limited Common Elements of the Condominiums and any facilites or services made available to the Unit Owners. A copy of the Rules and Regulations adopted from time to time as herein provided shall from time to time be posted in a conspicuous place and/or copies of same shall be furnished to each Unit Owners.

SECTION 2.  AS TO CONDOMINIUM UNITS:  The Board of Directors, may from time to time adopt or amend previously adopted Rules and Regulations governing and restricting the use and maintenance of the Condominium Unit(s) provided, however, that copies of such become effective, shall be posted in a conspicuous place and/or copies of same shall be furnished to each Unit Owner.

SECTION 3.  CONFLICT:  In the event of any conflict between the Rules and Regulations adopted, or from time to time amended, and the Condominium documents, or the Horizontal Property Act, the latter shall prevail. If any unreconciled conflict should exist or hereafter arise with respect to the interpretation of these By-Laws and the Declaration, the provisions of said Declaration shall prevail.

STATE OF TENNESSEE, CUMBERLAND COUNTY
The fore ... instrument and certificate were noted in Note Book _____ Page 342 No 250 Ordered Fld Oct 28, 1980.
and recorded _____ Deed Book 231, Series _____ Page 215 State Tax Paid $ _____ Fee _____ Recording Fee 1.00 Total $ 96.00
Witness My hand
Receipt No. 24401

Rhoda Mae Davis
Register
By: Margaret Madewell
D.R.

246

(7)

Ex. 4-43